WESTON & McELVAIN LLP
Aaron C. Agness (State Bar No. 221943)
Joel A. Graboff (State Bar No. 316900)
1960 East Grand Avenue, Suite 400
El Segundo, CA 90245
Telephone: (213) 596-8000
Facsimile: (213) 596-8039
E-mail: aagness@wmattorneys.com
jgraboff@wmattorneys.com

Attorneys for Defendant,
NORTHFIELD INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LANCE MILLER dba WESTHILL PROPERTY MANAGEMENT.<br><br>Plaintiff,<br><br>v.<br><br>NORTHFIELD INSURANCE COMPANY, an Iowa Corporation, and DOES 1-100, Inclusive,<br><br>Defendants. | CASE NO.<br><br>**DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441 ET SEQ. (DIVERSITY) [EXHIBITS "1"-"2", "4"]**<br><br>[Filed concurrently with the Request For Judicial Notice; Notice of Interested Parties; Notice of Related Cases; Civil Cover Sheet]<br><br>State Action Filed: March 15, 2022<br>Trial Date: None Set |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that defendant Northfield Insurance Company ("Northfield"), hereby removes to this Court the state court action described below.

1. On March 15, 2022, plaintiff Lance Miller dba Westhill Property Management ("Plaintiff") commenced an action in the Los Angeles Superior Court entitled Lance Miller dba Westhill Property Management v. Northfield Insurance Company, Case No. 22STCV09168 ("State Action"). A true and correct copy of the Complaint in the State Action ("Complaint") is attached hereto as Exhibit "1."

2. On March 16, 2022, Plaintiff served a copy of the summons ("Summons") and Complaint on Northfield's agent for service of process via personal service. A true and correct copy of the Summons and Notice of Service of Process are attached hereto as Exhibit "2."

3. The State Action is a civil action of which this Court has jurisdiction under 28 U.S.C. § 1332 and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441 and 28 U.S.C. § 1446 in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000.

4. Northfield removes this action to the Central District of California because the State Action was pending in the Los Angeles County Superior Court, located in the Central District. Removal is within 30 days of Northfield's receipt of the Complaint pursuant to 28 U.S.C. §§ 1446(b)(1), 1446(c)(1).

5. Defendant Northfield is, and at all relevant times herein was, a corporation duly organized and existing under the laws of the State of Iowa and maintains its principal place of business in Des Moines, IA. [Complaint ¶ 17, Exhibit "1"; Request for Judicial Notice, Exhibit "3" attached thereto.]

6. Plaintiff Lance Miller, doing business as Westhill Property Management, is, and at the time of filing of the Complaint was, a citizen of California. [Complaint ¶ 16, Exhibit "1".]

7. In the State Action, Plaintiff brought the following causes of action against Northfield: 1) Breach of Contract and 2) Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing. Plaintiff alleges that he was covered by Northfield's Commercial Property Insurance Policy, policy no. WS324766, effective June 25, 2017, to June 25, 2018 ("Subject Policy") which allegedly included coverage for direct physical loss to Plaintiff's commercial property located at 9938 Commerce Avenue, Tujunga, California (the "Property"). [Complaint ¶¶ 1-2, Exhibit "1".]

8. Plaintiff alleges that on or around February 10, 2018, the Property sustained damaged when its roof collapsed ("Loss"). [Complaint ¶ 5, Exhibit "1".]

9. In the Complaint, Plaintiff alleges that the sum of repair costs related to the Loss, sought by Plaintiff in this action, are in excess of $800,000. [Complaint ¶ 6, Exhibit "1".]

Therefore, Plaintiff seeks judgment in an amount in excess of $75,000 from Northfield, the minimum amount for jurisdiction in this Court.

10. Aside from policy benefits, Plaintiff also seeks to recover damages related to Northfield's alleged breach of the implied covenant of good faith and fair dealing, attorney's fees, and punitive damages.

11. Attached hereto as Exhibit "4" are true and correct copies of all other notices, processes, and proceedings served on Northfield or served and/or filed by Northfield in the State Action, which consists of: (1) Civil Case Cover Sheet; (2) Civil Case Cover Sheet Addendum; (3) Notice of Case Assignment; (4) Notice of Case Management Conference; (5) First Amended General Order; (6) Voluntary Efficient Litigation Stipulations Packet; and, (7) Alternative Dispute Resolution Information Package.

DATED: April 14, 2022

WESTON & McELVAIN LLP

*/s/ Joel A. Graboff*

Aaron C. Agness
Joel A, Graboff
Attorneys for Defendant
NORTHFIELD INSURANCE COMPANY

Electronically FILED by Superior Court of California, County of Los Angeles on 03/15/2022 03:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
22STCV09168
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Robert Draper

**FORTIS LLP**
Stanley H. Shure, Esq. (SBN 116230)
Salvatore Picariello, Esq. (SBN 190442)
650 Town Center Drive, Suite 1530
Costa Mesa, CA 92626
Telephone: 714-839-3800
Facsimile: 714-795-2994
Email: sshure@fortislaw.com
spicariello@fortislaw.com

Attorneys for Plaintiff
LANCE MILLER dba WESTHILL PROPERTY MANAGEMENT

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| LANCE MILLER dba WESTHILL PROPERTY MANAGEMENT,<br><br>Plaintiff,<br><br>vs.<br><br>NORTHFIELD INSURANCE COMPANY, an Iowa Corporation; and DOES 1-100, inclusive,<br><br>Defendants. | Case No.: 22STCV09168<br><br>**PLAINTIFF'S COMPLAINT FOR: (1) BREACH OF CONTRACT; AND (2) TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**(Jury Trial Demanded)** |

COMES NOW that Plaintiff, Lance Miller dba Westhill Property Management ("Plaintiff" or "Miller"), by and through his attorneys, alleges and states as follows:

## I. INTRODUCTION AND SUMMARY

1. This is an insurance coverage action for breach of good faith and fair dealing and breach of contract brought by Plaintiff against Northfield Insurance Company ("Northfield" or "Defendant"). Northfield knew that coverage existed under the policy it had issued to Miller for the physical damage sustained by Plaintiff's commercial warehouse located at 9938 Commerce

Avenue, Tujunga, California (the "Commerce Building"). Yet, Northfield, in complete and utter disregard of Miller's rights, denied coverage.

2. The Commerce Building was one of two buildings insured under Northfield's Commercial Policy, Policy No. WS324766, for the Policy Period of June 25, 2017 to June 25, 2018, Policy No. WS324766 (the "Policy" or "Northfield Policy"). (A true and correct copy of the Policy is attached hereto as **Exhibit A**.)

3. The Commerce Building was a single-story wood-framed commercial warehouse structure that was built in 1938 in conformance with the then-governing building code at the time of permit (the 1935 Uniform Building Code). The type and quality of Douglas Fir lumber used in connection with the construction of the Commerce Building was also typical for a 1938 building.

4. While changes to the California Building Code and Los Angeles Building Code have significantly reduced the allowable tension capacity of wood members used for building structures, at no relevant time was there a mandatory requirement to retrofit existing bow string wood trusses in the California or Los Angeles Building Codes.

5. On Saturday, February 10, 2018, the then-existing wood framed bow string roof structure partially collapsed. Miller's expert structural engineers conducted their evaluation of the damaged Commerce Building. These experts determined that, over the years, the existing bow string trusses had been exposed to high temperatures in the unconditioned attic space of the building. Among other things, these high temperatures caused shrinkage of the lumber due to drying and reduced the strength of the lumber. Miller's experts determined that drying of the bottom cord lumber and other factors all contributed to an unstable structural condition where a small external load would push the truss to failure. These experts have concluded that a gusty Santa Ana wind event on February 10, 2018, was most likely the single event (the proverbial "straw that broke the camel's back") that caused the progressive collapse of the existing roof structure.

6. For the Commerce Building, the Policy provides replacement cost limits of liability of $550,000 with an 80% co-insurance clause. The Policy provides additional limits of $25,000 for debris removal, $10,000 for code upgrade, and $10,000 for disposal of pollutants (in

this case, asbestos). The estimated cost for rebuilding the Commerce Building – back in 2018 – were well in excess of $800,000, not including debris removal and abatement costs.

7. Miller immediately reported the loss to Northfield. Northfield inspected the loss site on February 16 and 23, 2018, and its retained engineer inspected the site on February 23 and March 7, 2018.

8. On April 30, 2018, Northfield denied coverage under the Policy on two grounds. First, Northfield asserted that, at the time of the loss, coverage for the Commerce Building was "excluded" under the vacancy restriction contained in the Policy. Second, Northfield stated that, irrespective of the purported vacancy, the loss is excluded under the Policy's "collapse" exclusion. (A true and correct copy of Northfield's April 30, 2018 Denial Letter is attached hereto as **Exhibit B**.)

9. On December 28, 2018, Miller's insurance coverage counsel provided a detailed response to Northfield's April 30, 2018 Denial Letter. (A true and correct copy of the December 28, 2018 Response is attached hereto as **Exhibit C**.)

10. As set forth in the December 28th Response and below, Northridge's "vacancy" coverage defense lacks merit for several reasons. Among other things, the Policy contains two different and conflicting "vacancy" definitions and, under either definition, the Commerce Building was not vacant. The Policy's "vacancy restriction" is also unenforceable under the plain, clear, and conspicuous doctrine. *Haynes v. Farmers Ins. Exch.* (2004) 32 Cal. 4th 1198, 1204. Moreover, even if the Commerce Building is determined to be "vacant" under the Policy, Northfield has waived this defense and/or is estopped from relying on it. This is because, *inter alia*: (a) Northfield conducted an "insurability" inspection of the Commerce Building on August 15, 2017; (b) Northfield had reason to believe the building was vacant, (c) it said nothing about the "vacancy" issues to Miller; (d) it collected Miller's premiums; and (e) after the Commerce Building collapsed, Northfield denied coverage because it was allegedly "vacant". It has been California law since at least 1893 that an insurer waives its vacancy defense under such circumstances. *West Coast Lumber Co. v. State etc. Co.*, 98 Cal. 502, 508-09 (1893); *St. Mary & St. John Coptic Orthodox Church v. SBC Ins. Servs., Inc.*, 57 Cal. App. 5th 817, 829 (2020). If

Northfield had raised these issues with Miller, Miller would have purchased a "vacancy permit" endorsement for an additional premium.

11. Northfield's "collapse" exclusion coverage defense is equally unavailing. One of the exceptions to the Policy's "Collapse Exclusion", which is contained in the Policy's "Additional Coverage Collapse", is for "[b]uilding decay that is hidden from view". California case law from 2001 involving the failure of older "bow string trusses" that caused a building's roof to collapse (and which contains the same "Additional Coverage Collapse" hidden decay language as found in Northfield's Policy) is both factually and legally directly on point. As such, Northfield must cover the Commerce Building loss because of the failure of the "bow string trusses" qualifies as hidden decay. *Stamm Theatres v. Hartford Casualty Ins. Co.*, 93 Cal. App. 4th 531 (2001).

12. On April 24, 2019, Travelers replied on behalf of Northfield to the December 28, 2018 Response. Northfield argues, *inter alia*, that Miller is not able to rely on waiver and/or estoppel to avoid the application of the vacancy exclusion. (A true and correct copy of this April 24, 2019 Reply is attached hereto as **Exhibit D**.)

13. Northfield's bases for denying coverage are not just factually and legally erroneous and/or mistaken, they are unreasonable and made in bad faith. Some examples of Northfield's unreasonable and bad-faith conduct in denying coverage are: (a) Northfield intentionally hid from Miller its inspection results regarding the alleged "vacancy" to use them as a coverage defense if a covered loss occurred during the Policy Period (*see, e.g.*, *Howard v. American Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498 (2010) (insurer's refusal to settle could not be excused as a reasonable dispute because, *inter alia*, its no-coverage position was based on cherry-picked deposition testimony); (b) Northfield failed to conduct a reasonable investigation by looking at hidden decay as a Covered Cause of Loss. (*See, e.g.*, *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072 (2007) ("[T]o protect the interests of its insured, it was 'essential that an insurer *fully* inquire into *possible* bases that might support the insured's claim."); and (c) Northfield has unreasonably relied upon its expert consultants and failed to reconsider its prior denials even after it became aware of the numerous flaws, mistakes, errors, misstatements and

misrepresentations that its consultants made in connection with determining the cause of the loss and the scope of the repair work needed to repair the damages sustained.

14. Miller and Northfield have executed 6 tolling agreements in this matter in order to allow them an opportunity to resolve informally their dispute, with the latest version tolling Plaintiff's claims until December 31, 2021. Pursuant to its terms, there can be no question about the timeliness of this action. (A true and correct copy of the Sixth Tolling Agreement is attached hereto as **Exhibit E**.) The parties were unable to resolve their differences.

15. Pursuant to its terms, there can be no question about the timeliness of this action.

## II. THE PARTIES

16. Lance Miller is, and at all relevant times has been, an individual residing in the State of California, County of Los Angeles. At all relevant times, Lance Miller has done business as Westhill Property Management.

17. Plaintiff is informed and believes and thereon alleges that Northfield is a foreign corporation, incorporated in the State of Iowa with its principal place of business in Hartford, Connecticut.

18. Plaintiff is further informed and believes and thereon alleges that Northfield operates its insurance business primarily (if not exclusively) as a non-admitted carrier placing coverage for risks that are not able (or readily able) to be placed through a state's admitted insurers. Northfield conducts its business operations as discussed in its website through "wholesale general agents", which it also calls simply as "general agents".

19. Plaintiff is also informed and believes and thereon alleges that Northfield, provides its "general agents" ("wholesale general agents") with the responsibility for handling insurability issues on Northfield's behalf, including but not limited to, underwriting, binding, issuing, canceling and/or rescinding policies.

20. Plaintiff is informed and believes and thereon alleges that non-party Hawkeye Wholesale Insurance Services, Inc. ("Hawkeye") at all relevant times was one of Northfield's "general agents" ("wholesale general agents") in California, performed in that capacity for

purposes of the Northfield Policy, and was Northfield's agent addressing, *inter alia*, insurability issues pertaining to the Northfield Policy.

21. Plaintiff is informed and believes and thereon alleges that Hawkeye also holds itself out as, *inter alia*, a managing general agent on behalf of insurers, such as Northfield, and acted in that capacity with respect to the Northfield Policy. A managing general agent is a specialized insurance agent/broker who is vested with, *inter alia*, underwriting and other insurability related authority by an insurance company for certain kinds/lines of insurance.

22. The true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants named herein as Does 1 through 100, inclusive, and each of them, are presently unknown to Miller, who therefore sues said defendants by such fictitious names. When the true names of the defendants sued herein as Does 1 through 100, inclusive, have been ascertained, Plaintiff reserves the right to amend this Complaint to identify their true names and serve them with process pursuant to California Code of Civil Procedure section 474.

23. Miller alleges on information and belief that each of said fictitiously named defendants is responsible in some manner for the occurrences alleged in this Complaint, and that the injuries sustained by Miller were proximately caused by the actions and/or omissions of those defendants.

## III. JURISDICTION AND VENUE

24. The monetary damages and other relief sought by Plaintiff exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial.

25. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, Section 10, which grants the Superior Court "original jurisdiction in all cases except those given by statute to other courts." These statutes under which this action is brought do not specify any other basis for jurisdiction.

26. This Court has jurisdiction over all Defendants because, upon information and belief, each party either is a citizen of California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and

substantial justice.

27. Venue is proper in this Court because a corporation may be sued in the county where the contract is made or is to be performed, or where the obligation or liability arises, or where the breach occurs.

## IV. THE POLICY & POLICY PROVISIONS RELEVANT TO THE DISPUTE

28. The Northfield Policy provides Miller with both commercial liability and commercial property insurance for two properties that he owned and rented out to tenants.

29. Miller in obtaining the Northfield Policy paid Northfield premiums for the "all-risk" form of commercial property coverage to protect Miller in the event covered loss occurred to the insured premises, including the Commerce Building. The purpose of an "all risk" policy is to insure losses when the cause of the loss is unknown or the specific risk was not explicitly contemplated by either party. (7 Couch on Insurance § 101.7 (3d ed. 2010) (citations omitted). An "all risk" policy insurers against "all risks" of physical loss of or damage to Covered Property unless that risk – sometimes referred to as a peril – is explicitly and unambiguously excluded under the subject policy.

30. Here, the Policy provides broad coverage to Miller for physical loss of or damage to Covered Property: "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations cause by or resulting from any Covered Cause of Loss."

31. The Commercial Property Coverage Part Declarations specifies that "9938 Commerce Ave, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2" is one of the Covered Property(ies).

32. The Policy provides that "Covered Property" includes "a. Building, meaning the building or structure described in the Declarations . . . ."

33. The Policy's **CAUSES OF LOSS – SPECIAL FORM** provides: "When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." The Declarations page includes the term "Special". The Policy's CAUSES OF LOSS – SPECIAL FORM does not contain any exclusion or limitation that uses the word "vacant" or

some iteration or variant of that word.

34. Among other things, the Common Policy Declarations page of the Policy refers to a previous policy number (WS282922), and describes the business as "Lessor's risk". The Common Policy Declarations page also lists the charges making up the Premium charged to Miller for the Policy. One component of the Premium is an "Inspection Fee" of $175.00, which is fully earned at inception and not refundable in the event of flat cancellation. The Policy's Schedule of Forms and Endorsements page(s) includes a reference to "Causes of Loss – Special Form." It also refers to "Endorsement – Vacancy Restriction and Fungus Exclusion Changes", which was purportedly added per an 11/16 form.

35. The Policy's Common Policy Conditions, which are incorporated into all Coverage Parts, provides, in pertinent part, as follows:

**D. Inspections And Surveys**

1. We have the right to:
   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. . . .

36. The purpose of the $175 "Inspection Fee" component of the Premium paid by Miller for the Policy, as is readily apparent, was to fund Northfield's inspections and surveys of the Covered Properties. Northfield, pursuant to the Inspections and Surveys Condition, therefore had the right to: (i) make inspections; (ii) give reports on the conditions it found; and (iii) recommend changes. Such inspections, surveys, reports or recommendations and any actions Northfield undertakes "relate only to insurability and the premiums" Northfield will charge.

37. The Policy's **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** page describes the relevant Premises as follows: 9938 Commerce Avenue, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2."

38. The Policy's **BUILDING AND PERSONAL PROPERTY COVERAGE FORM,** *which is 15 pages in length and in a dense pack two-column format*, states, in relevant part, as follows:

> **A. Coverage**
>
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> **1. Covered Property**
>
> Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.
>
> a. **Building**, meaning the building or structure described in the Declarations, . . . .
>
> **3. Covered Causes Of Loss**
>
> See applicable Causes Of Loss form as shown in the Declarations.

39. Per the terms of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, an insured, to determine what qualifies as a covered and excluded risk under the Policy, must look to the Causes Of Loss Form contained within 148 pages making up the Policy.

40. The **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** also contains from pages 10 to 12 of that form a section entitled "Loss Conditions". The Loss Condition at page 11 of this form provides in pertinent part:

> E. Loss Conditions
>
> The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions. . . .
>
> **6. Vacancy**
>
> **a. Description Of Terms**
>
> (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

**a. Description Of Terms**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft;

(f) Attempted Theft;

(2) With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

41. The Loss Conditions as set forth in the Policy's **BUILDING AND PERSONAL PROPERTY COVERAGE FORM are one of three sets of conditions, along with** Common Policy Conditions and Commercial Property Conditions that apply. The "Vacancy" Loss

Condition – assuming its definition of what constitutes a "vacant" building is met and the building was vacant for a sufficient time before the loss or damage occurred eliminates coverage for six specific risks and imposes a 15% reduction on the amount payable for any other Covered Cause of Loss.

42. The Policy also contains an **Endorsement-VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES**, which, in pertinent part, states:

> A. The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:
>
> 1. Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:
>
> We will not pay for loss of or damage to any building that:
>
> a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or
>
> b. Was vacant at policy inception.
>
> This provision does not apply if the Vacancy Permit applies.
>
> 2. The following is added to Section E., Loss Conditions:
>
> **Increase In Hazard**
> We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

43. The title of this endorsement "Vacancy Restriction . . . Changes" is misleading and deceiving. A layperson reading the words "Vacancy Restriction" as used here in connection with the word "Changes" would understand that somewhere else in the Northfield Policy is a provision entitled "Vacancy Restriction", which is being changed by the subject endorsement. That, however, is not the case. The Policy, other than in the title to this endorsement, does not use the work "restriction" anywhere.

44. What is readily apparent from this endorsement, by its modification of the Vacancy Loss Condition, was that it created a provision wherein coverage is forfeited if a

building is vacant at specified points or periods in time, even if a building being vacant has nothing to do with the loss or damage at issue.

45. The Vacancy Restriction endorsement also references that it does not apply if there is a Vacancy Permit.

46. The Policy issued by Northfield contains a **CAUSES OF LOSS – SPECIAL FORM** which defines **Covered Cause of Loss** as "When Special is show in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." Notably, not a single reference to the term vacancy can be found anywhere in this form.

47. The concept of a "vacant" building is also addressed in another section of the Policy, in the "Cancellation Changes" Endorsement. It provides:

> The following is added to the **Cancellation** Common Policy Condition
>
> If anyone of the following conditions exists at any building that is Covered Property in this policy, we may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least five days before the effective date of cancellation.
>
> A. The building has been vacant or unoccupied 60 or more consecutive days. This does [sic] not apply to:
>
> 1. *Seasonal unoccupancy*;
> 2. Buildings in the course of construction, renovation or addition; or
> 3. Buildings to which the Vacancy Permit endorsement applies.
>
> Buildings with 65% of more of the rental units or floor area *vacant or unoccupied are considered unoccupied* under this provision.
>
> * * *
>
> F. Failure to:
>
> 1. Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of *seasonal unoccupancy*, or . . . . (*Italics* added.)

48. Pursuant to this endorsement, if a building is vacant for a given period of time, the policy (coverage part) can be cancelled. Additionally, as is the case with the Vacancy Restriction . . . Changes Endorsement, a building is not considered "vacant" under this provision if a

Vacancy Permit Endorsement is purchased.

49. The **CAUSES OF LOSS - SPECIAL FORM** also contains an "exclusion" section that states in part:

...

B. Exclusions

2. We will not pay for loss or damage caused by or resulting from any of the following:

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;
(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or
(b) To collapse cause by one or more of the following:
(i) The "specified causes of loss";
(ii) Breakage of building glass;
(iii) Weight of rain that collects on a roof; or
(iv) Weight of people or personal property. . . .

50. Later, in the same **CAUSES OF LOSS - SPECIAL FORM,** Northfield, irrespective of the Collapse Exclusion, nevertheless promised to provide coverage under certain circumstances for loss caused by collapse. These exceptions to the Collapse Exclusion are found in the "Additional Coverage – Collapse" provisions found in this form.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;
   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.
   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in 2.a. or 2.b.;
      (2) One or more of the "specified causes of loss";
      (3) Breakage of building glass;
      (4) Weight of people or personal property; or
      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;
   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

## V. NORTHFIELD'S "VACANCY" COVERAGE DEFENSE LACKS MERIT ON A NUMBER OF DIFFERENT GROUNDS

### A. <u>Is the "Vacancy Restriction" a Policy Exclusion, Limitation, Condition or Something Altogether Distinct?</u>

51. The Northfield Policy – an "all risk" policy – contains a "Causes Of Loss – Special Form" that sets forth the policy "exclusions" and "limitations" for which it is not providing coverage. The Policy also contains certain endorsements that specifically state they are adding to or modifying existing exclusions. The Policy also contains three distinct sections that are

characterized by Northfield as "conditions". This raises a question about just what kind of provision the "Vacancy Restriction" at issue here is.

52. Northfield's adjuster, who one can presume has some familiarity with insurance coverage issues, in writing its coverage denial, characterized the "restriction" as a "vacancy exclusion". Northfield's counsel has characterized the Vacancy Restriction as an exclusion, a limitation and a condition. The term "restriction", however, must be given a meaning separate and distinct from an exclusion, limitation or condition pursuant to California rules of contract interpretation. *Mirpad, LLC v. California Ins. Guarantee Assn.*, 132 Cal. App. 4th 1058, 1070 (2005). What kind of provision the Vacancy Restriction is will be an important determination under California law.

53. If a "Vacancy Restriction" is akin to an exclusion or limitation, it does not apply as a matter of law as a coverage defense here, as Northfield has supplied no evidence that the purported vacancy occurring at the Commerce Building had anything to do with the physical damage sustained at the Commerce Building.

54. Alternatively, if the Vacancy Restriction is more akin to a "condition" that has nothing to do with the substance of the coverage provided the Policy, it is a forfeiture clause that is not enforceable for the reasons articulated herein.

**B. Northfield Itself Does Not Know What A "Vacancy Restriction" Is.**

55. An insurer cannot escape its basic duty to insure based upon a policy exclusion that is unclear. *Haynes v. Farmers Ins. Exch.*, 32 Cal. 4th 1198, 1204 (2004). To be effective and enforceable, a policy exclusion must be stated clearly to apprise the insured of its effect. *Id.* Any provision that takes away or limits coverage reasonably expected by an insured must be "conspicuous, plain, and clear."[1] *Id.* Any policy exclusion or provision that takes away coverage must be placed and printed in the policy in such a way that it attracts the reader's attention. *Id.* To be effective and enforceable, policy exclusions must be stated with precision and understandably, in words that are part of the working vocabulary of the average layperson. *Id.* The burden of

[1] "The best indicator of an insured's reasonable expectation of coverage is, of course, the language of the insurance policy." *Spangle v. Farmer's Ins. Exchange*, 166 Cal. App. 4th 560, 569 (2008).

making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer. *Id.* "[E]xceptions and limitations on coverage the insured could reasonably expect must be called to the subscriber's attention clearly and plainly before the exclusion will be interpreted to relieve the insurer of the liability for performance." *Davis v. United Servs. Auto. Assn.*, 223 Cal. App. 3d 1322, 1332 (1990).

56. The Schedule of Forms And Endorsements starts on page 15 of 148 and ends on page 16. It refers to policy conditions, limitations and exclusions. There are no references to any warranty or representations. The only use of the term "restriction" is for "vacancy restriction" endorsement. The "vacancy restriction" turned a "condition" that applied a 15% penalty for a non-vacancy loss into a full forfeiture clause for a loss having nothing to do with vacancy.

57. A layperson looking at the forms and endorsements would not know what a restriction is. Giving separate meaning to the words used in the titles, a "restriction" is neither a "condition", "limitation", nor an "exclusion". Accordingly, from the perspective of an insured, it is something different from each of those items. Under these circumstances, an insured would view a restriction as not being a condition for coverage or an exclusion that would preclude coverage.

58. Northfield itself does not know what a "vacancy restriction" is. In its denial letter, Northfield called the "Vacancy Restriction" an exclusion. This is an admission that it was mislabeled. In its letter to Miller, Northfield's counsel called it an exclusion, limitation, and a "condition". This is an admission it is mislabeled. If the insurer does not know what a policy "restriction" is, how is an insured supposed to know? If the "restriction" is really an exclusion, this also has ramifications. If it is an exclusion, this means that the excluded risk/peril must be present as a cause of loss for the exclusion to apply.

59. The Northfield Policy does not contain any provision stating that titles or headings of policy provisions are not used or considered when interpreting policy terms.

60. Ultimately, the words in the heading "Vacancy Restriction" do not alert or otherwise inform an insured that it forfeits coverage if the "restriction" applies. Instead, the use of the term "restriction" misleads an insured as to the draconian impact of the provision if it applies.

An appropriate heading/label that would have alerted the insured that the Policy's existing Vacancy Condition was being modified to be an absolute bar to coverage if its terms were not satisfied are ones such as "Vacancy Warranty" or "Vacancy Condition Precedent".

61. Under the circumstances presented, the Vacancy Restriction . . . Change Endorsement is not enforceable because it is not "conspicuous", as it is mislabeled and does not alert an insured as to its potential legal impact if it is determined to apply.

### C. <u>Miller May Raise Waiver and Estoppel Because He Is Attempting to Avoid A Forfeiture of Benefits, Not Expand Benefits</u>.

62. Northfield has argued that the doctrines of waiver and estoppel are not available to Miller because California courts have rejected attempts to expand coverage beyond the terms of the policy on these grounds. Northfield's argument is wide of the mark.

63. California case law establishes a clear-cut distinction between using the doctrines of implied waiver and estoppel to avoid a forfeiture – which is permissible – and using these doctrines to create coverage under an insurance policy where such coverage did not originally exist. *See Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1066 (2010).

64. Here, the Northfield Policy makes clear that if the vacancy restriction applies, Miller forfeits all Policy benefits to which he would otherwise be entitled. *See Chase v. Blue Cross of California*, 42 Cal. App. 4th 1142 (1996). Specifically, the "vacancy" component of the endorsement entitled "Vacancy Restriction and Fungus Exclusion Changes" provides that Northridge "will not pay for loss of or damage to any building that: a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or b. Was vacant at policy inception." Thus, this provision works a forfeiture, which is disfavored under California law.

65. Notably, this "vacancy restriction" replaced the prior vacancy condition, which left open the possibility of payment (with a 15% reduction) for loss or damage under most loss scenarios.

66. Miller does not assert, for example, that Northfield has waived and/or is estopped from raising the Collapse Exclusion under the Policy. Instead, Miller contends that this exclusion is substantively inapplicable. Accordingly, because Miller is seeking to avoid the forfeiture of

benefits, and he is not attempting to expand coverage that otherwise would not exist, he may raise the doctrines of waiver and estoppel.

**D. Like All Other Contractual Provisions, the Northfield Policy Provision Requiring Any Waiver to be in Writing May Be Waived by Conduct.**

67. Northfield also argues that its Policy includes language requiring any waiver of a policy provision to be done by endorsement in writing. Like many jurisdictions, however, California law makes clear that parties may waive contractual rights, including a no-oral modification provision, by their words or conduct. *See, e.g.*, *Wind Dancer Production Group v. Walt Disney Pictures*, 10 Cal. App. 5th 56, (2017) (citations omitted); 3A A. Corbin, *Corbin on Contracts* § 763, at 531 (1960).

68. Thus, contrary to Northfield's position, a provision in a contract which requires waiver or modification to be in writing does not completely restrict the parties' ability to modify the contract through their words or conduct. As explained below, Northfield's words and conduct have modified the Policy's vacancy exclusion. Further, to the extent Northfield contends it is aware of facts that undermine Miller's assertion of waiver and/or estoppel, this is a factual issue for the trier of fact.

**E. The Facts Support Miller's Assertion of Waiver Estoppel. Breach of Contract and/or Fraud by Northfield. At Worst the Jury Will Decide these Issues.**

69. On Friday, August 15, 2017, less than two months after the Policy incepted on June 25, 2017, at the behest of Northfield and/or its general agent Hawkeye an "Insurability Inspection" of the Commerce Building was conducted of the Commerce Building. The purpose of an Insurability Inspection, as described by Northfield itself, is to conduct a "risk assessment" of the buildings/properties it has agreed to insure. This is also relevant to the amount of premiums it is charging.

70. Northfield, based upon the information it received from the August 15, 2017 "Insurability Inspection", has admitted in its post-loss communications with Plaintiff's representatives, that from its perspective it knew or at the very least strongly suspected that

information Miller had submitted to Northfield in his insurance application for the Policy pertaining to the Commerce Building was incorrect.[2] This incorrect information, per Northfield, included that the Commerce Building was "100% occupied" by a single tenant that was in the business of "Gardening Supplies".

71. The information provided to Northfield/Hawkeye by the August 15, 2017 "Insurability Inspection" also included that the Commerce Building: (i) was a vacant commercial building that was locked and gated: (ii) that had a parking lot to its right that was surrounded by a high fence with barbed wire; (iii) had large windows, with protective bars inside them, and a glass door; (iv) had broken windows; (v) had plywood installed on many, but not all of the, windows; (vi) the glass-door and a couple of the windows were not covered with plywood and (vi) there was signage on the windows stating "Grand Opening November 15th:" and referring to "hydro-garden" products.

72. Northfield, based upon its own admissions about the information it had obtained from the August 15, 2017 Insurability Inspection – which has never been provided to Miller – knew or at the very least suspected that some of the information provided to Northfield/Hawkeye in the policy application pertaining to the Commerce Building was inaccurate and, from its perspective, the Commerce Building was vacant on August 15, 2017, and for some significant period of time prior to that date. Northfield/Hawkeye, from the information obtained from the August 15, 2017 Insurability Inspection showing the Commerce Building's "vacancy" as of that date, would have reasonably suspected that, absent some new development, the Commerce Building would remain vacant on an ongoing basis.

73. Nor is the presence of an insured, but vacant, building a minor issue for Northbrook/Hawkeye from an insurability standpoint. As admitted by Northfield, "[a] vacant building carries with it an increased risk of hazard. A vacant building containing personal property that might be seen through large storefront windows and glass doors by anyone walking on the sidewalk is arguably an even greater risk of hazard than a vacant building without personal

---

[2] This was an innocent mistake by Miller who inadvertently failed to note that the information contained in the insurance application submitted was no longer correct.

property."

74. As reflected by the presence in the Northfield Policy itself of the "Vacancy Restriction", the provision giving Northfield the ability to cancel the Policy within only 5 days after notice if an insured building is determined to be "Vacant", and the inapplicability of those provisions if a "Vacancy Permit" is purchased by an Insured, shows how significant "Vacancy" is from an insurability standpoint.

75. Plaintiff is informed and believes and thereon alleges that Northfield and Hawkeye both hold themselves out as having specialized expertise and experience in providing insurance coverage for vacant buildings. Accordingly, there was nothing preventing Northfield and/or Hawkeye in placing coverage for the Commerce Building – by allowing Miller to purchase a Vacancy Permit -- even if, as they suspected, the Commerce Building was "vacant".

76. Northfield and/or Hawkeye, including their representatives, have specialized expertise and knowledge in insurance matters. Northfield and/or Hawkeye also knew, or at the very least strongly suspected, that Miller and those who worked for him were – from an insurance perspective – laypeople without expertise on insurance matters generally, let alone with the specific terms and intricacies of the Policy issued to him.

77. Northfield and/or Hawkeye, based upon the August 15, 2017 Insurability Inspection and their expertise, were thoroughly familiar with the implications from their perspective – that it had grounds for rescinding the Policy at that time – based on the apparent inaccuracies contained in the policy application provided for the Commercial Building. Instead of conducting any further investigation to determine whether it wanted to continue insuring the Commerce Building under the same or different terms, including increased premiums, it did nothing. Northfield and/or Hawkeye could have easily conducted such an investigation by, *inter alia,* contacting Miller and explaining the issues, determine from Miller what the facts were, including the identity of the tenant and nature of the tenant's business activities, and based thereon, determine how it wanted to proceed.

78. Further, based upon the August 15, 2017 Insurability Inspection information they received and their expertise and knowledge, Northfield and/or Hawkeye also understood that

there were various other material "insurability" issues implicated involving the Commerce Building, including "vacancy" issues. Those "vacancy" issues included that the information already in its possession, coupled with information obtained by additional investigation, would reveal that it had grounds to cancel the Policy and/or that it already had or would likely have a full defense to any otherwise covered loss or damage occurring during the Policy pursuant to the "Vacancy Restriction".

79. For example, based upon the information provided by the August 15, 2017 Insurability Inspection, Northfield and/or Hawkeye strongly suspected – that the Commerce Building may have been ". . . vacant at policy inception" and therefore already subject to the Vacancy Restriction. Similarly, based upon the information provided by the August 15, 2017 Insurability Inspection, Northfield and/or Hawkeye strongly suspected that "the building [may] ha[ve] been vacant or unoccupied 60 or more consecutive days" and therefore subject to cancellation. Instead of conducting any further investigation to determine whether it wanted to continue insuring the Commerce Building under the same or different terms, including increased premiums, it did nothing.

80. Northfield, under the circumstances presented, in failing to conduct any further investigation, *inter alia,* waived, is barred, and/or is otherwise estopped from now disclaiming coverage for the Commerce Building loss sustained by Miller predicated upon a Vacancy Restriction defense.

81. Moreover, Northfield and Hawkeye – with their superior insurance expertise and knowledge – *inter alia,* breached the terms of the Policy, mislead, misrepresented, deceived and/or defrauded Miller by keeping hidden and not fully disclosing to him all the insurability conditions they were privy to as a consequence of the August 15, 2017 Insurability Inspection.

82. As set forth in the Policy's "Common Policy Declarations", Northbrook charged Miller an "Inspection Fee" in the amount of $175, which "was fully earned at Inception and non-refundable in the event of flat cancellation."

83. Inspections are addressed in the Policy in the "Common Policy Conditions" coverage part of the policy at Section D, entitled "Inspections And Surveys". It provides in

pertinent part:

> D. Inspections And Surveys
>
> 1. We have the right to:
>
>     a. Make inspections and surveys at any time;
>
>     b. Give you reports on the conditions we find; and
>
>     c. Recommend changes.
>
> 2. We are not obligated to make any inspections, surveys, reports or recommendations and any ***such actions we do undertake relate only to insurability and the premiums to be charged***. We do not make safety inspections. . . . (***Emphasis*** added.)

84. Thus, the purpose of Northfield's August 15, 2017 Inspection was related only to the "insurability and the premiums to be charged" for the buildings it was insuring under the Policy. For the Commerce Building, Northfield exercised its inspection right and reported to Miller (apparently through his broker) that it had found broken windows that affected the insurability of that location and demanded that Miller have the broken windows replaced, which he did. The August 15, 2017 Inspection's conclusion that the Commerce Building was "vacant", which was reported to Northfield, or that Miller could fix any "vacancy" issue by purchasing a vacancy permit, were never raised by Northfield.

85. However, Northfield/Hawkeye, in revealing to Miller only that there were broken windows that needed to be fixed, breached the terms of the "Inspections And Surveys" Condition. Once Northfield/Hawkeye decided to exercise its "right" under this condition, it was contractually obligated to "report" about all the conditions it found, not pick and choose which it would report and which it would withhold. Miller, having been expressly advised by Northfield/Hawkeye, that the only insurability issue existing for the Commerce Building was the existence of broken windows, reasonably and detrimentally relied upon the incomplete and therefore misleading information provided.

86. Further, per Brian Kong, who was Miller's insurance broker, after hearing about the loss (collapse) having occurred, Hawkeye's owner, Nate, stated to him that

Hawkeye/Northfield should have cancelled the policy based upon knowing it was vacant. Hawkeye's owner made no qualifications about vacancy, but instead unequivocally stated the property was vacant.

87. Northfield's April 30th Denial Letter also noted its observation that the Commerce Building was vacant during its August 15, 2017 inspection. An insurer may not issue an insurance policy on a building if it knows it is vacant. *West Coast Lumber Co. v. State etc. Co.*, 98 Cal. 502, 508-09 (1893) (citation omitted). In *West Coast Lumber Co. v. State etc. Co.*, 98 Cal. 502, 508-09 (1893), the California Supreme Court observed:

> If, as was the case here, a building is insured against loss by fire under a policy containing a proviso that it shall be or become void in case the building is or shall become vacant or unoccupied, when, as was well known to the insurer at the date of the policy and subsequently, it was and remained unoccupied, the insurer will be presumed to have waived the clause as to occupancy. May on Insurance states it in this wise: "To deliver a policy with full knowledge of facts upon which its validity may be disputed, and then to insist upon these facts as ground of avoidance, is to attempt a fraud. This the courts will neither aid nor presume; and when the alternative is to find this or to find that, in accordance with honesty, there was an intent to waive the known ground of avoidance, they will choose the latter." (May on Insurance, sec. 497.)

88. Northfield and/or Hawkeye, at best, decided to conduct no further investigation following August 15, 2017, so they could keep Miller in the dark and later assert – after a loss occurred -- that there was no coverage under the Vacancy Restriction.

89. Northfield never informed Miller that the condition of the Commerce Building on August 15, 2017, was that it was "vacant", even though Northfield knew that "vacancy" was very relevant to the issues of a building's insurability and the premiums charged for such insurance.

90. As previously referenced, as reflected in Northfield's April 30, 2018 Denial Letter, it is now apparent that Northfield and Hawkeye (its wholesaler/underwriter) – due to the very same August 15, 2017 inspection that discovered the broken windows – also had other significant concerns regarding the insurability of the Commerce Building based upon their observations regarding the Commerce Building's "vacancy", and that it was a warehouse (not an office building), as reflected in the policy's declaration page. Neither the "vacancy" nor "warehouse" issues – both of which involve insurability issues – were brought to the attention of

Miller or his broker even though Miller had paid Northfield to have an inspection done to address that very purpose.

91. Moreover, in addition to the policy language about "inspections", once Northfield/Hawkeye informed Miller about one aspect of the Commerce Building's condition (i.e., the "broken windows") involving the "insurability"/increased risk, Northfield/Hawkeye assumed a duty to disclose all of its insurability/risk concerns about the Commercial Building. *See, e.g., Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 292 (2004) (citation omitted).

92. Further, Miller detrimentally relied upon Northfield's misleading partial "insurability" disclosure. Miller. If informed about Northfield's concerns about the Commerce Building being mischaracterized as an "office" in the declarations and Northfield's "vacancy" conclusion – Miller would have had the "office" mischaracterization easily rectified and the vacancy issue solved, *inter alia*, by purchasing a Vacancy Permit Endorsement (which allows Northfield, in exchange for an additional premium, to insure a "vacant" building) for the Commerce Building, purchasing an entirely new policy from a different insurer for the Commerce Building, and/or working out the perceived "vacancy" issues with his tenant. Miller, simply put, would have done whatever was reasonably necessary to protect the $8,000 per month rental income stream he was receiving for the Commerce Building.

93. Further, also as previously referenced, for purposes of the "Vacancy Restriction", the "restriction" applied irrespective of the date of loss if vacant at the time the Policy was incepted. Yet, Northfield did no investigation after the insurability inspection to find out that information. Similarly, the "vacancy" definition for purposes of cancellation has nothing to do with the date of loss. Accordingly, after the initial insurability inspection, there is nothing that prevented Northfield from doing a follow-up visit to determine if the Commerce Building was previously or still "vacant" and therefore subject to being cancelled.

94. Northfield is asking for strict enforcement of the "vacancy restriction" provision, on the one hand, while asking that its non-compliance with (and contractual breach regarding) the insurability inspection condition be excused, on the other. The "insurability inspection" language

in the Policy contains language that the Insured has the right to "[g]ive you reports on the conditions that we find; . . . ." "You" refers to the named Insured. Northfield did not have a duty to give a report(s) on the conditions found. Northfield did, however, have a right, which it exercised to give a report. Once Northfield exercised its right to give a report, it cannot pick and choose what condition it can report. Rather the Policy uses the plural term "conditions". Thus, it is reasonable to conclude that, if Northfield exercised its right to give a report, Northfield was obligated to report on all the conditions it found. In failing to properly disclose all conditions they found relevant to insurability, Northfield breached its contractual with Miller.

95. Alternatively, if Northfield had disclosed to Miller (including the broker, Kong) that the building was "vacant", Miller would have bought a vacancy permit or obtained new coverage from another carrier.

96. Under the facts presented here, Northfield has, *inter alia,* waived and/or is estopped from asserting the application of the "Vacancy Restriction" provision condition/exclusion.

97. Separately, in knowing about the "vacancy" issues and then failing to do anything about it, Northfield/Hawkeye may have implicitly agreed to fully insure the Commerce Building irrespective of any "vacancy" issues. *See* Ins. Code § 336. This conclusion is consistent with the statement made by Hawkeye's owner to Mr. Miller's broker, Brian Kong, to the effect that Northfield/Hawkeye had "screwed up" in not canceling the policy.

**F. <u>Even if the "Vacancy Restriction" Applies, the Commerce Building Was Not Vacant</u>.**

98. Even if Northfield's "vacancy restriction" applies here (and it does not), the Commerce Building was not vacant. By its terms, for the Policy's "vacancy restriction" to apply and preclude coverage for a loss, the subject building must first qualify as being "vacant" as that term is defined in the Policy. The Commerce Building, before its destruction, was a 5,500 square foot warehouse building from which sales could occur in the front of the building facing toward Commerce Avenue. The great majority of the space making up the Commerce Building (95% or more) is and always has simply been warehouse and storage space.

99. Before the Commerce Building was leased to Mr. Edvin Mailyan, it was used for the preceding couple of years by a nursery business as its warehouse and storage area, with some sales occurring at the front of the building, which faced onto Commerce Avenue. Prior to that, for more than a decade, the Commerce Building was rented by Comcast's cable business and used primarily as a warehouse providing inventory for 20 to 30 Comcast service vans that were parked at the Commerce Building adjacent parking lot overnight each evening.

100. The Commerce Building is 5500 square foot warehouse, with its ceiling approximately 16' feet high. The front of the Commerce Building faces onto Commerce Avenue. A large parking lot is located immediately on the north of the Commerce Building, and a liquor store is located on its other side immediately to the south. An alley is located to the rear of the Commerce Building. On the north side of the building were large "commercial" doors allowing entry from the parking lot into the warehouse for goods and vehicles. Goods/materials already stored in the warehouse could be removed and put into trucks (or other vehicles) for distribution through the same doors down a forklift ramp.

***1. Mailyan's Lease With Miller for the Commerce Building***

101. The Lease between Mr. Miller and Mr. Mailyan, dated December 5, 2016, provided that Mr. Mailyan could use the Commerce Building for "[a]ny lawful usage permitted by the City of Los Angeles" and was for the entirety of the Commerce Building (*see, e.g.*, Lease, ¶ 1.8.)

102. Mr. Mailyan agreed to pay Miller $8,000 per month to lease the Commerce Building, with the original lease term running for three (3) years from April 3, 2017, through March 31, 2020. Mailyan also provided a $16,000 security deposit (Lease, ¶¶ 1.3, 1.6 (a), 1.6(b)) and was also obligated to pay for all utilities and services supplied to the Commerce Building. (Lease, ¶ 11.)

103. Mailyan used the Commerce Building in connection with a seasonal toy business that he operated. Plaintiff is informed and believes and thereon alleges that Mr. Mailyan used the Commerce Building, *inter alia,* as a warehouse and distribution center for his toy business and performed all the other business functions for his toy business from other locations. Plaintiff is

further informed and believes and thereon alleges that the toys Mr. Mailyan would buy for later resale would be delivered by truck and brought into the Commerce Building warehouse through the back or side of the building. The reverse process would occur when Mailyan would sell his toys to retailers and then have them distributed to them.

*2. __Detailed Analysis of Northfield's "Vacancy Restriction" Provisions__*

104. Northfield's "vacancy restriction" itself contains two definitions of "vacant". One applies to policyholders who are tenants and therefore is inapplicable here. The other definition, which we focus upon below, applies when the policyholder is the building's owner, such as Mr. Miller here. It provides:

> (1) As used in this Vacancy Condition, the ***term building*** and the ***term vacant have the meanings*** set forth ***in*** (1)(a) and ***(1)(b)*** below:
>
> * * *
>
> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant ***unless*** at least 31% of its total square footage is:
>
> (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or
>
> (ii) Used by the building owner to conduct customary operations.

105. Northfield's definition of "vacant" – which is inconsistent with the common everyday meaning of the term – is framed by Northfield in the negative and presumes a building is "vacant" unless the two 31% square footage thresholds are met. Those thresholds are that 31% or more of the building's square footage must be: (1) rented to a lessee, and (2) used by the lessee to conduct its customary operations.

*a. __"Used By The Lessee to Conduct Its Customary Operations"__*

106. More than 31% of the Commerce Building was rented to Mr. Mailyan. Thus, the only issue is whether the second threshold requirement is met – *i.e.*, that *at least 31%* of the building's total square footage is "*used by the lessee . . . to conduct its customary operations.*" (*Italics* added.)

107. Turning next to the words contained in this clause, the term "Used" means

"employed in accomplishing something." Merriam-Webster Dictionary Online. "Used by the lessee" therefore refers to the lessee's employment or use of the building. The word "conduct" means to direct, organize or take part in the operation or management of a particular activity. American Heritage Dictionary of the English Language (4th ed. 2000). The particular activity here is the lessee's *customary operations*. The question of whether this second 31% threshold requirement is met – which would take the building outside the definition of "vacant" – therefore focuses upon what constitutes the lessee's *customary operations*.

108. In *St. Mary & St. John Coptic Orthodox Church, supra,* 57 Cal. App. 5th at 830, the court found that the term "customary operations" depends on the planned use of the building where the loss occurred. The court noted that St. Mary's was insured "as a religious organization, and it planned to use the 'building' where the loss occurred as a residence for the Coptic Pope in the western United States and for visiting clergy." According to the St. Mary's court, therefore, "the residence was vacant if it lacked sufficient personal property to conduct operations as a residence for the Coptic Pope and for these clergy." *Id.* In other words, the concept of "customary operations" is highly fact intensive.

109. The term "customary operations" does not contain any temporal limitations. Rather, it is broad enough from a temporal standpoint to encompass a lessee's customary work or business operations no matter how often it occurs, seasonally, intermittently, bi-monthly, monthly, weekly, bi-weekly, daily, habitually or continuously.

110. Mailyan's *customary operations* at the Commerce Building involved Mailyan's seasonal use of the Commerce Building's interior spaces as a warehouse and distribution center while being responsible for the continuous maintenance and security of the entire building, both interior and exterior.

111. The *St. Mary* case also made clear that determining what constitutes "customary operations" is made from the perspective of the tenant. For example, the California Court of Appeal cited favorably to *Imperial Beach Palm, LLC v. Travelers Property Casualty Co. of America*, 2015 WL 11401349, at *2 (S.D. Cal. July 8, 2015) as follows: "Where the property was insured for 'mercantile use' and the lessee sold shellfish traps and fishing equipment, the term

'customary operations' meant the lessee's customary business activities."

112. There is nothing in the plain meaning of the words "customary operations" from either the tenant's or landlord's perspective that would render the seasonal warehouse and distribution activities of Mailyan's at the Commerce Building as falling outside the common meaning of "customary operations" and therefore qualifying as "vacant". Miller's interpretation of the "customary operations" language based upon the factual circumstances presented and the policy language used is a reasonable one under California's rules of contract interpretation.

113. The ***entirety*** of the Commerce Building – from the inception of the Policy on June 25, 2017, through the February 10, 2018 loss – was leased to Mr. Mailyan for $8,000 per month and used by him in its customary role as the warehouse and distribution center for his Southern California based seasonal toy business. It was not "vacant". The reasonableness of Miller's interpretation that the phrase tenant's "customary operations" encompasses the Mailyan's seasonal toy business activities at the Commerce Building is supported by other sections of the Policy described below.

***b. <u>Analysis of "Cancellation Changes" Endorsement Vacancy Provision</u>***

114. The concept of "vacant" property is also addressed in another section of the Policy, in the "Cancellation Changes" Endorsement. It provides:

> The following is added to the **Cancellation** Common Policy Condition
>
> If anyone of the following conditions exists at any building that is Covered Property in this policy, we may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least five days before the effective date of cancellation.
>
> A. The building has been vacant or unoccupied 60 or more consecutive days. This does [sic] not apply to:
>
> 4. *Seasonal unoccupancy*;
>
> 5. Buildings in the course of construction, renovation or addition; or
>
> 6. Buildings to which the Vacancy Permit endorsement applies.
>
> Buildings with 65% of more of the rental units or floor area *vacant or unoccupied are considered unoccupied* under this provision.

* * *

F. Failure to:

1. Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of *seasonal unoccupancy* . . . . (Italics added).

115. The Cancellation Changes Endorsement provision, as reflected from simply reviewing its terms, specifically states that from Northfield's perspective the concepts of vacancy and unoccupancy are both considered unoccupancy. The Cancellation Change Endorsement also specifically states that both vacant or unoccupied floor area "are considered unoccupied."

116. Additionally, the Cancellation Change Endorsement specifically exempts from the concepts of vacancy and unoccupied situations that qualify as *seasonal unoccupancy*. With the terms "vacant" and "unoccupied" both qualifying as "unoccupied", the term *"seasonal unoccupancy"* as used here therefore also encompasses the concept of seasonal vacancy.

117. Under the Cancellation Change Endorsement, "*seasonal unoccupancy*" – which is the same as *seasonal vacancy* – such as those times when Mailyan was not actively using at least 31% of the Commerce Building as a warehouse and distribution center in his seasonal toy business, means the Commerce Building did not qualify as being "vacant" under the language used by Northfield in its Cancellation Change Endorsement.

118. Under the Policy's Cancellation Change Endorsement, the *"seasonal unoccupancy"* of the Commerce Building attributable to Mr. Mailyan's seasonal toy business operations does not qualify as a "vacancy" that would allow Northfield to cancel the Policy. Yet, Northfield asserts that the very same seasonal toy business operations do, in fact, qualify as "vacancy" for purposes of denying coverage under the Policy's "Vacancy" Loss Condition provisions. Northfield, to prevail on such an argument, would effectively have to assert that a layperson reviewing the entire Policy would have understood that Mailyan's seasonal business operations, under the exact same facts, qualifies in one portion of the Policy as vacancy precluding coverage under the Vacancy Loss Condition, but does not qualify as vacancy for purposes of canceling the Policy. Under California law, however, it is presumed that the meaning given a word or phrase that is used in one portion of the Policy has the same meaning when used

in another portion of the Policy. *See Palmer v. Truck Ins. Exchange*, 21 Cal. 4th 1109, 1116 (1999). Northfield would also have to show that the insured's interpretation harmonizing the two areas of the Policy that discuss "vacancy" as not encompassing a seasonal business such as Mailyan's here was unreasonable. *See MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 655 (2003). Putting aside such issues as whether the "vacancy restriction" is even enforceable in the first place, it is highly unlikely under California law that Northfield can establish that Miller's interpretation is unreasonable and therefore that its "vacancy restriction" is not ambiguous under the facts here. *Id.*

**G. <u>The Northfield Policy Contains Two Inconsistent Definitions of Vacancy. The Resulting Ambiguity Must be Resolved in Miller's Favor, Especially Where the Definition that is Most Favorable to Miller is Contained in an Endorsement.</u>**

119. Even if Northfield were not barred by waiver and estoppel from relying on the Policy's vacancy provisions (and it is), the Policy contains two inconsistent definitions of vacancy.

120. First, the Policy's "Vacancy" Loss Condition includes the following language:

> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant ***unless*** at least 31% of its total square footage is:
>
> (iii) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or
> (iv) Used by the building owner to conduct customary operations.

121. Second, the Policy's "Cancellation Changes" Endorsement includes the following language:

> A. The building has been vacant or unoccupied 60 or more consecutive days. This does [sic] not apply to:
>
> 7. *Seasonal unoccupancy* . . . .
>
> * * *
>
> F. Failure to:
>
> 1. Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of *seasonal unoccupancy*, . . . (*Italics* added.)

122. Thus, the meaning of vacancy under the Northfield Policy is susceptible to two reasonable interpretations. On the one hand, the definition of "vacancy" for purposes of the application of Northfield's "vacancy restriction" is found in the "Loss Condition" section of the Policy's body and turns on whether at least 31% of the building's square footage is rented and used by the lessee to conduct its "customary operations". On the other hand, however, the definition of vacancy in the "Cancellation Changes" endorsement makes clear that a vacancy does not exist under the Policy if the reason why the lessee is not using the building is due to "seasonal unoccupancy".

123. Under California's rules of contract interpretation, if there is any ambiguity or uncertainty in policy language, then the provision must be interpreted in favor of the insured and his reasonable expectation of coverage. *County of San Diego v. ACE Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 415 (2005). This is especially true where (as here) the language in the "Cancellation Changes" endorsement contains a definition of "vacancy" that is more favorable to Miller. *See, e.g., American Way Cellular, Inc., supra,* 216 Cal. App. 4th at 1057; *Venoco, Inc., supra,* 175 Cal. App. 4th at 766.

124. A review of the "Vacancy Restriction" Endorsement shows it does ***not*** contain any "vacancy" definition. In contrast, a review of the "Cancellation Changes" Endorsement shows it contains the "vacancy" definition with the "seasonal unoccupancy" exception. Since, a conflict exists between the two competing "vacancy" definitions at issue, under California's rules of contract interpretation, the "seasonal unoccupancy" vacancy definition controls because it is contained in the "Cancellation Changes" Endorsement. *See, e.g., American Way Cellular, Inc. v. Travelers Property Cas. Co. of Am.*, 216 Cal. App. 4th 1040, 1057 (2013); *Venoco, Inc. v. Gulf Underwriters Ins. Co.*, 175 Cal. App. 4th 750, 766 (2009).

125. Miller, in reading the provisions of the Cancellation Change Endorsement, would also reasonably construe the concept of "seasonal unoccupancy" – as including a seasonal toy business such as Mr. Mailyan's here – that qualifies as an exception to the building being "vacant". This interpretation of the Cancellation Change Endorsement is consistent with and further supports Miller's interpretation of Northfield's "vacancy restriction" provisions as not

including situations involving a seasonal business, such as Mailyan's here.

126. For Northfield to prevail in its denial of Miller's claim for coverage by relying upon the "vacancy restriction", it must establish that periods when a seasonal business is "slow" or is not operating (such as the one run by Mr. Mailyan) qualifies as vacant. It cannot do so.

**H. <u>Northfield Would Have to Rewrite The Provisions of Its "Vacancy Restriction" to Obtain the Interpretation It Is Asserting Applies Here.</u>**

127. To successfully assert the "vacancy restriction", Northfield must first show that the Commerce Building was "vacant" as the term is defined in its Policy. For "vacant" to not apply to seasonal business activities and therefore fall outside the meaning of "customary operations" – as Northfield is effectively arguing – it must rewrite the vacancy definition. This could be done only by expressly stating in the definition language to the effect that the habitual, common, or otherwise regularly occurring "seasonal" or "intermittent" business operations of a tenant/lessee at a building it is continually leasing does not qualify as that tenant's customary operations. Such a result, however, would require rewriting the "vacancy restriction", which one cannot do under California's rules of contract interpretation and therefore is neither a reasonable interpretation nor something a California court could do. *Rosen v. State Farm General Ins. Co.*, 30 Cal. 4th 1070, 1077-78 (2003).

128. Even if Northfield's interpretation of "customary operations" were reasonable, Miller's interpretation is also a reasonable one. The existence of these two reasonable interpretation creates an ambiguity that will be construed in Miller's favor and against Northfield. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 2 Cal. 4th 854, 868 (1993).

129. Under the factual circumstances presented here, Miller's interpretation that Mailyan's leasing of the Commerce Building (and his use of that building in connection with his seasonal toy business) does not qualify as being "vacant" under the Northfield policy is a reasonable one.

130. By contrast, Northfield's interpretation ignores all the provisions of the policy (and many, if not most of, the relevant facts), and is therefore not a reasonable one. And, even if Northfield's interpretation were determined to be reasonable, at best, this creates an ambiguity

that will be constructed against Northfield.

131. Finally, it should also be noted that, even based on the information Northfield obtained from Mailyan, the Vacancy Restriction does not apply. Specifically, the fact that Mailyan personally had not been to the Commerce Building for a couple of months prior to February 10, 2018, does not mean that the business was not being run by his employees and had sufficient toys in the building in mid-December 2017, within 60 days before the collapse, therefore making the Vacancy Restriction inapplicable.

## VI. NORTHFIELD'S "COLLAPSE" ARGUMENT LACKS MERIT

132. The second reason why Northfield has denied coverage for Mr. Miller's claim is based upon the Policy's collapse provisions. Specifically, Northfield argues in its April 30, 2018 Denial Letter that, "[t]he cause of the collapse is an overstressed bottom cord of the truss, which is excluded under the policy. Mr. Coronado ruled out both wind and water as possible causes of the loss. None of the other specified causes of loss that are set forth in the additional coverage for collapse apply." Once again, Northfield is wrong.

133. Neither Northfield, nor its retained engineer (Jeff Coronado) – who is on Travelers' list of "approved" engineers – ever considered Northfield's promise to provide "Additional Coverage – Collapse" for the abrupt collapse of the Commerce Building that occurred on February 10, 2018 if "caused by" hidden decay. Coronado's Report, dated April 16, 2018 – is also rife with material errors.

134. Some of the material errors made by Coronado in his April 16, 2018 included errors that rendered Coronado's analysis egregiously inaccurate. In particular, Coronado, *inter alia*, erroneously concluded which of the five wooden roof truss for the Commerce Building initially failed. Contrary to Coronado's Report, the addition of an "air handling" unit, weighting only some 150-200 pounds, to the 5th truss, a couple of years earlier is unrelated to and was not the cause of the collapse. Rather, as set forth in the Forensic Structural Evaluation Report for 9938 Commerce Avenue, dated July 31, 2018, it was the Commerce Building's 4th truss, which had nothing to do with "air handling" unit, that initially failed, setting in motion the failure of the other trusses and the roof's collapse.

135. Coronado's report also failed to address the age of the wooden trusses, including, *inter alia*, that under current code requirements the wooden roof trusses were highly overstressed and that over the course of the approximately eighty (80) years between the Commerce Building's construction and the February 10, 2018 collapse of its wooden truss systems the strength of the building's wooden truss system would have for a variety of reasons weakened.

136. While the **CAUSES OF LOSS - SPECIAL FORM** provides that Northridge "will not pay for loss or damage caused by or resulting from . . . k. Collapse . . .", it also states that "[t]his exclusion, k., does not apply: (a) To the extent that coverage is provided under the Additional Coverage Collapse . . . ." The Additional Coverage – Collapse, in turn, provides, in pertinent part, as follows:

> The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.
>
> 1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
>
> 2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:
>
>    a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
>
>    . . .
>
>    c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.
>
>    d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:
>
>       (1) A cause of loss listed in 2.a. or 2.b.;
>       (2) One or more of the "specified causes of loss";
>       (3) Breakage of building glass;
>       (4) Weight of people or personal property; or
>       (5) Weight of rain that collects on a roof.

137. The term "decay" is not defined in the Policy, just as it was not in *Stamm Theatres, supra,* 93 Cal. App. 4th 531, a decision which presented the question whether a property insurance policy covering collapse of a building due to "hidden decay" applies to the unexpected failure of wooden roof trusses, with no evidence of rot. *Id.* at 534. In fact, *Stamm* involved the roof collapse of the exact same "bow-string" wooden truss system at issue here.

138. The *Stamm* court found that the "dictionary definitions of 'decay' include a general sense of gradual deterioration in strength or soundness, and a more specific sense of rot or organic decomposition." *Id.* at 534; *see id.* at 539-40 & fn. 2. The *Stamm* court further reasoned that, "[i]f Hartford did not intend to create a reasonable expectation of coverage for collapse due to 'natural decline,' it could have used a term other than 'decay.' More limited terminology was certainly available to the insurer." *Id.* at 541. Since Hartford failed to do so, however, the insured, "after consulting any dictionary, would have good reason to be optimistic about its insurance coverage in this case." *Id.* at 543. The court pointed out that "[Hartford's] choice of the general term 'decay' is the source of any ambiguity arising from the coexistence of the broader and more limited definitions of the word." *Id.*

139. The *Stamm* court concluded that "coverage could not be ruled out merely because the trusses were not rotten. An insurer promising coverage for collapse due to 'hidden decay,' without limiting the scope of the term to organic decay, is liable on claims for any collapse caused by a concealed process of gradual loss in the strength of building materials, unless other policy terms limit coverage." *Id.* at 534. Thus, under the policy and circumstances at issue in *Stamm*, "the insured could reasonably expect coverage for an imminent collapse caused by the weakening roof trusses, unless the failure was caused by defective materials or construction methods." *Id.*

140. The *Stamm* decision, which Northfield has not and cannot distinguish, is completely consistent with both the policy and facts at issue here. Indeed, on July 31, 2018, Coffman Engineers Inc. produced its Forensic Structural Evaluation Report for 9938 Commerce Avenue, Tujunga, California. The Executive Summary of the Report provides as follows:

On Saturday, February 10, 2018 at approximately 12:00PM PST the existing wood framed bow string roof structure partially collapsed. The building is a single-story wood framed structure built in 1938. An investigation by Coffman Engineers was conducted to determine the cause of the roof collapse.

Based on our investigation, observations and structural analysis the existing bow string trusses were in general conformance with the governing building code at the time of permit (1935 Uniform Building Code). The type and quality of Douglas Fir lumber used for the building was typical for a 1938 building. Changes to the California Building Code and Los Angeles Building Code have significantly reduced the allowable tension capacity of wood members used for building structures. Our structural analysis confirms that the existing wood bottom cord of the bow string trusses are overstressed by 135% for dead loads only (Demand versus Allowable Capacity = 235%) using the current wood design building codes. There is no current mandatory requirement to retrofit existing bow string wood trusses in the California or Los Angeles Building Codes.

Over the years, the existing bow string trusses have been exposed to high temperatures in the unconditioned attic space of the building. High temperatures cause shrinkage of the lumber due to drying and reduce the strength of the lumber from checking. Also, the truss lumber shrinkage causes the web member and splice connection bolts to loosen over time reducing the existing capacity of the truss. Additionally, wood knots, nonparallel grain, and eccentric bolted connections contribute to further reduce the truss capacity to carry gravity and lateral loads (wind).

The building is located at the foothills of the San Gabriel Mountains. Off shore gusty Santa Ana winds are a common occurrence at the building site. On February 9, 2018 Santa Ana wind warnings of 45 to 55 mph winds for February 10th and 11th were reported by the OC Register:

https://www.ocregister.com/2018/02/09/santa-ana-winds-spur-fire-weather-warning-for-part-of-southern-california/

Coffman Engineers has determined the failure of the roof structure started at Truss #4, second panel point from wall support (see Figures 5 through 8). Drying of the bottom cord lumber, adjacent knots to second panel point, loose bolts, and the eccentricity of the web member connections to the bottom cord all contributed to an unstable structural condition where a small external load would push the truss to failure. Therefore, the Santa Ana Wind event on February 10, 2018 was most likely the single event ("straw that broke the camel's back") that caused the progressive collapse of the existing roof structure.

141. Thus, like the insurer in *Stamm*, Northfield has promised coverage for collapse due to "hidden decay", without limiting the scope of the term to organic decay. Coffman Engineers,

Inc.'s Forensic Report makes clear that "hidden decay" was the underlying and/or immediate cause of the collapse of the building. Thus, because Northfield promised coverage for collapse due to "hidden decay", without limiting the scope of the term to organic decay, it is liable on Miller's claim for collapse caused by a concealed process of gradual loss in the strength of building materials, such as what occurred with the Commerce Building's February 10, 2018 roof collapse.

142. Coffman Engineers, Inc.'s Forensic Report also discussed that the immediate cause of the loss may have been wind gusts that the Tujunga area was experiencing at the time the trusses of the Commerce Building. The Tujunga area, where the Commerce Building was located, is within a currently designated "high wind area". This "high wind area" designation, in fact, goes back to at least 1938 as reflected in the permit issued for the construction of the Commerce Building. Wind, is also a covered cause of loss under the Policy.

143. Whether "hidden decay", "wind", "high temperatures" drying out the wooden trusses, or some combination of them, the efficient proximate cause of the failure of wooden trusses at the Commerce Building and resulting building collapse were covered causes of loss. The Commerce Building loss, contrary to the various assertions made by Northfield, is covered.

**<u>FIRST CAUSE OF ACTION</u>**

(Breach of Written Contract – Against Defendant and DOES 1-100)

144. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 143, inclusive, as if fully set forth herein.

145. Northfield provides coverage under the Policy for "direct physical loss of or damage to Covered Property at the premises described in the Declarations cause by or resulting from any Covered Cause of Loss." The Commercial Property Coverage Part Declarations includes "9938 Commerce Ave, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2" as one of the insured premises. The Policy provides that "Covered Property" includes "a. Building, meaning the building or structure described in the Declarations . . . ."

146. The Policy's **CAUSES OF LOSS – SPECIAL FORM** provides: "When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded

or limited in this policy." The Declarations page includes the term "Special".

147. Miller has fulfilled all of his obligations and has complied with all conditions and agreements in the Policy and/or is otherwise excused from complying with them.

148. The direct physical damage sustained by the Commerce Building was caused by covered, i.e., non-excluded, fortuitous causes and events that occurred while the Northfield Policy was in effect and therefore constitutes a Covered Cause of Loss" as the term is defined in the Northfield Policy.

149. Because each of the above-referenced elements for coverage under the Policy is satisfied, Northfield is therefore required under its Policy to pay for all of the property damaged, and associated loss at the Commerce Building up to the Policy limits.

150. Northfield has breached its contractual obligations to pay Miller under the terms of its Policy for Miller's losses, as a consequence of Northfield's April 30, 2018 Denial Letter.

151. As a direct and proximate cause of Northfield's breach of contract, Miller has suffered, and continues to suffer, damages in an amount subject to proof at trial but which exceed the jurisdictional amount of this Court. Additionally, Miller is entitled to all direct, indirect, consequential, interest, special and compensatory damages as a result of Northfield's continuing breaches of contract.

## SECOND CAUSE OF ACTION

Breach of Implied Covenant of Good Faith and Fair Dealing

(Against Defendant and DOES 1-10)

152. Plaintiff realleges and incorporates by reference each and every allegation of the above paragraphs 1 through 151, inclusive, as if fully set forth herein.

153. Implied in the Northfield Policy is a covenant that Northfield would act in good faith and deal fairly with its Insured, that Northfield would do nothing to interfere with the rights of the Insured to receive the benefits of the Policy, which includes making its coverage determinations while at least giving the same level of consideration to Miller's interests as it gives to its own interests. As part of its duties, Northfield must therefore act reasonably in connection with its investigation, determining the scope and amount of loss and interesting the terms of its

Policy and applicable statutes. This includes Northfield having to look for possible covered bases, not just excluded bases, for coverage. Instead of complying with these duties, Northfield acted in bad faith when, among other things, it:

a. Denied coverage for the Commerce Building on the purported ground that it was vacant even though it had known of this issue before insuring the property;

b. Despite knowing there was a likelihood the building was vacant, it failed to disclose the issue to the Insured to get any uncertainty about the building being vacant clarified, and then sat on the information as its "ace in the hole" if any covered loss ensued;

c. To the extent Northfield asserts it needed more information to determine if the Commerce Building was, in fact, vacant, it intentionally decided to make no further inquiries to obtain that information, which was unreasonable and in bad faith;

d. Northfield also engaged in concealment (deceit) of all of Northfield's insurability issues when it only partially disclosed by mentioning the broken window issues and requiring that they be replaced, but not disclosing its conclusion that the building was vacant. The full disclosure was required both under a strict reading of the insurability inspection condition and under California common law requiring full disclosure on a given subject if a party speaks at all;

e. Denied coverage for the Commerce Building even though it knew there was a factual basis for concluding the Commerce Building was not vacant;

f. Failed to reconsider its denial for the Commerce Building even after it was informed about the inadequacies and errors made in connection with its expert's investigation;

g. Denied coverage for the Commerce Building by putting the burden upon Miller to establish the existence of non-excluded risks and maintaining that position even after it was provided with case law showing that position was incorrect;

h. Continuing to rely upon its expert consultants and failing to reconsider its prior denials even after it became aware of the numerous flaws, mistakes, errors, misstatements and misrepresentations that its consultants made in connection with determining the cause of the loss and the scope of the repair work needed to repair the damages sustained;

i. On information and belief, having an understanding with its expert consultants that the consultants were charged with coming up with opinions that would support Northfield's no-coverage position(s) irrespective of the facts and controlling engineering and scientific principles;

j. Unreasonably interpreting various Policy provisions, including but not limited to "vacancy" and "collapse" provisions in the Policy, in a manner contrary to California's rules of contract interpretation for purposes of improperly denying coverage and/or reducing the extent of its coverage obligations;

k. Unreasonably ignoring facts known to Northfield that undermine its reliance on the "vacancy" and "collapse" provisions in the Policy for purposes of denying and/or minimizing the amount of covered damage owed; and

l. Northfield's improper attempt to make a misleading record that provided Northfield with "factual" support for its April 30, 2018 Denial, through its extensive references to and reliance upon purported statements made by Michael Van Volkom ("Van Volkom"), a representative of Miller. The reality was – which Northfield conveniently omitted from its denial – that Van Volkom had expressly and unequivocally told Northfield's adjuster, a Mr. Baker, that he was ***not*** the one responsible for day-to-day management of the Commerce Building property, and ***only was guessing*** regarding the tenant's use or occupancy thereof;

m. Northfield's assertion that "customary operations" for purposes of determining whether the Vacancy Restriction applied was determined by considering the Commerce Building's use as an "office", when Northfield knew from its own investigation that the tenant for the Commerce Building used it as a warehouse and distribution center for his seasonal toy business;

n. For other conduct by Northfield as pleaded herein and/or which may later be discovered or revealed during the course of this litigation, which a trier of fact may deem to be unreasonable and therefore, in bad faith.

154. In breach of the implied covenant of good faith and fair dealing, Northfield did things and committed the acts alleged above for the purpose of consciously withholding from

Miller the contractual rights and benefits to which he is and was entitled to under the Policy. Northfield's acts are inconsistent with the reasonable expectations of the Insured, are contract to the well-established claims practices and legal requirements, are contrary to the express terms of the Policy, and constitute bad faith.

155. Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal.3d 813 (1985), Miller is entitled to recover all attorneys' fees that he reasonably incurred, and continues to incur, in his efforts to obtain the benefits of insurance that have been, and continues to be, wrongfully and in bad faith withheld by Northfield.

156. As a direct and proximate result of Northfield's acts, Miller has been damaged in an amount in excess of the Court's jurisdictional limits. Indeed, the damages proximately caused by Northfield's bad-faith conduct includes but is not limited to extra-contractual losses sustained by Miller as a consequence of Northfield's bad-faith conduct.

157. Northfield's conduct is despicable and has been done with a conscious disregard of Miller's rights, constituting oppression, fraud, and/or malice, in that Northfield engaged in a serious of acts designed to deny Miller the benefits due him under the Northfield Policy. Specifically, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarding the rights of its Insured, Northfield ignored the interests and concerns of Miller with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, Miller is entitled to recover punitive damages from Northfield in an amount that is sufficient to punish and make an example of Northfield and in order to deter similar misconduct in the future.

158. Northfield's conduct is especially egregious regarding vacancy as a defense because it holds itself out as being an insurer that insures vacant buildings. Specifically, one of the hard to place risks that Northfield advertises on its website that it "specializes in" is placing coverage for "vacant buildings/vacant land". (Hawkeye also says this on its website.) Northfield therefore was in the market of insuring vacant buildings, such as the Commerce Building, and could easily have priced the cost, including back to the Policy's inception, of any additional premiums for a Vacancy Permit, which in the Policy it issued, Northfield says – if present- will

make policy's vacancy clauses inapplicable. In other words, in addition to cancelling the Policy because of vacancy, Northfield was in a position to also insure the "vacant" Commerce Building, yet it did neither.

**PRAYER FOR RELIEF**

WHEREFORE, Miller demands Judgment as follows:

**AS TO THE FIRST CAUSE OF ACTION**

1. For all compensatory and consequential damages according to proof at trial.

**AS TO THE SECOND CAUSE OF ACTION**

2. For all compensatory and consequential damages according to proof at trial.

3. For attorneys' fees and costs of suit in obtaining benefits under the Northfield Policy, pursuant to *Brandt v. Superior Court*, 37 Cal.3d 813 (1985).

4. For punitive damages in an amount appropriate to punish Northfield and deter others from similar misconduct.

**ON ALL CAUSES OF ACTION**

1. For prejudgment and post-judgment interest according to law; and

2. For costs of suit incurred herein; and

3. For such other and further relief as the Court may deem appropriate.

DATED this 15th day of March, 2022

**FORTIS LLP**

*/s/ Stanley H. Shure*

Stanley H. Shure
Attorneys for Plaintiff
LANCE MILLER dba WESTHILL
PROPERTY MANAGEMENT

**DEMAND FOR JURY TRIAL**

Plaintiff LANCE MILLER dba WESTHILL PROPERTY MANAGEMENT hereby demands a trial by jury on all claims.

DATED this 15th day of March, 2022

**FORTIS LLP**

*/s/ Stanley H. Shure*

Stanley H. Shure
Attorneys for Plaintiff
LANCE MILLER dba WESTHILL
PROPERTY MANAGEMENT

# EXHIBIT "A"

**Northfield Insurance Company**
385 Washington Street, St. Paul, MN 55102
1-800-237-9334 Claims: 1-800-328-5972

# COMMERCIAL INSURANCE POLICY

**Your Policy Number:** WS324766

This policy consists of this policy cover, the Declarations and the forms, schedules and endorsements listed. READ YOUR POLICY CAREFULLY.

In return for the payment of the premium, the insuring company agrees with the Named Insured to provide the insurance afforded by this policy. That insurance will be provided by the company indicated as insuring company in the Declarations.

**In Witness Whereof,** we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative for us.

Wendy C. Skjerven
Secretary

Brian MacLean
President

# NOTICES

| |
|---|
| IMPORTANT: THIS POLICY IS NOT SUBJECT TO FLAT CANCELLATION. |

| |
|---|
| THIS POLICY IS SUBJECT TO AUDIT. EXPOSURES GREATER THAN THOSE ESTIMATED ON THIS POLICY WILL RESULT IN ADDITIONAL PREMIUM WHICH WILL BE DUE AND PAYABLE UPON RECEIPT OF BILLING. |

# NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 (Effective January 1, 2017)

## IMPORTANT NOTICE REGARDING COMPENSATION DISCLOSURE

For information about how Northfield compensates its agents, brokers and program managers, please visit this website:

http://www.northlandins.com/Producer_Compensation_Disclosure.asp

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Northfield Insurance Company, c/o Law Department, 385 Washington St., St. Paul, MN 55102.

N-3384 (7/08)

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:
   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.
3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.
4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

 Copyright, Insurance Services Office, Inc. 1998 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".


Copyright, ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 Copyright, ISO Properties, Inc., 2007 

Northfield Insurance Company
St. Paul, MN 55102

# COMMON POLICY DECLARATIONS

Policy No: WS324766
Agency No: 412000001 Producer No: Previous Policy No: WS282922

**POLICY PERIOD:** **From** 06/25/2017 **To** 06/25/2018 **Term:** 1 Year
**at 12:01 A.M. at your mailing address shown below.**

**Named Insured:**
Lance Miller / Westhill Property Management Co. DBA Lance Miller

**Mailing Address:** 220 26th St
Suite 200
Santa Monica CA 90402

**BUSINESS DESCRIPTION:** Lessor's risk

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| COVERAGE PART DESCRIPTION | PREMIUM |
|---|---|
| Commercial General Liability Coverage Part | $ 1,116.00 |
| Commercial Property Coverage Part | $ 2,590.00 MP |
| **PREMIUM TOTAL** | $ 3,706.00 |
| Policy Fee | $ 175.00 |
| Inspection Fee | $ 175.00 |
| Stamping Fee | $ 7.41 |
| Surplus Lines Tax | $ 111.18 |
| **POLICY TOTAL** | $ 4,174.59 |

Minimum earned premium of 25% of the policy premium applies in the event of cancellation.
Policy Fee is fully earned at inception and non-refundable in the event of flat cancellation.
Inspection Fee is fully earned at inception and non-refundable in the event of flat cancellation.

**FORMS AND ENDORSEMENTS**

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

Agency Name/Address: 949-954-5126
Hawkeye Wholesale Insurance Services, Inc.
17744 Sky Park Circle
Suite 205
Irvine, CA 92614

Countersigned: 07/06/2017 SH By [signature]
Date Authorized Representative


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# SCHEDULE OF FORMS AND ENDORSEMENTS

**Effective Date:** 06/25/2017 **Policy No:** WS324766

**Named Insured:**
Lance Miller / Westhill Property Management Co. DBA Lance Miller

**The following schedule of coverage declarations, forms and endorsements make up your policy as of the effective date shown above.**

**COMMON POLICY DECLARATIONS - S1D-IL (9/05)**
The following forms and endorsements apply to coverage parts as stated on the form or endorsement:

| | |
|---|---|
| S1-IL (9/05) | Commercial Insurance Policy |
| N-3384 (7/08) | Important Notice - Producer Compensation |
| IL 00 17 (11/98) | Common Policy Conditions |
| IL 00 21 (09/08) | Nuclear Energy Liability Exclusion Endorsement |
| S1D-IL (9/05) | Common Policy Declarations |
| S1D-ILS (9/05) | Schedule of Forms and Endorsements |
| S1030-IL (7/08) | Service of Suit |
| IL T4 14 (01/15) | Cap on Losses From Certified Acts of Terrorism |
| S2765-IL (1/14) | Amendment - Minimum Earned Premium |
| S2965-IL (3/15) | Amendment of Common Policy Conditions Prohibited Coverage - Unlicensed Insurance and Trade or Economic Sanctions |
| S2976-IL (8/15) | Exclusion Of Loss Due To Virus Or Bacteria |
| IL 09 35 (07/02) | Exclusion of Certain Computer-Related Losses |

**COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS - S2584D-CG (9/05)**
The following forms and endorsements apply to the Commercial General Liability Coverage Part only:

| | |
|---|---|
| S2584D-CG (9/07) | Commercial GL Coverage Part Declarations |
| CG 00 01 (12/07) | General Liability Coverage Form |
| S17-CG (7/09) | Limitation - Classification |
| S21-CG (6/16) | Deductible Liability Insurance |
| S23-CG (1/13) | Exclusion - Assault or Battery |
| S42-CG (2/16) | Total Pollution Exclusion with Exceptions for Building Heating, Cooling, Dehumidifying and Personal Hot Water Heating Equipment and Hostile Fire |
| S46-CG (2/16) | Exclusion - Independent Contractors |
| S94-CG (4/14) | Exclusion - Injury to Employees, Workers or Contracted Persons of Insureds or Contracted Organizations |
| S267-CG (6/14) | Combination Endorsement Bodily Injury and Property Damage Liability |
| S2582-CG (1/13) | Exclusion - Aircraft, Auto or Watercraft |
| S2612-CG (12/11) | Amendment - Non-Renewal |
| IL T3 68 (01/15) | Federal Terrorism Risk Insurance Act Disclosure |

# SCHEDULE OF FORMS AND ENDORSEMENTS

| | |
|---|---|
| S2623-CG (6/14) | Combination Endorsement Personal and Advertising Injury Liability |
| S2874-CG (2/14) | Exclusion - Animals |
| S2961-CG (6/14) | Exclusion - Cannabis or Marijuana - Absolute |
| S2996-CG (5/16) | Exclusion - Cross Liability - Broad Form |
| CG 21 36 (03/05) | Exclusion - New Entities |
| CG 21 39 (10/93) | Contractual Liability Limitation |
| CG 21 44 (04/17) | Limitation of Coverage to Designated Premises, Project or Operation |
| S43-CG (1/14) | Exclusion - Punitive or Exemplary Damages |
| S49-CG (10/04) | Exclusion - Voluntary Labor |
| S56-CG (10/04) | Amendment - Deposit Premium and Minimum Premium |
| S311-CG (3/11) | Exclusion - Professional Services |

**COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS - S9D-CP (9/05)**
The following forms and endorsements apply to the Commercial Property Coverage Part only:

| | |
|---|---|
| S9D-CP (9/05) | Commercial Property Coverage Part Declarations |
| CP 00 10 (10/12) | Building and Personal Property Coverage Form |
| CP 00 30 (10/12) | Business Income (and Extra Expense) Coverage Form |
| CP 00 90 (07/88) | Commercial Property Conditions |
| CP 10 30 (10/12) | Causes of Loss - Special Form |
| S69-CP (11/16) | Endorsement - Vacancy Restriction and Fungus Exclusion Changes |
| CP T3 81 (01/15) | Federal Terrorism Risk Insurance Act Disclosure |
| S2649-CP (9/06) | Multiple Deductible Form |
| S2983-CP (11/15) | Theft Exclusion |
| CP 02 99 (06/07) | Cancellation Changes |
| CP 12 70 (09/96) | Joint or Disputed Loss Agreement |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SERVICE OF SUIT

This policy is subject to the following:

In the event of our failure to pay any amount claimed to be due hereunder, we, at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practices of such court.

The service of process in such suit may be made upon our President or his nominee, at 385 Washington Street, St. Paul, MN 55102 and that in any suit instituted against one of them upon this contract, we will abide by the final decision of such court or of any Appellate court in the event of an appeal.

The above named are authorized and directed to accept service of process on our behalf in any such suit and/or upon the request of the Insured (or reinsured) to give a written undertaking to the Insured (or reinsured) that they will enter a general appearance upon our behalf in the event that a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his/her successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

*Special rule for California.* For the State of California we authorize CSC - Lawyers Incorporating Services, 2730 Gateway Oaks Drive, Suite 100, Sacramento, CA 95833 to be served and to mail us the papers.

*Special rule for Rhode Island.* For the State of Rhode Island we authorize Corporate Service Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888 to be served and to mail us the papers.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CYBERFIRST ESSENTIALS LIABILITY COVERAGE PART
CYBERFIRST LIABILITY COVERAGE
DELUXE PROPERTY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY+ WITH IDENTITY FRAUD EXPENSE REIMBURSEMENT COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EQUIPMENT BREAKDOWN COVERAGE PART
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE
LAW ENFORCEMENT LIABILITY COVERAGE PART
LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDFIRST PRODUCTS/COMPLETED OPERATIONS, ERRORS AND OMISSIONS, AND INFORMATION SECURITY LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PUBLIC ENTITY MANAGEMENT LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF TRANSPORTATION
TRIBAL BUSINESS MANAGEMENT LIABILITY COVERAGE PART
Any other Coverage Part or Coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended

The following is added to this policy. This provision can limit coverage for any loss arising out of a "certified act of terrorism" if such loss is otherwise covered by this policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of "certified acts of terrorism" in another endorsement to this policy.

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our insurer deductible under "TRIA", we will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of "TRIA", to be an act of terrorism pursuant to "TRIA". The criteria contained in "TRIA" for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to "TRIA"; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"TRIA" means the federal Terrorism Risk Insurance Act of 2002 as amended.

© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT - MINIMUM EARNED PREMIUM

*This endorsement is **EFFECTIVE** 06/25/2017 *and is part of Policy Number: WS324766

*issued to: Lance Miller / Westhill Property Management Co. DBA Lance Miller

*Entry optional if shown in the Common Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following is added to the Common Policy Conditions:

**Minimum Earned Premium**

If this insurance is cancelled at your request, we will retain a minimum earned premium in addition to all fully earned premiums and, if applicable, 100% of all fees. After reduction for all fully earned premiums and applicable fees, we will calculate the minimum earned premium by one of the following three methods, whichever is shown by entry below:

**(1)** __25__ % of the remaining premium for this insurance.

**(2)** $ ________________.

**(3)** _____ % of the remaining premium for this insurance or $ ________________ , whichever is greater.

We will consider cancellation of this insurance for nonpayment of premium to be a request by the first Named Insured for cancellation of this insurance.

The provisions of this amendment apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the minimum earned premium.


© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF COMMON POLICY CONDITIONS - PROHIBITED COVERAGE - UNLICENSED INSURANCE AND TRADE OR ECONOMIC SANCTIONS

This endorsement modifies insurance provided under the following:

ALL COVERAGES INCLUDED IN THIS POLICY

The following is added to the Common Policy Conditions:

**Prohibited Coverage - Unlicensed Insurance**

**1.** With respect to loss sustained by any insured, or loss to any property, located in a country or jurisdiction in which we are not licensed to provide this insurance, this insurance does not apply to the extent that insuring such loss would violate the laws or regulations of such country or jurisdiction.

**2.** We do not assume responsibility for:

**a.** The payment of any fine, fee, penalty or other charge that may be imposed on any person or organization in any country or jurisdiction because we are not licensed to provide insurance in such country or jurisdiction; or

**b.** The furnishing of certificates or other evidence of insurance in any country or jurisdiction in which we are not licensed to provide insurance.

**Prohibited Coverage - Trade Or Economic Sanctions**

We will provide coverage for any loss, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose us or any of our affiliated or parent companies to:

**1.** Any trade or economic sanction under any law or regulation of the United States of America; or

**2.** Any other applicable trade or economic sanction, prohibition or restriction.


© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense, rental value or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.


© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** We will not pay for loss ("loss") or damage caused directly or indirectly by the following. Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

**1.** The failure, malfunction or inadequacy of:

**a.** Any of the following, whether belonging to any insured or to others;

**(1)** Computer hardware, including microprocessors;

**(2)** Computer application software;

**(3)** Computer operating systems and related software;

**(4)** Computer networks;

**(5)** Microprocessors (computer chips) not part of any computer system; or

**(6)** Any other computerized or electronic equipment or components; or

**b.** Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph **A.1.a.** of this endorsement;

due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

**2.** Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph **A.1.** of this endorsement.

**B.** If an excluded Cause of Loss as described in Paragraph **A.** of this endorsement results:

**1.** In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

**2.** Under the Commercial Property Coverage Part:

**a.** In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss - Special Form; or

**b.** In a Covered Cause of Loss under the Causes Of Loss - Basic Form or the Causes Of Loss - Broad Form;

we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

**C.** We will not pay for repair, replacement or modification of any items in Paragraphs **A.1.a.** and **A.1.b.** of this endorsement to correct any deficiencies or change any features.


Copyright, ISO Properties, Inc., 2001

Northfield Insurance Company
St. Paul, MN 55102

# COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Effective Date:** 06/25/2017 12:01 A.M. at your mailing address **Policy No:** WS324766

**Named Insured:**
Lance Miller / Westhill Property Management Co. DBA Lance Miller

## LIMITS OF INSURANCE

| | | |
|---|---|---|
| Each Occurrence Limit | $ 1,000,000 | |
| Damage To Premises Rented To You Limit | $ 100,000 | Any One Premises |
| Medical Expense Limit | $ 5,000 | Any One Person |
| Personal and Advertising Injury Limit | $ 1,000,000 | Any One Person or Organization |
| General Aggregate Limit | $ 2,000,000 | |
| Products/Completed Operations Aggregate Limit | $ 1,000,000 | |

## BUSINESS INFORMATION

Form of Business: ☒ Individual ☐ Joint Venture ☐ Partnership ☐ Limited Liability Company ☐ Trust
☐ Organization, including a Corporation (but not including a partnership, joint venture, trust or limited liability company.)

| Loc. # | Address of All Premises (Including Zip Code) That You Own, Rent or Occupy | | | |
|---|---|---|---|---|
| 001 | 9938 Commerce Ave | Tujunga | CA | 91042 |
| 002 | 4206 Santa Monica Blvd<br>4206-4210 Santa Monica Blvd | Los Angeles | CA | 90029 |

## PREMIUM

| Loc. # | Classification | Code No. | Premium Base | | Rate Pr/CO | Rate All Other | Advance Premium Pr/CO | Advance Premium All Other |
|---|---|---|---|---|---|---|---|---|
| 001 | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured - (lessor's risk only) - For Profit. - Products-completed operations are subject to General Aggregate Limit. | 61217 | a+ | 5,500 | Included | 106.908 | $ Included | $ 588.00 |
| 002 | Buildings or Premises - bank or office - mercantile or manufacturing - maintained by the insured - (lessor's risk only) - For Profit. - Products-completed operations are subject to General Aggregate Limit. | 61217 | a+ | 4,938 | Included | 106.908 | $ Included | $ 528.00 |

Subline Premiums $ .00 $ 1,116.00
Total Advance Premium $ 1,116.00

## FORMS AND ENDORSEMENTS

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

When used as a premium base:
**"Area"** (premium basis symbol a) means:
The total number of square feet of floor space at the insured premises, computed as follows:

1. For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:
   a. Courts and mezzanine types of floor openings.
   b. Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.
2. For tenants, determine the area they occupy in the same manner as for the entire buildings.
3. The rates apply per 1,000 square feet of area.

**"Total Cost"** (premium basis symbol c) means:
The total cost of all work let or sublet in connection with each specific project including:

1. The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work, however, do not include the cost of finished equipment installed but not furnished by the subcontractor if the subcontractor does no other work on or in connection with such equipment; and
2. All fees, bonuses or commissions made, paid or due.
3. The rates apply per $1,000 of total cost.

**"Admissions"** (premium basis symbol m) means:
The total number of persons, other than employees of the named insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.
The rates apply per 1,000 admissions.
**"Payroll"** (premium basis symbol p) means:

1. Commissions;
2. Bonuses;
3. Extra pay for overtime work, except as provided in Paragraph 17;
4. Pay for holidays, vacations or periods of sickness;
5. Payment by an employer of amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as the Federal Social Security Act;
6. Payment to employees on any basis other than time worked, such as piecework, profit sharing or incentive plans;
7. Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations to the insured;
8. The rental value of an apartment or a house provided for an employee based on comparable accommodations;
9. The value of lodging, other than an apartment or house, received by employees as part of their pay, to the extent shown on the insureds records;
10. The value of meals received by employees as part of their pay to the extent shown in the insured's records;
11. The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;
12. The payroll of mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;
13. The payroll of executive officers of a corporation and individual insureds and co-partners. For the purposes of payroll determination, managers of limited liability companies shall be considered executive officers and members of limited liability companies shall be considered co-partners.
    The executive officers of a corporation are those persons holding any of the officer positions created by the named insured's charter, constitution or by-laws or any other similar governing document.
    The payroll of all executive officers of a corporation and individual insureds or co-partners engaged principally in clerical operations or as salespersons, and officers and co-partners who are inactive for the entire policy period, shall not be included for premium purposes.
    For part-time or seasonal businesses the payroll amounts may be reduced by 2 percent for each full calendar week in excess of twelve during which the risk performs no operations.
14. The payroll of leased workers furnished to the named insured by a labor leasing firm. Premium on such payroll shall be based on the classifications and rates which would have applied if the leased workers had been the direct employees of the named insured. If payroll is unavailable, use 100% of the total cost of the contract for leased workers as the payroll of leased workers. The premium shall be charged on that amount as payroll.
    If investigation of a specific employee leasing contract discloses that a definite amount of the contract price represents payroll, such amount shall be considered payroll for premium computation purposes.
15. Fees paid to employment agencies for temporary personnel provided to the insured.
16. Payroll does not include:
    a. Tips and other gratuities received by employees;
    b. Payments by an employer to group insurance or group pension plans for employees other than payments covered by Paragraph 5. above.
    c. The value of special rewards for individual invention or discovery;
    d. Dismissal or severance payments except for time worked or accrued vacation;
    e. The payroll of clerical office employees. Clerical office employees are those employees who work in an area which is physically separated by walls, floors or partitions from all other work areas of the insured and whose duties are strictly limited to keeping the insured's books or records or conducting correspondence, including any other employees engaged in clerical work in the same area;
    f. The payroll of salesmen, collectors or messengers who work principally away from the insured's premises.
       Salesmen, collectors or messengers are those employees engaged principally in any such duties away from the premises of the employer;
       Exception: This term does not apply to any employee whose duties include the delivery of any merchandise handled, treated or sold.
    g. The payroll of drivers and their helpers if their principal duties are to work on or in connection with automobiles.
    h. The payroll of aircraft pilots or co-pilots if their principal duties are to work on or in connection with aircraft in either capacity.
    i. The payroll of draftsmen if their duties are limited to office work only and who are engaged strictly as draftsmen in such a manner that they are not exposed to the operative hazards of the business. The payroll of these draftsmen shall be assigned to the classification "Draftsmen" - Code 91805.
17. **Overtime**
    a. Definition
       Overtime means those hours worked for which there is an increase in the rate of pay:
       (1) For work in any day or in any week in excess of the number of hours normally worked; or
       (2) For hours worked in excess of 8 hours in any day or 40 hours in any week; or
       (3) For work on Saturdays, Sundays or holidays.
       In the case of guaranteed wage agreements, overtime means only those hours worked in excess of the number specified in such agreement.
    b. Exclusion Of Overtime Payroll
       The extra pay for overtime shall be excluded from the payroll on which premium is computed as indicated in (1) or (2), provided the insured's books and records are maintained to show overtime pay separately by employee and in summary by classification.
       (1) If the records show separately the extra pay earned for overtime, the entire extra pay shall be excluded.
       (2) If the records show the total pay earned for overtime (regular pay plus overtime pay) in one combined amount, 1/3 of this total pay shall be excluded. If double time is paid for overtime and the total pay for such overtime is recorded separately, 1/2 of the total pay for double time shall be excluded.
       Exclusion of overtime pay does not apply to payroll assigned to the "Stevedoring" classifications.
       The rates apply per $1,000 of payroll.

**"Gross Sales"** (premium basis symbol s) means:

a. The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:
   (1) All goods or products, sold or distributed;
   (2) Operations performed during the policy period;
   (3) Rentals; and
   (4) Dues and fees.
b. Inclusions
   The following items shall not be deducted from gross sales:
   (1) Foreign exchange discounts;
   (2) Freight allowance to customers;
   (3) Total sales of consigned goods and warehouse receipts;
   (4) Trade or cash discounts;
   (5) Bad debts; and
   (6) Repossession of items sold on installments (amount actually collected).
c. Exclusions
   The following items shall be deducted from gross sales:
   (1) Sales or excise taxes which are collected and submitted to a governmental division;
   (2) Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;
   (3) Finance charges for items sold on installments;
   (4) Freight charges on sales if freight is charged as a separate item on customer's invoice;
   (5) Royalty income from patent rights or copyrights which are not product sales; and
   (6) Rental receipts from products liability coverage only.
d. The rates apply per $1,000 of gross sales.

**"Units"** (premium basis symbol u) means:
A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone. The rates apply per each unit

Premium basis symbol t means: Refer to classification description.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** - Definitions.

**SECTION I - COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

 Copyright, ISO Properties, Inc., 2006 

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;


Copyright, ISO Properties, Inc., 2006

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for;

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:


Copyright, ISO Properties, Inc., 2006

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate rate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** - Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a sub-contractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting an your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.


Copyright, ISO Properties, Inc., 2006

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** - Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed to the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of the oral or written publication of material whose first publication took place before the beginning of the policy period.

 Copyright, ISO Properties, Inc., 2006 

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of any insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand or order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.


Copyright, ISO Properties, Inc., 2006

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazards**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.


Copyright, ISO Properties, Inc., 2006

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II - WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.


Copyright, ISO Properties, Inc., 2006

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers," any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B**.


Copyright, ISO Properties, Inc., 2006

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.


Copyright, ISO Properties, Inc., 2006

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date of the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.


Copyright, ISO Properties, Inc., 2006

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purposes of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.


Copyright, ISO Properties, Inc., 2006

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;


Copyright, ISO Properties, Inc., 2006

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement."

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.


Copyright, ISO Properties, Inc., 2006

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, factors or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee," and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.


Copyright, ISO Properties, Inc., 2006

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIMITATION - CLASSIFICATION

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A.** The following is added to Paragraph **1.b., Insuring Agreement** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

This insurance applies to "bodily injury" and "property damage" caused by only those operations which are classified and shown on the Commercial General Liability Coverage Declarations, its endorsements, and supplements.

**B.** The following is added to Paragraph **1.b., Insuring Agreement** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance applies to "personal and advertising injury" caused by only those operations which are classified and shown on the Commercial General Liability Coverage Declarations, its endorsements, and supplements.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY INSURANCE

*This endorsement is **EFFECTIVE** 06/25/2017 *and is part of Policy Number: WS324766

*issued to: Lance Miller / Westhill Property Management Co. DBA Lance Miller

*Entry optional if shown in the Policy Declarations. If no entry is shown, the effective date of the endorsement is the same as the effective date of the policy.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE OF DEDUCTIBLES**

| **Coverage** | **Amount of Deductible** | | |
|---|---|---|---|
| Bodily Injury Liability | $ | | Each Claim |
| | $ | | Each Occurrence |
| Property Damage Liability | $ | | Each Claim |
| | $ | | Each Occurrence |
| Bodily Injury Liability and Property Damage Liability Combined | $ | | Each Claim |
| | $ | 500 | Each Occurrence |
| Personal and Advertising Injury Liability | $ | | Each Claim |

**PROVISIONS**

The following Section is added:

**DEDUCTIBLE LIABILITY INSURANCE**

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, and Personal and Advertising Injury Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amount shown in the Schedule Of Deductibles as applicable to such coverages.

2. The applicable limit of insurance will be reduced by the amount of any damages within the deductible amount. Any aggregate limit will not be reduced by the application of the deductible amount.

3. The deductible amount will also apply towards handling, investigation, adjustment, and legal expenses, even when no payment is made to the claimant, when a compromise settlement is reached, or when the claim is denied.

4. The deductible amount shown in the Schedule Of Deductibles applies as follows:

   **a.** Each Claim. If the deductible amount is shown as Each Claim, the deductible amount applies as follows:

   **(1)** Under Bodily Injury Liability coverage, to all damages because of "bodily injury" sustained by any one person as a result of any one "occurrence".

   **(2)** Under Property Damage Liability, to all damages because of "property damage" sustained by any one person or organization as a result of any one "occurrence".


© 2016 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**(3)** Under Bodily Injury Liability and Property Damage Liability combined, to all damages because of "bodily injury" and "property damage" sustained by any one person or organization as a result of any one "occurrence".

**(4)** Under Personal and Advertising Injury Liability, to all damages because of "personal and advertising injury" sustained by any one person or organization.

**b.** Each Occurrence. If the deductible amount is shown as Each Occurrence, the deductible amount applies as follows:

**(1)** Under Bodily Injury Liability, to the sum of all damages because of "bodily injury" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**(2)** Under Property Damage Liability, to the sum of all damages because of "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**(3)** Under Bodily Injury Liability and Property Damage Liability combined, to the sum of all damages because of all "bodily injury" and "property damage" as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**5.** The terms of this insurance, including those with respect to:

**a.** Our right and duty to defend the insured against any "suits" seeking those damages; and

**b.** Your duties in the event of an "occurrence", claim or "suit";

apply irrespective of the application of the deductible amount.

**6.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you will promptly reimburse us for the part of the deductible amount paid by us.


© 2016 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION - ASSAULT OR BATTERY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1. The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

   **Assault Or Battery**

   "Bodily injury" or "property damage" arising out of any act of "assault" or "battery" committed by any person, including any act or omission in connection with the prevention or suppression of such "assault" or "battery".

2. The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

   **Assault Or Battery**

   "Personal and advertising injury" arising out of any act of "assault" or "battery" committed by any person, including any act or omission in connection with the prevention or suppression of such "assault" or "battery".

3. The following is added to the **DEFINITIONS** Section:

   "Assault" means any attempt or threat to inflict injury to another, including any conduct that would reasonably place another in apprehension of such injury.

   "Battery" means any intentional, reckless or offensive physical contact with, or any use of force against, a person without his or her consent that inflicts some injury, regardless of whether the resulting injury inflicted is intended or expected.


© 2013 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH EXCEPTIONS FOR BUILDING HEATING, COOLING, DEHUMIDIFYING AND PERSONAL HOT WATER HEATING EQUIPMENT AND HOSTILE FIRE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1. The following replaces Exclusion **f.**, **Pollution**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

   **f. Pollution**

   **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants".

   This paragraph does not apply to:

   **(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or produced by or originating from equipment that is used to heat water for personal use by the building's occupants or their guests; or

   **(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

   **(i)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

   **(ii)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are or were at any time performing operations to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

   **(2)** Any loss, cost or expense arising out of any:

   **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   **(b)** Claim or "suit" by or on behalf of a government authority or others because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

2. The following replaces the last paragraph of Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

   Exclusions **c.** through **e.** and **g.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in **SECTION III - LIMITS OF INSURANCE.**

© 2016 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - INDEPENDENT CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

   **Independent Contractors**

   "Bodily injury" or "property damage" arising out of the operations of any independent contractor performed for or on behalf of any insured.

2. The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

   **Independent Contractors**

   "Personal and advertising injury" arising out of the operations of any independent contractor performed for or on behalf of any insured.

© 2016 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - INJURY TO EMPLOYEES, WORKERS OR CONTRACTED PERSONS OF INSUREDS OR CONTRACTED ORGANIZATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**1.** The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Bodily Injury To Employees, Workers Or Contracted Persons Of Insureds Or Contracted Organizations**

This insurance does not apply to "bodily injury" to:

**(1)** Any person who is an "employee", "leased worker", "temporary worker" or "volunteer worker" of you or any insured arising out of and in the course of:

**(a)** Employment by you or any insured; or

**(b)** Performing duties related to the conduct of your or any insured's business;

**(2)** Any person who contracted with you or with any insured for services arising out of and in the course of performing duties related to the conduct of your or any insured's business;

**(3)** Any person who is employed by, is leased to or contracted with any organization that:

**(a)** Contracted with you or with any insured for services; or

**(b)** Contracted with others on your behalf for services;

arising out of and in the course of employment by that organization or performing duties related to the conduct of that organization's business; or

**(4)** The spouse, child, parent, brother or sister of any of those persons as a consequence of the "bodily injury" described in Paragraphs **(1)**, **(2)** or **(3)** above.

For the purposes of this exclusion, contracted includes entering into an oral or written contract.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

**2.** The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Injury To Employees, Workers Or Contracted Persons Of Insureds Or Contracted Organizations**

This insurance does not apply to "personal and advertising injury" to:

**(1)** Any person who is an "employee", "leased worker", "temporary worker" or "volunteer worker" of you or any insured arising out of and in the course of:

**(a)** Employment by you or any insured; or

**(b)** Performing duties related to the conduct of your or any insured's business;


© 2014 The Travelers Indemnity Company. All rights reserved.

**(2)** Any person who contracted with you or with any insured for services arising out of and in the course of performing duties related to the conduct of your or any insured's business;

**(3)** Any person who is employed by, is leased to or contracted with any organization that:

**(a)** Contracted with you or with any insured for services; or

**(b)** Contracted with others on your behalf for services;

arising out of and in the course of employment by that organization or performing duties related to the conduct of that organization's business; or

**(4)** The spouse, child, parent, brother or sister of any of those persons as a consequence of the "personal and advertising injury" described in Paragraphs **(1)**, **(2)** or **(3)** above.

For the purposes of this exclusion, contracted includes entering into an oral or written contract.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.


© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMBINATION ENDORSEMENT

# BODILY INJURY AND PROPERTY DAMAGE LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A. AMENDMENT OF EXCLUSIONS**

**1. EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY**

The following replaces Exclusion **p.**, **Electronic Data**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

"Bodily injury" and "property damage" arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access or inability to manipulate data, including information, facts or programs in any electronic or other format.

**2. EXCLUSION - UNSOLICITED COMMUNICATION**

The following replaces Exclusion **q.**, **Distribution Of Material In Violation Of Statutes**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**q. Unsolicited Communication**

"Bodily injury" or "property damage" arising out of any actual or alleged violation of any law that restricts or prohibits the sending, transmitting or distributing of "unsolicited communication".

**3. EXCLUSION - AIRCRAFT PRODUCTS AND GROUNDING**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Aircraft Products and Grounding**

"Bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any "aircraft product" or the "grounding" of any aircraft.

**4. EXCLUSION - ASBESTOS OR SILICA**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Asbestos or Silica**

"Bodily injury" or "property damage" arising out of the actual or alleged presence or actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation or respiration of:

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** Asbestos, asbestos fibers or products containing asbestos, provided that the "bodily injury" or "property damage" is caused, or contributed to, by the hazardous properties of asbestos; or

**(2)** Silica or products or substances containing silica.

**5. EXCLUSION - DISCRIMINATION**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Discrimination**

"Bodily injury" arising out of discrimination, whether intentional or unintentional, based upon a person's sex, sexual orientation, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

**6. EXCLUSION - EMPLOYMENT-RELATED PRACTICES**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Employment-Related Practices**

"Bodily injury" to:

**(1)** A person, other than an "independent contractor", arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment or "temporary worker" status; or

**(c)** Other practice, policy, act or omission related to that person's employment or "temporary worker" status, such as coercion, demotion, evaluation, reassignment, discipline, harassment, humiliation, discrimination, libel, slander, violation of the person's right of privacy, malicious prosecution or false arrest, detention or imprisonment, regardless of whether such practice, policy, act or omission occurs, is applied or is committed before, during or after the time of that person's employment or "temporary worker" status; or

**(2)** The spouse, child, parent, brother, sister, domestic partner or member of the household of that person as a consequence of "bodily injury" described in Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be held liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

**7. EXCLUSION - FUNGI OR BACTERIA**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Fungi or Bacteria**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to the "bodily injury" or "property damage".


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(2)** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**8. EXCLUSION - LEAD**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Lead**

**(1)** "Bodily injury" or "property damage" arising out of the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance.

**(2)** Any loss, cost or expense arising out of any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

**9. EXCLUSION - VIOLATION OF CONSUMER FINANCIAL PROTECTION LAWS**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Violation of Consumer Financial Protection Laws**

"Bodily injury" or "property damage" arising out of any actual or alleged violation of a "consumer financial protection law", or any other "bodily injury" or "property damage" alleged in any claim or "suit" that also alleges any such violation.

**B. AMENDMENT OF LIMITS OF INSURANCE - NONCUMULATION OF LIMITS**

The following replaces Paragraph **5.** of **SECTION III - LIMITS OF INSURANCE:**

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of all:

**a.** Damages under Coverage **A** because of all "bodily injury" and "property damage"; and

**b.** Medical expenses under Coverage **C** because of all "bodily injury";

arising out of any one "occurrence".

Noncumulation of Each Occurrence Limit - If any one "occurrence" causes:

**a.** "Bodily injury" or "property damage" to which this insurance applies; and

**b.** "Bodily injury" or "property damage" to which commercial general liability coverage included in one or more prior or future policies issued to you by us, or any of our affiliated insurance companies, applies;

this policy's Each Occurrence Limit applicable to that "occurrence" also will be reduced by the amount of each payment made because of the "bodily injury" or "property damage" described in Paragraph **b.** above by us or any of our affiliated insurance companies under, and within the applicable limit of insurance of, each such other policy.

**C. AMENDMENT OF CONDITIONS - OTHER INSURANCE**

**1.** The following replaces the part of the first paragraph of Paragraph **4., Other Insurance,** of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** that precedes Paragraph **a.:**


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

If valid and collectible other insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as described in Paragraphs **a.** and **b.** below.

As used anywhere in this Coverage Part, other insurance means insurance, or the funding of losses, that is provided by, through or on behalf of:

**(i)** Another insurance company;

**(ii)** Us or any of our affiliated insurance companies, except when the Noncumulation of Each Occurrence Limit provision of Paragraph **5.** of Section **III** - Limits Of Insurance applies or when the Noncumulation of Personal and Advertising Injury Limit provision of Paragraph **4.** of Section **III** - Limits of Insurance applies if that provision is part of this policy;

**(iii)** Any risk retention group;

**(iv)** Any self-insurance method or program, including any failure to buy insurance, or decision to not buy insurance, for any reason, in which case the insured will be deemed to be the provider of other insurance; or

**(v)** Any similar risk transfer or risk management method.

Other insurance does not include umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the Limits of Insurance shown in the Declarations for this Coverage Part.

2. The following replaces Paragraph **4.b., Excess Insurance,** of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**:

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

**(2)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

**(4)** If the loss arises out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft to the extent not subject to Exclusion **g.** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability; or

**(5)** That is available to the insured when the insured has been added as an additional insured by attachment of an endorsement under any other insurance or is any other insured that is not a named insured under such insurance.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any provider of other insurance has a duty to defend the insured against that "suit". If no provider of other insurance defends, we will undertake to do so, but we will be entitled to the insured's rights against all those providers of other insurance.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all such other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**D. AMENDMENT OF DEFINITIONS**

**1. COVERAGE TERRITORY**

The following replaces the definition of "coverage territory" in the **DEFINITIONS** Section:

"Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place; or

**(2)** The "personal and advertising injury" is caused by an offense committed;

in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses committed through the Internet or other electronic means of communication;

provided that the insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in Paragraph **a.** above, or in a settlement we agree to.

**2. LEASED WORKER**

The following replaces the definition of "leased worker" in the **DEFINITIONS** Section:

"Leased worker" means a person hired from a labor leasing firm under an agreement between the hirer and that firm to perform duties related to the conduct of the hirer's business. However, "leased worker" does not include a "temporary worker".

**3. LOADING OR UNLOADING**

The following replaces the definition of "loading or unloading" in the **DEFINITIONS** Section:

"Loading or unloading" means the handling of any person or property:

**a.** After it is moved from the place where the person or property is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While in or on an aircraft, watercraft or "auto"; or

**c.** While being moved from an aircraft, watercraft or "auto" to the place where the person or property is finally delivered.

However, "loading or unloading" does not include the movement of any person or property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**4. PROPERTY DAMAGE**

The following replaces the definition of "property damage" in the **DEFINITIONS** Section:

"Property damage" means:

**a.** Physical damage to tangible property of others, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical damage that caused it; or

**b.** Loss of use of tangible property of others that is not physically damaged. All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, data including information, facts or programs in any electronic or other format, is not tangible property.

**5. TEMPORARY WORKER**

The following replaces the definition of "temporary worker" in the **DEFINITIONS** Section:

"Temporary worker" means a person who is hired to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**6. AIRCRAFT PRODUCT**

The following is added to the **DEFINITIONS** Section:

"Aircraft product" means:

**a.** Aircraft, including missile or spacecraft, and any ground support or control equipment used with any aircraft, missile or spacecraft;

**b.** Any of "your products" manufactured for, used in connection with, or incorporated into aircraft, aircraft parts, aircraft equipment or aircraft accessories, including ground handling tools and equipment;

**c.** Any of "your products" used for the purpose of guidance, navigation or direction of aircraft, whether an aircraft is in flight or on the ground; or

**d.** Training aids, navigation charts, navigation aids, manuals, blueprints, engineering or other data or advice, and services and labor relating to such aircraft or products.

**7. CONSUMER FINANCIAL IDENTITY INFORMATION**

The following is added to the **DEFINITIONS** Section:

"Consumer financial identity information" means any of the following information for a person that is used or collected for the purpose of serving as a factor in establishing such person's eligibility for personal credit, insurance or employment, or for the purpose of conducting a business transaction:

**a.** Part or all of the account number, the expiration date or the balance of any credit, debit, bank or other financial account.

**b.** Information bearing on a person's credit worthiness, credit standing or credit capacity.

**c.** Social security number.

**d.** Drivers license number.

**e.** Birth date.


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**8. CONSUMER FINANCIAL PROTECTION LAW**

The following is added to the **DEFINITIONS** Section:

"Consumer financial protection law" means:

**a.** The Fair Credit Reporting Act (FCRA) and any of its amendments, including the Fair and Accurate Credit Transactions Act (FACTA);

**b.** California's Song-Beverly Credit Card Act and any of its amendments; or

**c.** Any other law or regulation that restricts or prohibits the collection, dissemination, transmission, distribution or use of "consumer financial identity information".

**9. FUNGI**

The following is added to the **DEFINITIONS** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**10. GROUNDING**

The following is added to the **DEFINITIONS** Section:

"Grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft, by reason of the actual, alleged or suspected existence of any defect, fault or condition in such aircraft or any part thereof:

**a.** Sold, handled or distributed by the insured; or

**b.** Manufactured, assembled or processed by any other person or organization

**(1)** According to specifications, plans, suggestions, orders, or drawings of the insured; or

**(2)** With tools, machinery or other equipment furnished to such persons or organizations by the insured.

Whether such aircraft so withdrawn or restricted are owned or operated by the same or different persons or organizations.

**11. INDEPENDENT CONTRACTOR**

The following is added to the **DEFINITIONS** Section:

"Independent contractor" means any person who is not the insured's "employee", "temporary worker" or "volunteer worker", but who performs duties related to the conduct of the insured's business because of a contract or agreement between the insured and that person for specified services.

**12. UNSOLICITED COMMUNICATION**

The following is added to the **DEFINITIONS** Section:

"Unsolicited communication" means any communication, in any form, that the recipient of such communication did not specifically request to receive.


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - AIRCRAFT, AUTO OR WATERCRAFT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1. The following replaces Exclusion **g., Aircraft, Auto or Watercraft**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contractor providing services for or on behalf of any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contractor providing services for or on behalf of any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry any person or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided that the "auto" is not owned by or rented or loaned to you, any insured, any employee of the insured, any of your "volunteer workers" or any "volunteer workers" of the insured.

**(4)** Liability assumed by you under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft, provided that the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement;

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of any "supplementary machinery or equipment" that is attached to, or part of, a land vehicle that would qualify as "mobile equipment" under the definition of "mobile equipment" if such land vehicle were not:

**(i)** Subject to a compulsory or financial responsibility law, or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(ii)** Designated as a covered "auto" under your automobile liability insurance; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment"; or

**(6)** An aircraft chartered with a pilot to any insured. This exception does not apply if:

**(a)** The aircraft is owned by any insured; or

**(b)** Any insured is using the aircraft to carry any person or property for a charge.

© 2013 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**2.** The following is added to the **DEFINITIONS** Section:

"Supplementary machinery or equipment" means machinery or equipment designed for work, other than the transportation of any person or property on a public road. However, "supplementary machinery or equipment" does not include:

**a.** Any communication device, such as a radio or telephone; or

**b.** Any machinery or equipment that is designed to perform any function normal to the operation of the land vehicle during travel on public roads, such as a steering mechanism.


© 2013 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT - NON-RENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART

The following replaces Paragraph **9., When We Do Not Renew,** of **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** and **SECTION IV - LIQUOR LIABILITY CONDITIONS,** whichever section is included in the Coverage Part:

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal.

 © 2011 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CYBERFIRST ESSENTIALS LIABILITY COVERAGE PART
CYBERFIRST LIABILITY COVERAGE
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY+ WITH IDENTITY FRAUD EXPENSE REIMBURSEMENT COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE
LAW ENFORCEMENT LIABILITY COVERAGE PART
LIMITED ABOVE GROUND POLLUTION LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDFIRST PRODUCTS/COMPLETED OPERATIONS, ERRORS AND OMISSIONS, AND INFORMATION SECURITY LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PUBLIC ENTITY MANAGEMENT LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF TRANSPORTATION
TRIBAL BUSINESS MANAGEMENT LIABILITY COVERAGE PART
Any other Commercial Liability coverage included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended

**PROVISIONS**

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA") establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

85% with respect to such Insured Losses occurring in calendar year 2015.

84% with respect to such Insured Losses occurring in calendar year 2016.

83% with respect to such Insured Losses occurring in calendar year 2017.

82% with respect to such Insured Losses occurring in calendar year 2018.

81% with respect to such Insured Losses occurring in calendar year 2019.

80% with respect to such Insured Losses occurring in calendar year 2020.


© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is included in the premium for such coverage. The charge for such Insured Losses that has been included for each such coverage is indicated below, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA.

- **1% of each applicable Commercial Liability Coverage premium.**


© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMBINATION ENDORSEMENT

# PERSONAL AND ADVERTISING INJURY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**A. AMENDMENT OF EXCLUSIONS**

**1. EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**2. EXCLUSION - KNOWING VIOLATION OF RIGHTS OF ANOTHER**

The following replaces Exclusion **a., Knowing Violation Of Rights Of Another,** in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict that "personal and advertising injury".

This exclusion does not apply to "personal and advertising injury" caused by malicious prosecution.

**3. EXCLUSION - MATERIAL PUBLISHED WITH KNOWLEDGE OF FALSITY**

The following replaces Exclusion **b., Material Published With Knowledge Of Falsity**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, including publication by electronic means, of material, if done by or at the direction of the insured with knowledge of its falsity.

**4. EXCLUSION - MATERIAL PUBLISHED OR USED PRIOR TO POLICY PERIOD**

The following replaces Exclusion **c., Material Published Prior To Policy Period**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**c. Material Published Or Used Prior To Policy Period**

"Personal and advertising injury" arising out of:

**(1)** Oral or written publication, including publication by electronic means, of material whose first publication took place prior to the policy period; or

**(2)** Infringement of copyright, "title" or "slogan" in your "advertisement" whose first infringement in your "advertisement" was committed prior to the policy period.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**5. EXCLUSION - BREACH OF CONTRACT**

The following replaces Exclusion **f., Breach Of Contract**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract.

**6. EXCLUSION - INTELLECTUAL PROPERTY**

The following replaces Exclusion **i., Infringement Of Copyright, Patent, Trademark Or Trade Secret**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**i. Intellectual Property**

"Personal and advertising injury" arising out of any actual or alleged infringement or violation of any of the following rights or laws, or any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation:

**(1)** Copyright;

**(2)** Patent;

**(3)** Trade dress;

**(4)** Trade name;

**(5)** Trademark;

**(6)** Trade secret; or

**(7)** Other intellectual property rights or laws.

This exclusion does not apply to:

**(1)** "Personal and advertising injury" arising out of any actual or alleged infringement or violation of another's copyright, "title" or "slogan" in your "advertisement"; or

**(2)** Any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such infringement or violation of another's copyright, "title" or "slogan" in your "advertisement".

**7. EXCLUSION - INSUREDS IN MEDIA AND INTERNET TYPE BUSINESSES**

The following replaces Exclusion **j., Insureds In Media And Internet Type Businesses**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" arising out of an offense committed by an insured whose business is:

**(1)** Advertising, "broadcasting" or publishing;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

This exclusion does not apply to Paragraphs **a.(1)**, **(2)** and **(3)** of the definition of "personal and advertising injury".

For the purposes of this exclusion:

**(1)** Creating and producing correspondence written in the conduct of your business, bulletins, financial or annual reports, or newsletters about your goods, products or services will not be considered the business of publishing; and

**(2)** The placing of frames, borders or links, or advertising, for you or others anywhere on the Internet will not, by itself, be considered the business of advertising, "broadcasting" or publishing.

**8. EXCLUSION - POLLUTION-RELATED**

The following replaces Paragraph **(2)** of Exclusion **n.**, **Pollution-Related**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**(2)** Claim or "suit" by or on behalf of a governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**9. EXCLUSION - WAR**

The following replaces Exclusion **o.**, **War**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**o. War**

"Personal and advertising injury" arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**10. EXCLUSION - ASBESTOS OR SILICA**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Asbestos or Silica**

"Personal and advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened discharge, dispersal, emission, release, escape, handling, contact with, exposure to or inhalation or respiration of:

**(1)** Asbestos, asbestos fibers or products containing asbestos, provided that the "personal and advertising injury" is caused, or contributed to, by the hazardous properties of asbestos; or

**(2)** Silica or products or substances containing silica.

**11. EXCLUSION - DISCRIMINATION**

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Discrimination**

"Personal and advertising injury" arising out of discrimination, whether intentional or unintentional, based upon a person's sex, sexual orientation, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**12. EXCLUSION - EMPLOYMENT-RELATED PRACTICES**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Employment-Related Practices**

"Personal and advertising injury" to:

**(1)** A person, other than an "independent contractor", arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment or "temporary worker" status; or

**(c)** Other practice, policy, act or omission related to that person's employment or "temporary worker" status, such as coercion, demotion, evaluation, reassignment, discipline, harassment, humiliation, discrimination, libel, slander, violation of the person's right of privacy, malicious prosecution or false arrest, detention or imprisonment, regardless of whether such practice, policy, act or omission occurs, is applied or is committed before, during or after the time of that person's employment or "temporary worker" status; or

**(2)** The spouse, child, parent, brother, sister, domestic partner or member of the household of that person as a consequence of "personal and advertising injury" described in Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be held liable as an employer or in any other capacity; and

**(2)** Whether the insured may have any obligation to share damages with or repay someone else who must pay damages because of the injury.

**13. EXCLUSION - FUNGI OR BACTERIA**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Fungi or Bacteria**

**(1)** "Personal and advertising injury" arising out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to the "personal and advertising injury".

**(2)** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**14. EXCLUSION - LEAD**

The following exclusion is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Lead**

**(1)** "Personal and advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance.

**(2)** Any loss, cost or expense arising out of any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**15. EXCLUSION - UNSOLICITED COMMUNICATION**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Unsolicited Communication**

"Personal and advertising injury" arising out of any actual or alleged violation of any law that restricts or prohibits the sending, transmitting or distributing of "unsolicited communication".

**16. EXCLUSION - VIOLATION OF CONSUMER FINANCIAL PROTECTION LAWS**

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**Violation of Consumer Financial Protection Laws**

"Personal and advertising injury" arising out of any actual or alleged violation of a "consumer financial protection law", or any other "personal and advertising injury" alleged in any claim or "suit" that also alleges any such violation.

**B. AMENDMENT OF CONTRACTUAL LIABILITY EXCLUSION - EXCEPTION FOR "PERSONAL AND ADVERTISING INJURY" ASSUMED IN AN "INSURED CONTRACT"**

**1.** The following is added to Exclusion **e., Contractual Liability**, in Paragraph **2.** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

This exclusion also does not apply to liability for damages because of "personal and advertising injury" assumed by you in a contract or agreement that is an "insured contract", provided that the "personal and advertising injury" is caused by an offense committed subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed by you in an "insured contract", reasonable attorneys fees and necessary litigation expenses incurred by or for a party other than an insured will be deemed to be damages because of "personal and advertising injury", provided that:

**(1)** Liability to such party for, or for the cost of, that party's defense has also been assumed by you in the same "insured contract"; and

**(2)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages because of "personal and advertising injury" to which this insurance applies are alleged.

**2.** The following replaces Paragraph **2.d.** of **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B** of **SECTION I - COVERAGES:**

**d.** The allegations in the "suit" and the information we know about the "occurrence" or offense are such that no conflict appears to exist between your interests and the interests of the indemnitee;

**3.** The following replaces the third sentence of Paragraph **2.** of **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B:**

Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** - Coverage **A** - Bodily Injury And Property Damage Liability, or the provisions of Paragraph **2.e.** of Section **I** - Coverage **B** - Personal and Advertising Injury Liability, such payments will not be deemed to be damages because of "bodily injury" or "property damage", or damages because of "personal and advertising injury", and will not reduce the limits of insurance.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

4. The following replaces the first paragraph of Paragraph **f.** of the definition of "insured contract" in the **DEFINITIONS** Section:

   **f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**C. AMENDMENT OF LIMITS OF INSURANCE - NONCUMULATION OF LIMITS**

The following is added to Paragraph **4.** of **SECTION III - LIMITS OF INSURANCE:**

Noncumulation of Personal and Advertising Injury Limit - If any one person or organization sustains:

**a.** "Personal and advertising injury" to which this insurance applies; and

**b.** "Personal and advertising injury" to which commercial general liability coverage included in one or more prior or future policies issued to you by us, or any of our affiliated insurance companies, applies;

this policy's Personal and Advertising Injury Limit applicable to that person or organization also will be reduced by the amount of each payment made because of the "personal and advertising injury" described in Paragraph **b.** above by us or any of our affiliated insurance companies under, and within the applicable limit of insurance of, each other such policy.

**D. AMENDMENT OF DEFINITIONS**

**1. PERSONAL AND ADVERTISING INJURY**

The following replaces the definition of "personal and advertising injury" in the **DEFINITIONS** Section:

"Personal and advertising injury":

**a.** Means injury caused by one or more of the following offenses committed by or on behalf of the insured:

**(1)** False arrest, detention or imprisonment, provided that the claim is made or the "suit" is brought by a person who claims to have been falsely arrested, detained or imprisoned;

**(2)** Malicious prosecution, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been maliciously prosecuted;

**(3)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion of the right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room, dwelling or premises;

**(4)** Oral or written publication, including publication by electronic means, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services, provided that the claim is made or the "suit" is brought by a person or organization that claims to have been slandered or libeled, or that claims to have had its goods, products or services disparaged;

**(5)** Oral or written publication, including publication by electronic means, of material that:

**(a)** Appropriates a person's name, voice, photograph or likeness; or

**(b)** Unreasonably places a person in a false light; or

**(6)** Infringement of copyright, "title" or "slogan" in your "advertisement", provided that the claim is made or the "suit" is brought by a person or organization that claims ownership of such copyright, "title" or "slogan".

**b.** Includes "bodily injury" caused by one or more of the offenses described in Paragraph **a.** above.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**2. BROADCASTING**

The following is added to the **DEFINITIONS** Section:

"Broadcasting" means transmitting any audio or visual material for any purpose:

**a.** By radio or television; or

**b.** In, by or with any other electronic means of communication, such as the Internet, if that material is part of:

**(1)** Radio or television programming being transmitted;

**(2)** Other entertainment, educational, instructional, music or news programming being transmitted; or

**(3)** Advertising transmitted with any of such programming.

**3. CONSUMER FINANCIAL IDENTITY INFORMATION**

The following is added to the **DEFINITIONS** Section:

"Consumer financial identity information" means any of the following information for a person that is used or collected for the purpose of serving as a factor in establishing such person's eligibility for personal credit, insurance or employment, or for the purpose of conducting a business transaction:

**a.** Part or all of the account number, the expiration date or the balance of any credit, debit, bank or other financial account.

**b.** Information bearing on a person's credit worthiness, credit standing or credit capacity.

**c.** Social security number.

**d.** Drivers license number.

**e.** Birth date.

**4. CONSUMER FINANCIAL PROTECTION LAW**

The following is added to the **DEFINITIONS** Section:

"Consumer financial protection law" means:

**a.** The Fair Credit Reporting Act (FCRA) and any of its amendments, including the Fair and Accurate Credit Transactions Act (FACTA);

**b.** California's Song-Beverly Credit Card Act and any of its amendments; or

**c.** Any other law or regulation that restricts or prohibits the collection, dissemination, transmission, distribution or use of "consumer financial identity information".


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**5. SLOGAN**

The following is added to the **DEFINITIONS** Section:

"Slogan":

**a.** Means a phrase that others use for the purpose of attracting attention in their advertising.

**b.** Does not include a phrase used as, or in, the name of:

**(1)** Any person or organization, other than you; or

**(2)** Any business, or any of the premises, goods, products, services or work, of any person or organization, other than you.

**6. TITLE**

The following is added to the **DEFINITIONS** Section:

"Title" means a name of a literary or artistic work.

**7. UNSOLICITED COMMUNICATION**

The following is added to the **DEFINITIONS** Section:

"Unsolicited communication" means any communication, in any form, that the recipient of such communication did not specifically request to receive.


© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ANIMALS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

The following is added to Paragraph **2., Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Domestic Or Wild Animals**

"Bodily injury" or "property damage" caused by any domestic or wild animal arising from your operations at any premises including the supervision, instruction, training, or monitoring of any person in the keeping, handling or demonstration of such animal.

 © 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - CANNABIS OR MARIJUANA - ABSOLUTE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Cannabis Or Marijuana**

"Bodily injury" or "property damage" arising out of the manufacture, sale, gift, distribution, consumption or use of any product that contains cannabis or marijuana.

© 2014 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - CROSS LIABILITY - BROAD FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**:

**Cross Liability**

"Bodily injury" or "property damage" sustained or alleged by:

**(1)** Any business enterprise in which any insured owns an interest, is a partner, or which is a parent, affiliate, subsidiary or sister company of any insured;

**(2)** Any business enterprise directly or indirectly controlled, operated or managed by a business enterprise described in **(1)**;

**(3)** A present, former, future or prospective partner, officer, director, stockholder or employee of any insured;

**(4)** Any named insured; or

**(5)** The spouse, child, parent or sibling of any of the above as consequence of **(1)**, **(2)**, **(3)** or **(4)**.

**2.** The following exclusion is added to Paragraph **2.**, **Exclusions**, of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**:

**Cross Liability**

"Personal and advertising injury" sustained or alleged by:

**(1)** Any business enterprise in which any insured owns an interest, is a partner, or which is a parent, affiliate, subsidiary or sister company of any insured;

**(2)** Any business enterprise directly or indirectly controlled, operated or managed by a business enterprise described in **(1)**;

**(3)** A present, former, future or prospective partner, officer, director, stockholder or employee of any insured;

**(4)** Any named insured; or

**(5)** The spouse, child, parent or sibling of any of the above as consequence of **(1)**, **(2)**, **(3)** or **(4)**.


© 2016 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II - Who Is An Insured** does not apply.

 Copyright, ISO Properties, Inc., 2004 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINITIONS Section is replaced by the following:

"Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement.



Copyright, Insurance Services Office, Inc., 1992

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES, PROJECT OR OPERATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Premises:**<br>All Covered Locations as Scheduled on the Declarations |
| **Project Or Operation:** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 01,** the provisions under this Paragraph **A.** apply:

**1.** Paragraph **1.b.** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

**(1)** The "bodily injury" or "property damage":

**(a)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(b)** Arises out of the project or operation shown in the Schedule;

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**2.** Paragraph **1.b.** under **Section I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

**(1)** The offense arises out of your business:

**(a)** Performed on the premises shown in the Schedule; or


Copyright, Insurance Services Office, Inc., 2016

(b) In connection with the project or operation shown in the Schedule; and

(2) The offense was committed during the policy period.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

(1) False arrest, detention or imprisonment; or

(2) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I - Coverage C - Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

(1) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

(2) Arises out of the project or operation shown in the Schedule;

provided that:

(a) The accident takes place during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**B.** If this endorsement is attached to Commercial General Liability Coverage Form **CG 00 02**, the provisions under this Paragraph **B.** apply:

**1.** Paragraph **1.b.** under **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

**b.** This insurance applies to "bodily injury" and "property damage" caused by an "occurrence" that takes place in the "coverage territory" only if:

(1) The "bodily injury" or "property damage":

(a) Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

(b) Arises out of the project or operation shown in the Schedule;

(2) The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

(3) A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** - Extended Reporting Periods.

**2.** Paragraph **1.b.** under **Section I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

**b.** This insurance applies to "personal and advertising injury" caused by an offense committed in the "coverage territory" but only if:

(1) The offense arises out of your business:

(a) Performed on the premises shown in the Schedule; or

(b) In connection with the project or operation shown in the Schedule;

(2) The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and


Copyright, Insurance Services Office, Inc., 2016

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **1.c.** of this Insuring Agreement, during the policy period or any Extended Reporting Period we provide under Section **V** - Extended Reporting Periods.

However, with respect to Paragraph **1.b.(1)(a)** of this Insuring Agreement, if the "personal and advertising injury" is caused by:

**(1)** False arrest, detention or imprisonment; or

**(2)** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

then such offense must arise out of your business performed on the premises shown in the Schedule and the offense must have been committed on the premises shown in the Schedule or the grounds and structures appurtenant to those premises.

**3.** Paragraph **1.a.** under **Section I - Coverage C - Medical Payments** is replaced by the following:

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident that takes place in the "coverage territory" if the "bodily injury":

**(1)** Occurs on the premises shown in the Schedule or the grounds and structures appurtenant to those premises; or

**(2)** Arises out of the project or operation shown in the Schedule;

provided that:

**(a)** The accident takes place during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.


Copyright, Insurance Services Office, Inc., 2016

Northfield Insurance Company
St. Paul, MN 55102

# COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

**Effective Date:** 06/25/2017 12:01 A.M. at your mailing address **Policy No:** WS324766

**Named Insured:**
Lance Miller / Westhill Property Management Co. DBA Lance Miller

## DESCRIPTION OF PREMISES

| PREM. # | BLDG. # | Location (Including County, Zip Code), # of Stories, Construction, Occupancy, Protection Class |
|---|---|---|
| 001 | 001 | 9938 Commerce Ave, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2 |
| 002 | 001 | 4206 Santa Monica Blvd, 4206-4210 Santa Monica Blvd, Los Angeles, CA, Los Angeles, 90029, 1 Story, Frame, Mixed Use Commercial, PC2 |

## COVERAGES PROVIDED

Insurance at the Described Premises applies only for Coverages for which a Limit of Insurance is shown below.
**IF EXTRA EXPENSE COVERAGE, LIMITS ON LOSS PAYMENTS
FE - Fully Earned

| PREM. # | BLDG. # | Coverage | Limit of Insurance | Percent of Coinsurance** | Covered Causes of Loss | Rates | Premium |
|---|---|---|---|---|---|---|---|
| 001 | 001 | Building | $ 550,000 | 80% | Special Excl Theft | .2040 | $ 1,123.00 |
| 002 | 001 | Building | $ 493,800 | 80% | Special Excl Theft | .2650 | $ 1,309.00 |
| 002 | 001 | Business Income with Extra Expense | $ 80,000 | 100% | Special Excl Theft | .1920 | $ 154.00 |

## COVERAGE OPTIONS

Applicable only when entries are made in the Schedule below. *APPLIES TO BUSINESS INCOME ONLY

| PREM. # | BLDG. # | Coverage | Agreed Value Expir. Date | Agreed Value Amount | Replacement Cost | *Mo. Limit of Indemnity | *Max. Period of Indemnity | *Extended Period of Indemnity | Inflation Guard % |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 001 | Building | | | X | | | | |
| 002 | 001 | Building | | | X | | | | |

**DEDUCTIBLE** $ See S2649-CP

**COVERAGE PART PREMIUM** $ 2590.00 MP

## MORTGAGE HOLDERS

Mortgage Holders as scheduled on S2767-CP, if applicable.

## FORMS AND ENDORSEMENTS

The schedule of coverage declarations, forms and endorsements shown on S1D-ILS make up your policy as of the effective date shown above.

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **H.** Definitions.

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit Of Insurance is shown in the Declarations for that type of property.

**a. Building,** meaning the building or structure described in the Declarations, including:

**(1)** Completed additions;

**(2)** Fixtures, including outdoor fixtures;

**(3)** Permanently installed:

**(a)** Machinery; and

**(b)** Equipment;

**(4)** Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

**(a)** Fire-extinguishing equipment;

**(b)** Outdoor furniture;

**(c)** Floor coverings; and

**(d)** Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

**(5)** If not covered by other insurance:

**(a)** Additions under construction, alterations and repairs to the building or structure;

**(b)** Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Your Business Personal Property** consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater:

**(1)** Furniture and fixtures;

**(2)** Machinery and equipment;

**(3)** "Stock";

**(4)** All other personal property owned by you and used in your business;

**(5)** Labor, materials or services furnished or arranged by you on personal property of others;

**(6)** Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

**(a)** Made a part of the building or structure you occupy but do not own; and

**(b)** You acquired or made at your expense but cannot legally remove;

**(7)** Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

**c. Personal Property Of Others** that is:

**(1)** In your care, custody or control: and

 Copyright, Insurance Services Office, Inc., 2011 

**(2)** Located in or on the building or structure described in the Declarations or in the open (or in a vehicle) within 100 feet of the building or structure or within 100 feet of the premises described in the Declarations, whichever distance is greater.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

**a.** Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

**b.** Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

**c.** Automobiles held for sale;

**d.** Bridges, roadways, walks, patios or other paved surfaces;

**e.** Contraband, or property in the course of illegal transportation or trade;

**f.** The cost of excavations, grading, backfilling or filling;

**g.** Foundations of buildings, structures, machinery or boilers if their foundations are below:

**(1)** The lowest basement floor; or

**(2)** The surface of the ground, if there is no basement;

**h.** Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetated roof);

**i.** Personal property while airborne or waterborne;

**j.** Bulkheads, pilings, piers, wharves or docks;

**k.** Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

**l.** Retaining walls that are not part of a building;

**m.** Underground pipes, flues or drains;

**n.** Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph **n.**, does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system;

**o.** The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

**p.** Vehicles or self-propelled machines (including aircraft or watercraft) that:

**(1)** Are licensed for use on public roads: or

**(2)** Are operated principally away from the described premises.

This paragraph does not apply to:

**(a)** Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

**(b)** Vehicles of self-propelled machines, other than autos, you hold for sale;

 Copyright, Insurance Services Office, Inc., 2011 

**(c)** Rowboats or canoes out of water at the described premises; or

**(d)** Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers.

**q.** The following property while outside of buildings:

**(1)** Grain, hay, straw or other crops;

**(2)** Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), all except as provided in the Coverage Extensions.

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Coverages**

**a. Debris Removal**

**(1)** Subject to Paragraphs **(2)**, **(3)** and **(4)**, we will pay your expense to remove debris of Covered Property and other debris that is on the described premises, when such debris is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

**(2)** Debris Removal does not apply to costs to:

**(a)** Remove debris of property of yours that is not insured under this policy, or property in your possession that is not Covered Property;

**(b)** Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

**(c)** Remove any property that is Property Not Covered, including property addressed under the Outdoor Property Coverage Extension;

**(d)** Remove property of others of a type that would not be Covered Property under this Coverage Form;

**(e)** Remove deposits of mud or earth from the grounds of the described premises;

**(f)** Extract "pollutants" from land or water; or

**(g)** Remove, restore or replace polluted land or water.

**(3)** Subject to the exceptions in Paragraph **(4)**, the following provisions apply:

**(a)** The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

**(b)** Subject to **(a)** above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage. However, if no Covered Property has sustained direct physical loss or damage, the most we will pay for removal of debris of other property (if such removal is covered under this Additional Coverage) is $5,000 at each location.

**(4)** We will pay up to an additional $25,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

**(a)** The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

**(b)** The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if **(4)(a)** and/or **(4)(b)** applies, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $25,000.


Copyright, Insurance Services Office, Inc., 2011

**(5) Examples**

The following examples assume that there is no Coinsurance penalty.

**Example 1**

| | |
|---|---|
| Limit of Insurance: | $90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $50,000 |
| Amount of Loss Payable: | $49,500 |
| | ($50,000 - $500) |
| Debris Removal Expense: | $10,000 |
| Debris Removal Expense Payable: | $10,000 |
| ($10,000 is 20% of $50,000) | |

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

**Example 2**

| | | |
|---|---|---|
| Limit of Insurance: | | $90,000 |
| Amount of Deductible: | | $ 500 |
| Amount of Loss: | | $80,000 |
| Amount of Loss Payable: | | $79,500 |
| | | ($80,000 - $500) |
| Debris Removal Expense: | | $40,000 |
| Debris Removal Expense Payable | | |
| | Basic Amount: | $10,500 |
| | Additional Amount: | $25,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4),** because the debris removal expense ($40,000) exceeds 25% of the loss payable plus the deductible ($40,000 is 50% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $40,000 = $119,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $25,000, the maximum payable under Paragraph **(4).** Thus, the total payable for debris removal expense in this example is $35,500; $4,500 of the debris removal expense is not covered.

**b. Preservation Of Property**

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

**c. Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000 for service at each premises described in the Declarations, unless a higher limit is shown in the Declarations. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

This Additional Coverage applies to your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

**d. Pollutant Clean-Up And Removal**

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.


Copyright, Insurance Services Office, Inc., 2011

**e. Increased Cost Of Construction**

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in **e.(3)** through **e.(9)** of this Additional Coverage.

**(3)** The ordinance or law referred to in **e.(2)** of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

**(a)** You were required to comply with before the loss, even when the building was undamaged; and

**(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

**(a)** The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

**(b)** Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

**(a)** We will not pay for the Increased Cost of Construction:

**(i)** Until the property is actually repaired or replaced, at the same or another premises; and

**(ii)** Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the same premises.

**(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of **e.(6)** of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.


Copyright, Insurance Services Office, Inc., 2011

**(9)** The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in **e.(6)** of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data. This Additional Coverage does not apply to your "stock" of prepackaged software, or to electronic data which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

**(3)** The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

**(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes of Loss - Broad Form applies, coverage under this Additional Coverage, Electronic Data includes Collapse as set forth in that form.

**(c)** If the Causes of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Electronic Data, is $2,500 (unless a higher limit is shown in the Declarations) for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

**5. Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**a. Newly Acquired Or Constructed Property**

**(1) Buildings**

If this policy covers Building, you may extend that insurance to apply to:

**(a)** Your new buildings while being built on the described premises; and

**(b)** Buildings you acquire at locations, other than the described premises, intended for:


Copyright, Insurance Services Office, Inc., 2011

**(i)** Similar use as the building described in the Declarations; or

**(ii)** Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

**(2) Your Business Personal Property**

**(a)** If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

**(i)** Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions; or

**(ii)** Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance provided under this Coverage Extension for Newly Acquired Or Constructed Property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss - Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(3)** If the Causes Of Loss - Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist) and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore, coverage of such costs is not additional insurance.


Copyright, Insurance Services Office, Inc., 2011

**d. Property Off-Premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

**(2)** This Extension does not apply to property:

**(a)** In or on a vehicle; or

**(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than trees, shrubs or plants which are "stock" or are part of a vegetated roof), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

Subject to all aforementioned terms and limitations of coverage, this Coverage Extension includes the expense of removing from the described premises the debris of trees, shrubs and plants which are the property of others, except in the situation in which you are a tenant and such property is owned by the landlord of the described premises.

**f. Non-Owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

**(a)** The trailer is used in your business;

**(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

**(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

**(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

**(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**g. Business Personal Property Temporarily In Portable Storage Units**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to such property while temporarily stored in a portable storage unit (including a detached trailer) located within 100 feet of the building or structure described in the Declarations or within 100 feet of the premises described in the Declarations, whichever distance is greater.

**(2)** If the applicable Covered Causes of Loss form or endorsement contains a limitation or exclusion concerning loss or damage from sand, dust, sleet, snow, ice or rain to property in a structure, such limitation or exclusion also applies to property in a portable storage unit.

**(3)** Coverage under this Extension:

**(a)** Will end 90 days after the business personal property has been placed in the storage unit;


Copyright, Insurance Services Office, Inc., 2011

**(b)** Does not apply if the storage unit itself has been in use at the described premises for more than 90 consecutive days, even if the business personal property has been stored there for 90 or fewer days as of the time of loss or damage.

**(4)** Under this Extension, the most we will pay for the total of all loss or damage to business personal property is $10,000 (unless a higher limit is indicated in the Declarations for such Extension) regardless of the number of storage units. Such limit is part of, not in addition to, the applicable Limit of Insurance on Your Business Personal Property. Therefore, payment under this Extension will not increase the applicable Limit of Insurance on Your Business Personal Property.

**(5)** This Extension does not apply to loss or damage otherwise covered under this Coverage Form or any endorsement to this Coverage Form or policy, and does not apply to loss or damage to the storage unit itself.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

**D. Deductible**

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

**Example 1**

(This example assumes there is no Coinsurance penalty.)

| | | |
|---|---|---|
| Deductible: | $ | 250 |
| Limit of Insurance - Building 1: | $ | 60,000 |
| Limit of Insurance - Building 2: | $ | 80,000 |
| Loss to Building 1: | $ | 60,100 |
| Loss to Building 2: | $ | 90,000 |

The amount of loss to Building 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building 1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building 1:

$ 60,100
\- 250
$ 59,850 Loss Payable - Building 1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building 2. Loss payable for Building 2 is the Limit of Insurance of $80,000.

Total amount of loss payable:
$59,850 + 80,000 = $139,850

**Example 2**

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example 1.

| | | |
|---|---|---|
| Loss to Building 1: | $ | 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss to Building 2: | $ | 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | | |
| Loss Payable - Building 1: | $ | 60,000 |
| (Limit of Insurance) | | |
| Loss Payable - Building 2: | $ | 80,000 |
| (Limit of Insurance) | | |
| Total amount of loss payable: | $ | 140,000 |

 Copyright, Insurance Services Office, Inc., 2011 

**E. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties In The Event Of Loss Or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4. Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

**b.** The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.


Copyright, Insurance Services Office, Inc., 2011

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**g.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**(1)** We have reached agreement with you on the amount of loss; or

**(2)** An appraisal award has been made.

**h.** A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

**5. Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6. Vacancy**

**a. Description Of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

**(1)** We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** With respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.


Copyright, Insurance Services Office, Inc., 2011

**7. Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At actual cash value as of the time of loss or damage, except as provided in **b., c., d.,** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value, even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

**d.** Glass at the cost of replacement with safety-glazing material if required by law.

**e.** Tenants' Improvements and Betterments at:

**(1)** Actual cash value of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**F. Additional Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in Step **(1)**;

**(3)** Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step **(2)**; and

**(4)** Subtract the deductible from the figure determined in Step **(3)**.

We will pay the amount determined in Step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**Example 1 (Underinsurance)**

| | | |
|---|---|---|
| When: | The value of the property is: | $ 250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 100,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

| | |
|---|---|
| Step **(1)**: | $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements) |
| Step **(2)**: | $100,000 ÷ $200,000 =.50 |
| Step **(3)**: | $40,000 x .50 = $20,000 |
| Step **(4)**: | $20,000 - $250 = $19,750 |

We will pay no more than $19,750. The remaining $20,250 is not covered.


Copyright, Insurance Services Office, Inc., 2011

**Example 2 (Adequate Insurance)**

| | | |
|---|---|---|
| When: | The value of the property is: | $ 250,000 |
| | The Coinsurance percentage for it is: | 80% |
| | The Limit of Insurance for it is: | $ 200,000 |
| | The Deductible is: | $ 250 |
| | The amount of loss is: | $ 40,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate, and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example 3**

| | | |
|---|---|---|
| When: | The value of property is: | |
| | Building at Location 1: | $ 75,000 |
| | Building at Location 2: | $ 100,000 |
| | Personal Property at Location 2: | $ 75,000 |
| | | $ 250,000 |
| | The Coinsurance percentage for it is: | 90% |
| | The Limit of Insurance for Buildings and Personal Property at Locations 1 and 2 is: | $ 180,000 |
| | The Deductible is: | $ 1,000 |
| | The amount of loss is: | |
| | Building at Location 2: | $ 30,000 |
| | Personal Property at Location 2: | $ 20,000 |
| | | $ 50,000 |

Step **(1)**: $250,000 x 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step **(2)**: $180,000 : $225,000 = .80

Step **(3)**: $50,000 x .80 = $40,000

Step **(4)**: $40,000 - $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

**a.** The term mortgageholder includes trustee.

**b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or


Copyright, Insurance Services Office, Inc., 2011

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

g. If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Agreed Value**

a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

c. The terms of this Optional Coverage apply only to loss or damage that occurs:

(1) On or after the effective date of this Optional Coverage; and

(2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

**2. Inflation Guard**

a. The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**Example**

| | | | |
|---|---|---|---|
| If: | The applicable Limit of Insurance is: | $ | 100,000 |
| | The annual percentage increase is: | | 8% |
| | The number of days since the beginning of the policy year (or last policy change) is: | | 146 |
| | The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $ | 3,200 |

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

b. This Optional Coverage does not apply to:

(1) Personal property of others;

(2) Contents of a residence;

(3) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

(4) "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

 Copyright, Insurance Services Office, Inc., 2011 

**(4)** We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

**e.** We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)** or **(3)**, subject to **f.** below:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

**4. Extension Of Replacement Cost To Personal Property Of Others**

**a.** If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

**b.** With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

**H. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**3.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.


Copyright, Insurance Services Office, Inc., 2011

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Coverage

### 1. Business Income

Business Income means the:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses incurred, including payroll.

For manufacturing risks, Net Income includes the net sales value of production.

Coverage is provided as described and limited below for one or more of the following options for which a Limit Of Insurance is shown in the Declarations:

**(1)** Business Income Including "Rental Value".

**(2)** Business Income Other Than "Rental Value".

**(3)** "Rental Value".

If option **(1)** above is selected, the term Business Income will include "Rental Value". If option **(3)** above is selected, the term Business Income will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

With respect to the requirements set forth in the preceding paragraph, if you occupy only part of a building, your premises means:

**(a)** The portion of the building which you rent, lease or occupy;

**(b)** The area within 100 feet of the building or within 100 feet of the premises described in the Declarations, whichever distance is greater (with respect to loss of or damage to personal property in the open or personal property in a vehicle); and

**(c)** Any area within the building or at the described premises, if that area services, or is used to gain access to, the portion of the building which you rent, lease or occupy.

### 2. Extra Expense

**a.** Extra Expense Coverage is provided at the premises described in the Declarations only if the Declarations show that Business Income Coverage applies at that premises.

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

**(1)** Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

 Copyright, Insurance Services Office, Inc., 2011 

(2) Minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**3. Covered Causes Of Loss, Exclusions And Limitations**

See applicable Causes Of Loss form as shown in the Declarations.

**4. Additional Limitation - Interruption Of Computer Operations**

**a.** Coverage for Business Income does not apply when a "suspension" of "operations" is caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of electronic data, or any loss or damage to electronic data, except as provided under the Additional Coverage, Interruption Of Computer Operations.

**c.** Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**d.** This Additional Limitation does not apply when loss or damage to electronic data involves only electronic data which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

**a. Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

**(1)** Four consecutive weeks after the date of that action; or

**(2)** When your Civil Authority Coverage for Business Income ends;

whichever is later.


Copyright, Insurance Services Office, Inc., 2011

**b. Alterations And New Buildings**

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense you incur due to direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 100 feet of the described premises and:

**(a)** Used in the construction, alterations or additions; or

**(b)** Incidental to the occupancy of new buildings.

If such direct physical loss or damage delays the start of "operations", the "period of restoration" for Business Income Coverage will begin on the date "operations" would have begun if the direct physical loss or damage had not occurred.

**c. Extended Business Income**

**(1) Business Income Other Than "Rental Value"**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

**(a)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(1)(a)** above.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**(2) "Rental Value"**

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:

**(a)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)** Ends on the earlier of:

**(i)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or

**(ii)** 60 consecutive days after the date determined in **(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

**d. Interruption Of Computer Operations**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Additional Limitation – Interruption Of Computer Operations.

 Copyright, Insurance Services Office, Inc., 2011 

**(2)** Subject to all provisions of this Additional Coverage, you may extend the insurance that applies to Business Income and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of electronic data due to a Covered Cause of Loss. However, we will not provide coverage under this Additional Coverage when the Additional Limitation - Interruption Of Computer Operations does not apply based on Paragraph **A.4.d.** therein.

**(3)** With respect to the coverage provided under this Additional Coverage, the Covered Causes of Loss are subject to the following:

**(a)** If the Causes Of Loss - Special Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, is limited to the "specified causes of loss" as defined in that form and Collapse as set forth in that form.

**(b)** If the Causes Of Loss - Broad Form applies, coverage under this Additional Coverage, Interruption Of Computer Operations, includes Collapse as set forth in that form.

**(c)** If the Causes Of Loss form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Interruption Of Computer Operations.

**(d)** The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(4)** The most we will pay under this Additional Coverage, Interruption Of Computer Operations, is $2,500 (unless a higher limit is shown in the Declarations) for all loss sustained and expense incurred in any one policy year, regardless of the number of interruptions or the number of premises, locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions in that policy year. A balance remaining at the end of a policy year does not increase the amount of insurance in the next policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

**(5)** This Additional Coverage, Interruption Of Computer Operations does not apply to loss sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in **(4)** above has not been exhausted.

**6. Coverage Extension**

If a Coinsurance percentage of 50% or more is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

**Newly Acquired Locations**

**a.** You may extend your Business Income and Extra Expense Coverages to apply to property at any location you acquire other than fairs or exhibitions.

**b.** The most we will pay under this Extension, for the sum of Business Income loss and Extra Expense incurred, is $100,000 at each location, unless a higher limit is shown in the Declarations.

**c.** Insurance under this Extension for each newly acquired location will end when any of the following first occurs:

**(1)** This policy expires;


Copyright, Insurance Services Office, Inc., 2011

**(2)** 30 days expire after you acquire or begin to construct the property; or

**(3)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property.

The Additional Condition, Coinsurance, does not apply to this Extension.

**B. Limits Of Insurance**

The most we will pay for loss in any one occurrence is the applicable Limit Of Insurance shown in the Declarations.

Payments under the following coverages will not increase the applicable Limit of Insurance:

**1.** Alterations And New Buildings;

**2.** Civil Authority;

**3.** Extra Expense; or

**4.** Extended Business Income.

The amounts of insurance stated in the Interruption Of Computer Operations Additional Coverage and the Newly Acquired Locations Coverage Extension apply in accordance with the terms of those coverages and are separate from the Limit(s) Of Insurance shown in the Declarations for any other coverage.

**C. Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

**1. Appraisal**

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Loss**

**a.** You must see that the following are done in the event of loss:

**(1)** Notify the police if a law may have been broken.

**(2)** Give us prompt notice of the direct physical loss or damage. Include a description of the property involved.

**(3)** As soon as possible, give us a description of how, when and where the direct physical loss or damage occurred.

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**(5)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(7)** Cooperate with us in the investigation or settlement of the claim.

**(8)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

 Copyright, Insurance Services Office Inc., 2011 

**3. Loss Determination**

**a.** The amount of Business Income loss will be determined based on:

**(1)** The Net Income of the business before the direct physical loss or damage occurred;

**(2)** The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

**(4)** Other relevant sources of information, including:

**(a)** Your financial records and accounting procedures;

**(b)** Bills, invoices and other vouchers; and

**(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

**(1)** All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

**(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(2)** Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

**c. Resumption Of Operations**

We will reduce the amount of your:

**(1)** Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for covered loss within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part, and:

**a.** We have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

**D. Additional Condition**

**COINSURANCE**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Property Conditions.

We will not pay the full amount of any Business Income loss if the Limit of Insurance for Business Income is less than:

**1.** The Coinsurance percentage shown for Business Income in the Declarations; times

**2.** The sum of:

**a.** The Net Income (Net Profit or Loss before income taxes), and

**b.** Operating expenses, including payroll expenses,

that would have been earned or incurred (had no loss occurred) by your "operations" at the described premises for the 12 months following the inception, or last previous anniversary date, of this policy (whichever is later).


Copyright, Insurance Services Office, Inc., 2011

Instead, we will determine the most we will pay using the following steps:

Step **(1)**: Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this policy by the Coinsurance percentage;

Step **(2)**: Divide the Limit of Insurance for the described premises by the figure determined in Step **(1)**; and

Step **(3)**: Multiply the total amount of loss by the figure determined in Step **(2)**.

We will pay the amount determined in Step **(3)** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**(1)** Prepaid freight - outgoing;

**(2)** Returns and allowances;

**(3)** Discounts;

**(4)** Bad debts;

**(5)** Collection expenses;

**(6)** Cost of raw stock and factory supplies consumed (including transportation charges);

**(7)** Cost of merchandise sold (including transportation charges);

**(8)** Cost of other supplies consumed (including transportation charges);

**(9)** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**(10)** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**(11)** All payroll expenses or the amount of payroll expense excluded (if Form **CP 15 10** is attached); and

**(12)** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example 1 (Underinsurance)**

| | | |
|---|---|---|
| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: | $ 400,000 |
| | The Coinsurance percentage is: | 50% |
| | The Limit of Insurance is: | $ 150,000 |
| | The amount of loss is: | $ 80,000 |

Step **(1)**: $400,000 x 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step **(2)**: $150,000 / $200,000 = .75

Step **(3)**: $80,000 x .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

**Example 2 (Adequate Insurance)**

| | | |
|---|---|---|
| When: | The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date, of this policy at the described premises would have been: | $ 400,000 |
| | The Coinsurance percentage is: | 50% |
| | The Limit of Insurance is: | $ 200,000 |
| | The amount of loss is: | $ 80,000 |

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of loss).

This condition does not apply to Extra Expense Coverage.

**E. Optional Coverages**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

**1. Maximum Period Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.


Copyright, Insurance Services Office, Inc., 2011

**b.** The most we will pay for the total of Business Income loss and Extra Expense is the lesser of:

**(1)** The amount of loss sustained and expenses incurred during the 120 days immediately following the beginning of the "period of restoration"; or

**(2)** The Limit Of Insurance shown in the Declarations.

**2. Monthly Limit Of Indemnity**

**a.** The Additional Condition, Coinsurance, does not apply to this Coverage Form at the described premises to which this Optional Coverage applies.

**b.** The most we will pay for loss of Business Income in each period of 30 consecutive days after the beginning of the "period of restoration" is:

**(1)** The Limit of Insurance, multiplied by

**(2)** The fraction shown in the Declarations for this Optional Coverage.

**Example**

| | | | |
|---|---|---|---|
| When: | The Limit of Insurance is: | $ | 120,000 |
| | The fraction shown in the Declarations for this Optional Coverage is: | | 1/4 |
| | The most we will pay for loss in each period of 30 consecutive days is: ($120,000 x 1/4 = $ 30,000) | $ | 30,000 |
| | If, in this example, the actual amount of loss is: | | |
| | Days 1-30: | $ | 40,000 |
| | Days 31-60: | $ | 20,000 |
| | Days 61-90: | $ | 30,000 |
| | | $ | 90,000 |
| | We will pay: | | |
| | Days 1-30: | $ | 30,000 |
| | Days 31-60: | $ | 20,000 |
| | Days 61-90: | $ | 30,000 |
| | | $ | 80,000 |

The remaining $10,000 is not covered.

**3. Business Income Agreed Value**

**a.** To activate this Optional Coverage:

**(1)** A Business Income Report/Work Sheet must be submitted to us and must show financial data for your "operations":

**(a)** During the 12 months prior to the date of the Work Sheet; and

**(b)** Estimated for the 12 months immediately following the inception of this Optional Coverage.

**(2)** The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies, and an Agreed Value must be shown in the Declarations. The Agreed Value should be at least equal to:

**(a)** The Coinsurance percentage shown in the Declarations; multiplied by

**(b)** The amount of Net Income and operating expenses for the following 12 months you report on the Work Sheet.

**b.** The Additional Condition, Coinsurance, is suspended until:

**(1)** 12 months after the effective date of this Optional Coverage; or

**(2)** The expiration date of this policy;

whichever occurs first.

**c.** We will reinstate the Additional Condition, Coinsurance, automatically if you do not submit a new Work Sheet and Agreed Value:

**(1)** Within 12 months of the effective date of this Optional Coverage; or

**(2)** When you request a change in your Business Income Limit of Insurance.

**d.** If the Business Income Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

**(1)** The Business Income Limit of Insurance; divided by

**(2)** The Agreed Value.

**Example**

| | | | |
|---|---|---|---|
| When: | The Limit of Insurance is: | $ | 100,000 |
| | The Agreed Value is: | $ | 200,000 |
| | The amount of loss is: | $ | 80,000 |

Step **(1)**: $100,000 / $200,000 = .50

Step **(2)**: .50 x $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4. Extended Period Of Indemnity**

Under Paragraph **A.5.c., Extended Business Income,** the number 60 in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.


Copyright, Insurance Services Office, Inc., 2011

**F. Definitions**

**1.** "Finished stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a Coinsurance percentage shown for Business Income in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the premises of any retail outlet insured under this Coverage Part.

**2.** "Operations" means:

**a.** Your business activities occurring at the described premises; and

**b.** The tenantability of the described premises, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.

**3.** "Period of restoration" means the period of time that:

**a.** Begins:

**(1)** 72 hours after the time of direct physical loss or damage for Business Income Coverage; or

**(2)** Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

"Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down, of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**5.** "Rental Value" means Business Income that consists of:

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the described premises which is occupied by you; and

**b.** Continuing normal operating expenses incurred in connection with that premises, including:

**(1)** Payroll; and

**(2)** The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**6.** "Suspension" means:

**a.** The slowdown or cessation of your business activities; or

**b.** That a part or all of the described premises is rendered untenantable, if coverage for Business Income Including "Rental Value" or "Rental Value" applies.


Copyright, Insurance Services Office, Inc., 2011

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and
2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.
2. If there is other insurance covering the same loss or damage, other than that described in **1.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:
   - **a.** During the policy period shown in the Declarations; and
   - **b.** Within the coverage territory.
2. The coverage territory is:
   - **a.** The United States of America (including its territories and possessions);
   - **b.** Puerto Rico; and
   - **c.** Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.
2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:
   - **a.** Someone insured by this insurance;
   - **b.** A business firm:
     - **(1)** Owned or controlled by you; or
     - **(2)** That owns or controls you; or
   - **c.** Your tenant.

This will not restrict your insurance.


Copyright, ISO Commercial Risk Services, Inc., 1983, 1987

# CAUSES OF LOSS - SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.** Definitions.

**A. Covered Causes Of Loss**

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

**B. Exclusions**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**a. Ordinance Or Law**

The enforcement of or compliance with any ordinance or law:

**(1)** Regulating the construction, use or repair of any property; or

**(2)** Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

**(a)** An ordinance or law that is enforced even if the property has not been damaged; or

**(b)** The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

**b. Earth Movement**

**(1)** Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

**(2)** Landslide, including any earth sinking, rising or shifting related to such event;

**(3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**(4)** Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **b.(1)** through **(4)** above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

**(5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

**(a)** Airborne volcanic blast or airborne shock waves;

**(b)** Ash, dust or particulate matter; or

**(c)** Lava flow.

With respect to coverage for Volcanic Action as set forth in **(5)(a)**, **(5)(b)** and **(5)(c)**, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused.

 Copyright, Insurance Services Office, Inc., 2011 

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph **(1)**, **(3)** or **(4)**, or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **(1)** through **(5)**, is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if any of the above, in Paragraphs **(1)** through **(5)**, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**h. "Fungus", Wet Rot, Dry Rot and Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".


Copyright, Insurance Services Office, Inc., 2011

This exclusion does not apply:

**(1)** When "fungus", wet or dry rot or bacteria result from fire or lightning; or

**(2)** To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria, with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, distrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**b.** Delay, loss of use or loss of market.

**c.** Smoke, vapor or gas from agricultural smudging or industrial operations.

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

But if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or


Copyright, Insurance Services Office, Inc., 2011

**(2)** You drain the equipment and shut off the supply if the heat is not maintained.

**h.** Dishonest or criminal act (including theft) by you, any of your partners, members, officers, managers, employees (including temporary employees and leased workers), directors, trustees or authorized representatives, whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion:

**(1)** Applies whether or not an act occurs during your normal hours of operation;

**(2)** Does not apply to acts of destruction by your employees (including temporary employees and leased workers) or authorized representatives; but theft by your employees (including temporary employees and leased workers) or authorized representatives is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**j.** Rain, snow, ice or sleet to personal property in the open.

**k.** Collapse, including any of the following conditions of property or any part of the property:

**(1)** An abrupt falling down or caving in;

**(2)** Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**(3)** Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to **(1)** or **(2)** above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, **k.**, does not apply:

**(a)** To the extent that coverage is provided under the Additional Coverage, Collapse; or

**(b)** To collapse caused by one or more of the following:

**(i)** The "specified causes of loss";

**(ii)** Breakage of building glass;

**(iii)** Weight of rain that collects on a roof; or

**(iv)** Weight of people or personal property.

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

**m.** Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

**3.** We will not pay for loss or damage caused by or resulting from any of the following, **3.a.** through **3.c.** But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**a.** Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **1.** above to produce the loss or damage.

**b.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**c.** Faulty, inadequate or defective:

**(1)** Planning, zoning, development, surveying, siting;

**(2)** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)** Materials used in repair, construction, renovation or remodeling; or

**(4)** Maintenance;

of part or all of any property on or off the described premises.

 Copyright, Insurance Services Office, Inc., 2011 

**4. Special Exclusions**

The following provisions apply only to the specified Coverage Forms:

**a. Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, or Extra Expense Coverage Form**

We will not pay for:

**(1)** Any loss caused by or resulting from:

**(a)** Damage or destruction of "finished stock"; or

**(b)** The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

**(2)** Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(3)** Any increase of loss caused by or resulting from:

**(a)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.** Ordinance Or Law;

**(b)** Paragraph **B.1.c.** Governmental Action;

**(c)** Paragraph **B.1.d.** Nuclear Hazard;

**(d)** Paragraph **B.1.e.** Utility Services; and

**(e)** Paragraph **B.1.f.** War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

 Copyright, Insurance Services Office, Inc., 2011 

**5. Additional Exclusion**

The following provisions apply only to the specified property:

**Loss Or Damage To Products**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

**a.** Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**c.** The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

**d.** Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**(1)** Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

**(2)** Business Income Coverage or Extra Expense Coverage.

**e.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**f.** Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

**g.** Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

**(1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

**(2)** Changes in or extremes of temperature;

**(3)** Disease;

**(4)** Frost or hail; or

**(5)** Rain, snow, ice or sleet.

**2.** We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**a.** Animals, and then only if they are killed or their destruction is made necessary.

**b.** Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

**(1)** Glass; or

**(2)** Containers of property held for sale.

**c.** Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**(1)** If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

**(2)** To Business Income Coverage or to Extra Expense Coverage.

 Copyright, Insurance Services Office, Inc., 2011 

**3.** The special limit shown for each category, **a.** through **d.**, is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are (unless a higher limit is shown in the Declarations):

**a.** $2,500 for furs, fur garments and garments trimmed with fur.

**b.** $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

**c.** $2,500 for patterns, dies, molds and forms.

**d.** $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

This limitation, **C.3.**, does not apply to Business Income Coverage or to Extra Expense Coverage.

**4.** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

**a.** Results in discharge of any substance from an automatic fire protection system; or

**b.** Is directly caused by freezing.

However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

**1.** For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

**2.** We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

**a.** Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

**b.** Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

**c.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

**d.** Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

**(1)** A cause of loss listed in **2.a. or 2.b.;**

**(2)** One or more of the "specified causes of loss";

**(3)** Breakage of building glass;

**(4)** Weight of people or personal property; or

**(5)** Weight of rain that collects on a roof.

**3.** This **Additional Coverage - Collapse** does **not** apply to:

**a.** A building or any part of a building that is in danger of falling down or caving in;

**b.** A part of a building that is standing, even if it has separated from another part of the building; or

**c.** A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**4.** With respect to the following property:

**a.** Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;


Copyright, Insurance Services Office, Inc., 2011

**b.** Awnings, gutters and downspouts;

**c.** Yard fixtures;

**d.** Outdoor swimming pools;

**e.** Fences;

**f.** Piers, wharves and docks;

**g.** Beach or diving platforms or appurtenances;

**h.** Retaining walls; and

**i.** Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

**(1)** Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

**(2)** The property is Covered Property under this Coverage Form.

**5.** If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**6.** This Additional Coverage, Collapse, does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**7.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

**8.** The term Covered Cause of Loss includes the Additional Coverage, Collapse, as described and limited in **D.1.** through **D.7.**

**E. Additional Coverage - Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

**1.** The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria are the result of one or more of the following causes that occur during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence:

**a.** A "specified cause of loss" other than fire or lightning; or

**b.** Flood, if the Flood Coverage Endorsement applies to the affected premises.

This Additional Coverage does not apply to lawns, trees, shrubs or plants which are part of a vegetated roof.

**2.** We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

**a.** Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

**b.** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

**c.** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

**3.** The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continue to be present or active, or recur, in a later policy period.


Copyright, Insurance Services Office, Inc., 2011

**4.** The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria cause an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

**5.** The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss form or under the Additional Coverage, Collapse.

**6.** The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form:

**a.** If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**b.** If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**F. Additional Coverage Extensions**

**1. Property In Transit**

This Extension applies only to your personal property to which this form applies.

**a.** You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

**b.** Loss or damage must be caused by or result from one of the following causes of loss:

**(1)** Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

**(2)** Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

**(3)** Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

**c.** The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

**2. Water Damage, Other Liquids, Powder Or Molten Material Damage**

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

**3. Glass**

**a.** We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.


Copyright, Insurance Services Office, Inc., 2011

**b.** We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension, **F.3.** does not increase the Limit of Insurance.

**G. Definitions**

**1.** "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

**a.** Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

**(1)** The cost of filling sinkholes; or

**(2)** Sinking or collapse of land into man-made underground cavities.

**b.** Falling objects does not include loss or damage to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means:

**(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and

**(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion. Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **c.(1)** or **c.(2)** of this definition of "specified causes of loss", such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground.


Copyright, Insurance Services Office, Inc., 2011

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ENDORSEMENT - VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

**A.** The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:

**1.** Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:

We will not pay for loss of or damage to any building that:

**a.** Has been vacant for more than sixty consecutive days before that loss or damage occurs; or

**b.** Was vacant at policy inception.

This provision does not apply if the Vacancy Permit applies.

**2.** The following is added to Section **E., Loss Conditions:**

**Increase In Hazard**

We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

**B.** The **Causes Of Loss - Basic Form, Causes Of Loss - Broad Form, and Causes Of Loss - Special Form** are revised as follows:

**1.** Exclusion **B.1.h., "Fungus", Wet Rot, Dry Rot, And Bacteria** is replaced by the following:

**h. "Fungus", Wet Rot, Dry Rot, And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot, or bacteria.

**2. Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot, And Bacteria** is deleted.

**C.** The following provision is added to the **COMMON POLICY CONDITIONS**:

**Premiums - Fully Earned:**

If loss or damage by a Covered Cause of Loss occurs to Covered Property and the Limit of Insurance for that Covered Property is paid, then the entire premium for such Covered Property is earned and no premium refund will be due in the event of cancellation.


© 2016 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA") establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). "Act Of Terrorism" is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

85% with respect to such Insured Losses occurring in calendar year 2015.

84% with respect to such Insured Losses occurring in calendar year 2016.

83% with respect to such Insured Losses occurring in calendar year 2017.

82% with respect to such Insured Losses occurring in calendar year 2018.

81% with respect to such Insured Losses occurring in calendar year 2019.

80% with respect to such Insured Losses occurring in calendar year 2020.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

The charge for such Insured Losses under this Coverage Part is included in the Coverage Part premium. The charge for such Insured Losses that has been included for this Coverage Part is indicated below, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA:

- 7% of your total Commercial Property Coverage Part premium if your primary location is in a Designated City (as listed below).
- 3% of your total Commercial Property Coverage Part premium if your primary location is not in a Designated City (as listed below).

© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

| **Designated Cities are:** | | | |
|---|---|---|---|
| Albuquerque, NM | El Paso, TX | Miami, FL | San Diego, CA |
| Atlanta, GA | Fort Worth, TX | Milwaukee, WI | San Antonio, TX |
| Austin, TX | Fresno, CA | Minneapolis, MN | San Francisco, CA |
| Baltimore, MD | Honolulu, HI | Nashville-Davidson, TN | San Jose, CA |
| Boston, MA | Houston, TX | New Orleans, LA | Seattle, WA |
| Charlotte, NC | Indianapolis, IN | New York, NY | St. Louis, MO |
| Chicago, IL | Jacksonville, FL | Oakland, CA | Tucson, AZ |
| Cleveland, OH | Kansas City, MO | Oklahoma City, OK | Tulsa, OK |
| Colorado Springs, CO | Las Vegas, NV | Omaha, NE | Virginia Beach, VA |
| Columbus, OH | Long Beach, CA | Philadelphia, PA | Washington, DC |
| Dallas, TX | Los Angeles, CA | Phoenix, AZ | Wichita, KS |
| Denver, CO | Memphis, TN | Portland, OR | |
| Detroit, MI | Mesa, AZ | Sacramento, CA | |


© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MULTIPLE DEDUCTIBLE FORM
## (FIXED DOLLAR DEDUCTIBLES)

This endorsement is **EFFECTIVE** 06/25/2017 and is part of Policy Number: WS324766

issued to: Lance Miller / Westhill Property Management Co. DBA Lance Miller

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

The following is added to the DEDUCTIBLE section:

**A.** In the event that loss or damage occurs to Covered Property at more than one building location as a result of one occurrence, the largest applicable deductible for that Covered Cause of Loss, shown in the Schedule above or in the Declarations, will apply.

**B.** The terms of this endorsement do not apply to any Earthquake Deductible or to any Windstorm or Hail Percentage Deductible provided elsewhere in this policy.

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

** For each deductible listed in this Schedule, enter the number corresponding to the Covered Cause(s) of Loss to which that deductible applies (or enter the description):

**(1)** All Covered Causes of Loss
**(2)** All Covered Causes of Loss **except** Windstorm or Hail
**(3)** All Covered Causes of Loss **except** Theft
**(4)** All Covered Causes of Loss **except** Windstorm or Hail and Theft
**(5)** Windstorm or Hail
**(6)** Theft
**(7)** Vandalism
**(8)** Other Peril: ______________________________

**SCHEDULE***

The Deductibles applicable to any one occurrence are shown below:

| **Prem. No.** | **Bldg. No.** | **Deductible** | **Covered Causes of Loss** ** |
|---|---|---|---|
| 001 | 001 | $ 1,000 | All Covered Causes of Loss |
| 002 | 001 | $ 1,000 | All Covered Causes of Loss |


Includes copyrighted material of Insurance Services Office, with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# THEFT EXCLUSION

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS - SPECIAL FORM

The following is added to the **EXCLUSIONS** Section:

We will not pay for loss or damage caused by or resulting from theft, and from acts of vandalism committed concurrently or in conjunction with theft.

But we will pay for:

**1.** Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or

**2.** Building damage caused by the breaking in or exiting of burglars.

And if theft results in a Covered Causes of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.


© 2015 The Travelers Indemnity Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CANCELLATION CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

The following is added to the **Cancellation** Common Policy Condition:

If any one of the following conditions exists at any building that is Covered Property in this policy, we may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least five days before the effective date of cancellation.

**A.** The building has been vacant or unoccupied 60 or more consecutive days. This dos not apply to:

**1.** Seasonal unoccupancy;

**2.** Buildings in the course of construction, renovation or addition; or

**3.** Buildings to which the Vacancy Permit endorsement applies.

Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**B.** After damage by a covered cause of loss, permanent repairs to the building:

**1.** Have not started; and

**2.** Have not been contracted for,

within 30 days of initial payment of loss.

**C.** The building has:

**1.** An outstanding order to vacate;

**2.** An outstanding demolition order;

**3.** Been declared unsafe by governmental authority.

**D.** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

**E.** Failure to:

**1.** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

**2.** Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.


Copyright, ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# JOINT OR DISPUTED LOSS AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** This endorsement is intended to facilitate payment of insurance proceeds when:

**1.** Both a boiler and machinery policy and this commercial property policy are in effect;

**2.** Damage occurs to Covered Property that is insured by the boiler and machinery policy and this commercial property policy; and

**3.** There is disagreement between the insurers as to whether there is coverage or as to the amount of the loss to be paid, if any, by each insurer under its own policies.

**B.** This endorsement does not apply if:

**1.** Both the boiler and machinery insurer(s) and we do not admit to any liability; and

**2.** Neither the boiler and machinery insurer(s) nor we contend that coverage applies under the other insurer's policy.

**C.** The provisions of this endorsement apply only if all of the following requirements are met:

**1.** The boiler and machinery policy carried by the named insured, insuring the Covered Property, contains a similar provision at the time of the loss or damage, with substantially the same requirements, procedures and conditions as contained in this endorsement.

**2.** The damage to the Covered Property was caused by a loss for which:

**a.** Both the boiler and machinery insurer(s) and we admit to some liability for payment under the respective policies; or

**b.** Either:

**(1)** The boiler and machinery insurer(s) does not admit to any liability for payment, while we contend that:

**(a)** All liability exists under the boiler and machinery policy; or

**(b)** Some liability exists under both the boiler and machinery policy and this commercial property policy;

**(2)** We do not admit to any liability for payment, while the boiler and machinery insurer(s) contends that:

**(a)** All liability exists under this commercial property policy; or

**(b)** Some liability exists under both the boiler and machinery policy and this commercial property policy; or

**(3)** Both the boiler and machinery insurer(s) and we:

**(a)** Do not admit to any liability for payment; and

**(b)** Contend that some or all liability exists under the other insurer's policy; and

**3.** The total amount of the loss is agreed to by you, the boiler and machinery insurer(s) and us.

**D.** If the requirements listed in Paragraph **C.** above are satisfied, we and the boiler and machinery insurer(s) will make payments to the extent, and in the manner, described as follows:

**1.** We will pay, after your written request, the entire amount of loss that we have agreed as being covered, if any, by this commercial property policy and one-half (1/2) the amount of the loss that is in disagreement.

**2.** The boiler and machinery insurer(s) will pay, after your written request, the entire amount of loss that they have agreed as being covered, if any, by the boiler and machinery policy and one-half (1/2) the amount of loss that is in disagreement.

**3.** Payments by the insurers of the amounts that are in disagreement, as described in Paragraphs **1.** and **2.**, do not alter, waive or surrender any rights of any insurer against any other with regard to the portion of the loss for which each insurer is liable.

**4.** The amount in disagreement to be paid by us under this endorsement shall not exceed the amount payable under the equivalent Loss Agreement(s) of the boiler and machinery policy.

 Copyright, ISO Commercial Risk Services, Inc., 1996 

5. The amount to be paid under this endorsement shall not exceed the amount we would have paid had no boiler and machinery policy been in effect at the time of loss. In no event will we pay more than the applicable Limit of Insurance shown in the Declarations.

6. Acceptance by you of sums paid under this endorsement does not alter, waive or surrender any other rights against us.

**E. Arbitration**

1. If the circumstances described in Paragraph **C.2.a.** exist and the boiler and machinery insurer(s) and we agree to submit our differences to arbitration, the boiler and machinery insurer(s) and we will determine the amount each will pay and will pay the insured within 90 days. Arbitration will then take place within 90 days after payment of the loss under the terms of this endorsement.

2. If any of the circumstances described in Paragraph **C.2.b.** exist, then the boiler and machinery insurer(s) and we agree to submit our differences to arbitration within 90 days after payment of the loss under the terms of this endorsement.

3. You agree to cooperate with any arbitration procedures. There will be three arbitrators: one will be appointed by us, and another will be appointed by the boiler and machinery insurer(s). The two arbitrators will select a third arbitrator. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. A decision agreed to by two of the three arbitrators will be binding on both parties. Judgment on any award can be entered in any court that has jurisdiction.

**F. Final Settlement Between Insurers**

The insurer(s) found responsible for the greater percentage of the ultimate loss must return the excess contribution to the other insurer(s). In addition, the insurer(s) found responsible for the greater portion of the loss must pay Liquidated Damages to the other insurer(s) on the amount of the excess contribution of the other insurer(s). Liquidated Damages are defined as interest from the date the insured invokes this Agreement to the date the insurer(s) that contributed the excess amount is reimbursed. The interest is calculated at 1.5 times the highest prime rate from the Money Rates column of the Wall Street Journal during the period of the Liquidated Damages. Arbitration expenses are not a part of the excess contribution for which liquidated damages are calculated. Arbitration expenses will be apportioned between insurers on the same basis that the ultimate loss is apportioned.


Copyright, ISO Commercial Risk Services, Inc., 1996

**THESE ENDORSEMENTS CHANGE THE POLICY. PLEASE READ THEM CAREFULLY.**

These endorsements modify insurance provided under the COMMERCIAL GENERAL LIABILITY COVERAGE PART.

# EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGES

The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**Punitive Or Exemplary Damages**

Any claim for punitive or exemplary damages, fines, penalties or multiplied damages.

S43-CG (1/14) © 2014 The Travelers Indemnity Company. All rights reserved.

---

## EXCLUSION - VOLUNTARY LABOR

This insurance does not apply to "bodily injury" or "personal and advertising injury" to, or medical expense sustained by, any person loaned to or volunteering services to you arising out of or in the course of work performed on your behalf.

S49-CG (10/04)

---

## AMENDMENT - DEPOSIT PREMIUM AND MINIMUM PREMIUM

Paragraph b. of Commercial General Liability Condition 5. Premium Audit is replaced by the following:

Premium shown in this Coverage Part as advance premium is both a deposit premium and a minimum premium for the full policy period. At the close of each audit period, we will compute the earned premium for that period. If the earned premium is more than the advance premium, notice of the amount by which it exceeds the advance premium will be sent to the first Named Insured. The due date for the audit and retrospective premiums is the date shown as the due date on the bill. If the earned premium is less than the advance premium, the advance premium will apply as the minimum premium, with no return premium payable to you.

S56-CG (10/04)

---

## EXCLUSION - PROFESSIONAL SERVICES

**PROVISIONS**

1. The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE A BODILY INJURY AND PROPERTY DAMAGE:**

   **Professional Services**

   "Bodily injury" or "property damage" arising out of the providing or failure to provide "professional services".

2. The following exclusion is added to Paragraph **2., Exclusions,** of **SECTION I - COVERAGES - COVERAGE B PERSONAL AND ADVERTISING INJURY:**

   **Professional Services**

   "Personal and advertising injury" arising out of the providing or failure to provide "professional services".

3. The following is added to the **DEFINITIONS** Section:

   "Professional services" means only those services performed by an insured in the insured's professional capacity as a provider of the services identified under the Classification column in the Premium Section of the Declarations.

S311-CG (3/11)

---

 © 2011 The Travelers Indemnity Company. All rights reserved.

# EXHIBIT "B"

NORTHFIELD
EXCESS & SURPLUS LINES | A TRAVELERS COMPANY

Mike Baker
*Claim Professional*
*Travelers*
*One Tower Square, MS06-A*
*Hartford, CT 06183*
*(916) 710-6717*
*(866) 342-7097 (fax)*

April 30, 2018

The Greenspan Company
Attn: John Hartshorn
16542 Ventura Blvd., #200
Encino, CA 91436-2092

| | | |
|---|---|---|
| Re: | Named Insured: | Lance Miller / Westhill Property Management Co. DBA Lance Miller |
| | Claim Number: | C5E4689 |
| | Date of Loss: | 2/10/2018 |
| | Location of Loss: | 9938 Commerce Ave, Tujunga, CA 91042 |
| | Underwriting Company: | Northfield Insurance Company |

Dear Mr. Hartshorn:

Northfield Insurance Company has completed its investigation pertaining to a roof collapse damage at 9938 Commerce Ave., Tujunga, CA, 91042.[1] As explained further below, there is no coverage under the policy for this loss.

## I. Factual Background

You reported damage to primarily the building's roof and surrounding structural materials after the loss occurred on February 10, 2018. We inspected the loss site on February 16th and February 23rd, 2018 and our retained engineer inspected the loss site on February 23rd and March 7th, 2018.

Our investigation has determined that the affected building was vacant for more than sixty consecutive days before the loss occurred. The insured's representative Michael Van Volcom explained during the February 23rd loss site inspection that the current tenant Edvin Mailyan started paying rent for the building in early 2017. However, as of the date of the loss, Mr. Van Volcom stated the tenant had not actually moved in or begun business operations. When we spoke to Mr. Mailyan on March 20th, 2018, he advised that he last visited the location a few months before the loss. During our inspections, the only personal property observed in the building was one ladder. An employee of a neighboring business advised that no business has occupied the loss site for about a year, which is consistent with the representation by Mr. Van Volcom.

We also interviewed Mr. Mailyan, whose statements about his business operations and use of the building were vague and inconsistent with other information we obtained. Mr. Mailyan was first interviewed by telephone on March 20, 2018. Mr. Mailyan stated that his business was a

[1] In addition to the loss location, the policy also insures property located at 4206-4210 Santa Monica Blvd., Los Angeles, CA.

seasonal holiday business selling toys. Mr. Mailyan also stated that he previously used the building to store toys, but at the time of the loss the building was vacant. Later that day, a follow up interview with Mr. Mailyan was conducted in person. He stated that he signed the lease in December 2016 and moved in during February 2017. He confirmed that the building was used as seasonal storage for toys. Mr. Mailyan also confirmed the building was vacant at the time of the loss and that the last time he visited the building was a few months before the loss.

Although Mr. Mailyan stated that he used the building as storage, this statement appears inconsistent with the information provided by Mr. Van Volcom as well as personnel from the adjacent business. Mr. Mailyan's statement that he moved into the building in February 2017 is not only contradicted by Mr. Van Volcom, but it is contrary to the terms of the lease. The lease period does not commence until April 3, 2017.

As part of Northfield's risk assessment, on August 15, 2017 both locations on the policy were inspected by Coast Inspection Services. On that date, it was observed that the loss location was vacant. There was broken exterior glass noted. In addition, photographs of the building show plywood installed on the interior of many of the windows. The Santa Monica Blvd. location, on the other hand, was observed to be occupied with operating retail shops and a salon.

Additionally, Travelers retained Jeff Coronado Structural Engineering Consultants to determine the cause of the loss event. Based upon Mr. Coronado's report, the cause of the roof collapse was a failure in the bottom chord of the eastern-most bowstring truss due to vertical over stress. The failure resulted in some of its load being distributed to the neighboring truss, which was incapable of supporting the additional load, causing it to fail as well. This pattern continued in a chain reaction until all trusses collapsed.

As part of his analysis, Mr. Coronado ruled out both wind and water intrusion as possible causes of loss. With respect to the wind, Mr. Coronado determined the average wind pressure for the date of loss to be 0.064 (0.58 gust value) pounds per square foot. Historically, the building has been subjected to significantly larger wind pressures than the wind pressure on the date of loss. Moreover, the design wind speed for the loss location was determined to be 110 mph, which corresponds to a design wind pressure of 30.98 pounds per square foot, which is approximately 50 times greater than the wind pressure recorded on the date of loss.

Mr. Coronado also ruled out water as a possible cause of loss as no precipitation was recorded by the two nearest weather stations in the two months preceding the date of loss.

Mr. Coronado also observed two air handlers that had been attached to the building, one in the northwest corner and the other in the northeast corner. The air handler in the northwest corner showed signs of wear and use, while the air handler in the northeast corner appeared shiny and new. The ductwork attached to the air handler in the northeast corner also appeared new. The Los Angeles Building Department did not have any permits on file for the installation of the air handlers and ductwork.

On pages 10-11 of his report, Mr. Coronado summarized his conclusions as to the cause of loss, noting in part as follows:

> The vertical load in the failed connection was preliminary calculated to be 1.85, indicating the bottom chord vertical loading was 85% greater than its rated capacity. In this condition, additional loading would trigger failure. It follows that the cause of loss was a vertical over stress of the bottom chord.
>
> . . .
>
> The bottom chord had axial loading imposed by roof loads, and vertical loading imposed by the ceiling loads. Photograph 12 shows in blue up and down arrows the reactions at the bottom chord that caused a tendency of the steel plate to rotate clockwise (red semi-circular arrow) in response to the downward force (green, dashed downward arrow) caused by this loading.
>
> The diameter of the bolts in the bottom chord splices of the bowstring trusses was 7/8 of an inch. The minimum recommended distance from the center of a 7/8 inch diameter bolt to the edge of the member, as specified in the National Design Specification for Wood (NDS), is 3 ½ inches to prevent the lumber from splitting. The observed distance at the top of the member, encircled in yellow in Photograph 13, was measured to be 2 ½ inches.
>
> It follows that the reduced edge distance induced the split observed in Picture 14, in response to the applied loading. This split then reduced the bolt's ability to carry its load and the added weight of the interior air handlers that were being installed at the time of the failure. The resultant overloading of the adjacent bolts led to the failure of the bottom chord immediately south of the splice.

The report from Jeff Coronado Structural Engineering Consultants was provided to your office on April 16th, 2018 via email.

## II. The Policy

Northfield Insurance Company issued policy number WS324766 to Lance Miller / Westhill Property Management Co. DBA Lance Miller, with effective dates from 06/25/1017 to 06/25/2018. The policy contains both a liability coverage part and property coverage part. With respect to the premises description, The Commercial Property Coverage Part Declarations provides the following information: "Location (Including County, Zip Code), # of Stories, Construction, Occupancy, Protection Class." The loss location is described as follows: "9938 Commerce Ave, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2." Notably, the building is located adjacent to a liquor store that is currently in business. There is a public

sidewalk along the front of the building, which, before the loss, had a storefront containing large windows on both sides of the entryway door.

Please refer to pages 10-11 of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CP 00 10 (10/12), where it states in part:

...

E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

...

6. Vacancy

a. Description Of Terms

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

...

Please refer to **Endorsement-VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES**, S69-CP (11/16), page 1 of 1. The endorsement states:

...

A. The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:

1. Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:

   We will not pay for loss of or damage to any building that:

   a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or
   b. Was vacant at policy inception.

   This provision does not apply if the Vacancy Permit applies.

2. The following is added to Section E., Loss Conditions:

   **Increase In Hazard**

   We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

Additionally, please refer to pages 1 through 4 of 10 in the form, CP 10 30 10 12, **CAUSES OF LOSS – SPECIAL FORM.** The policy states in part:

...

B. Exclusions

2. We will not pay for loss or damage caused by or resulting from any of the following:

   k. Collapse, including any of the following conditions of property or any part of the property:

      (1) An abrupt falling down or caving in;
      (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
      (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

   But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

   This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";
(ii) Breakage of building glass;
(iii) Weight of rain that collects on a roof; or
(iv) Weight of people or personal property.

...

Now please refer to pages 7 of 10 of the same coverage form. The policy states in part:

...

D. **Additional Coverage – Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in 0.1. through D.7.

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;
   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.
   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in 2.a. or 2.b.;
      (2) One or more of the "specified causes of loss";
      (3) Breakage of building glass;

(4) Weight of people or personal property; or
(5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

a. A building or any part of a building that is in danger of falling down or caving in;
b. A part of a building that is standing, even if it has separated from another part of the building; or
c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

...

## III. Coverage Position

There are two primary reasons why the policy does not provide coverage for this loss. First, at the time of loss the property was vacant within the meaning of the policy and thus no coverage exists for any cause of loss. In prior communications, your position has been that the property was not vacant because the tenant was paying rent. We respectfully disagree. The payment of rent is a factor that only goes toward satisfying the first part of the vacancy definition, *i.e.*, that the building must be rented to a lessee. The second part of the vacancy definition requires that the building be "used by the lessee to conduct its customary operations." Mr. Van Volcom acknowledged that, since entering into the lease, Mr. Mailyan never moved in or began business operations. Although Mr. Mailyan provided vague and inconsistent statements regarding his business operations and use of the building, Mr. Mailyan admitted that the building was vacant at the time of the loss and that he had not stopped by the building for a few months prior to the loss. In addition, although Mr. Mailyan stated that he moved into the building in February 2017, by August 15, 2017 the building was clearly vacant.

Even if Mr. Mailyan was using the building for storage at some point, such use is not sufficient to constitute the "customary operations" of a building described on the policy declarations page as an office. The building has a storefront with large windows and a glass door, which is indicative of an office and/or retail use, not storage. A vacant building carries with it an increased risk of hazard. A vacant building containing personal property that might be seen through large storefront windows and glass doors by anyone walking on the sidewalk is arguably an even greater risk of hazard than a vacant building without personal property.[2] A vacant building used for seasonal storage of personal property does establish the continuing and significant presence at the building that is expected with the customary operations of an office and/or retail building. Thus, a limited use of the building for seasonal storage of property, even if true, is not sufficient to constitute "customary operations" within the context of the vacancy exclusion.

[2] Although the photographs from the August 15, 2017 inspection show many of the window openings covered with plywood, it appears the glass doorway and two window panes were not covered.

The increased risk of hazard for a vacant building is acknowledged under section 13.1(a) of the insured's lease with Mr. Mailyan. It is an event of default under the lease for the tenant to vacate "the Premises without providing a commercially reasonable level of security, *or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof*, or without providing reasonable assurances to minimize potential vandalism." (Emphasis added). Notably, vacating the premises is a default under the lease without regard to whether rent payments are continuing. This is because the payment of rent has nothing to do with "a commercially reasonable level of security." It is also important to emphasize that the insured acknowledges in its lease that a vacant building not only increases the risk of hazard, but jeopardizes its insurance. The insured understands the increased risk of loss inherent with a vacant building and expressly contracted to make vacancy a default event. Moreover, the insured understood that its insurance coverage would be jeopardized as a result of the building being vacant. Accordingly, it is Travelers' position that the loss is excluded under the vacancy restriction as set forth above.

Even if the building was not vacant, the loss is excluded under the applicable collapse provisions. The cause of the collapse is an overstressed bottom chord of the truss, which is excluded under the policy. Mr. Coronado ruled out both wind and water as possible causes of the loss. None of the other specified causes of loss that are set forth in the additional coverage for collapse apply.

This decision is based on the information and documentation we received during our research of this claim. If you are aware of any new or different information or documentation that might lead us to reconsider our decision, please contact me immediately.

This letter is not intended to recite each and every fact or circumstance upon which we relied in determining the outcome of your claim. In addition, your policy may have other terms, conditions and exclusions that apply to this claim. We do not waive any rights, including our right to deny coverage, for any other valid reason under the policy or at law.

We remind you to review the "Legal Action Against Us" condition in the policy, which can be found in the Commercial Property Conditions, form CP 00 90 07 88, page 1 of 1. This condition states, in part, that the time limit for bringing action is 2 years after the date on which the direct physical loss or damage occurred.

Please understand that we cannot give advice regarding an insured's or claimant's legal rights. Thus, our interpretation of the law should not be considered legal advice. An insured or claimant who has questions regarding the time within which a lawsuit may be brought against us, or any other questions about legal rights regarding the policy or this claim, has the right to seek legal counsel at their own expense.

Please note that we will not pursue subrogation against whatever parties may be responsible for the claimed loss. Thus, any recovery to be pursued in connection with this matter is now the responsibility of the owner(s) of the property that is the subject of this claim, or to whoever this

right may be assigned. The cost and expenses incurred in pursuing subrogation are to be borne by the party(ies) pursuing it.

We are also required to advise you that you may have your claim reviewed by the California Department of Insurance, Consumer Services Division, 300 South Spring Street, South Tower, Los Angeles, CA 90013, (800-927-4357).

If you have any questions, please contact me at (916)710-6717 or MWBAKER@travelers.com.

Sincerely,

Mike Baker

Michael Baker
Claim Professional
Direct: (916)710-6717
Fax: (866)342-7097
Email: MWBAKER@travelers.com

CC: Lance Miller/ Westhill Property Management Co., DBA Lance Miller

# EXHIBIT "C"

# FORTIS LLP

Stanley Shure
Special Counsel
Direct: (310) 309-9571
sshure@fortislaw.com

December 28, 2018

***VIA E-MAIL ONLY***

Northfield Insurance Company
Attn: Mike Baker, Claim Professional
Travelers
One Tower Square, MS06-A
Hartford, CT 06183
Email: MWBAKER@travelers.com

Re: Response to Northfield's April 30, 2018 Denial of Coverage

| | |
|---|---|
| Insured(s): | Lance Miller/Westhill Property Management Co.<br>DBA Lance Miller |
| Policy No.: | Northfield Insurance Company Policy No. WS324766 |
| Policy Period: | June 25, 2017 to June 25, 2018 |
| Northfield's Claim No.: | C5E4689 |

Dear Mr. Baker:

We are in receipt of your letter of April 30, 2018, in which you wrote on behalf of Northfield Insurance Co. ("Northfield") to advise that Northfield had completed its investigation pertaining to the roof collapse damage at 9938 Commerce Avenue, Tujunga, CA 91042 (the "Commerce Building"), and Northfield has concluded that there is no coverage under Northfield Insurance Policy No. WS324766 (the "Policy"). According to your letter, Northfield contends there is no coverage under the Policy for two reasons: (1) at the time of loss, coverage for the Commerce Building was "excluded" under the vacancy provisions of the Policy; and (2) irrespective of vacancy, the loss is excluded under the Policy's collapse exclusion. As explained in greater detail, neither of these reasons is meritorious.

***First***, although identified in the Policy as a "Loss Condition", Northfield acknowledges (as it must) that when it denied coverage the vacancy provisions upon which it relies function as an exclusion[1], as they purport to take away or limit coverage. Thus, Northfield has the burden to establish that its vacancy exclusion is conspicuous, plain, and clear. Northfield cannot make this showing and, as a result, the vacancy exclusion provisions are unenforceable. *See, e.g., TIG Ins. Co. of Mich. v. Homestore*, 137 Cal. App. 4th 749, 760 fn. 11 (2006).

The vacancy exclusion provisions upon which Northfield relies to deny coverage were hidden by Northfield in its 148-page policy, buried deep in a densely packed 15-page policy form entitled "**BUILDING AND PROPERTY COVERAGE FORM**" under the misleading label "Loss Conditions". The Northfield "Loss Conditions" consist of seven different provisions - six of which are actual post-loss conditions, with the seventh being the "vacancy" exclusion provisions that preclude coverage for loss if the risk of vacancy (as defined by Northfield) exists. Miller's characterization of Northfield's vacancy provisions as acting as a policy exclusion or limitation is also reasonable and consistent with California case law, as well as the practices of other insurers who physically place vacancy provisions akin to Northfield's in the exclusion section of their policies. *See, e.g., TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 23 (2006).

Nor would a reasonable insured (such as Miller here), who is trying to determine what risks – sometime also referred to as perils – are covered by Northfield's "all risk" policy, find the vacancy exclusion provisions. Instead, Northfield directs an insured who is reviewing the Policy's **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** for exclusions and limitations to: "See applicable Causes of Loss form as shown in the Declarations." However, the applicable ". . . Causes of Loss" form, entitled "Causes of Loss – Special Form", nowhere references vacancy as an exclusion or limitation. Under the facts presented here, the "vacancy" provisions of the Northfield policy are not conspicuous and are therefore unenforceable. *See TIG Ins. Co. of Mich., supra*, 137 Cal. App. 4th at 760 fn. 11.

***Second***, even if the Northfield vacancy provisions are ultimately deemed to be conspicuous (and they are not), they will be construed as an exclusion. *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1191 (1998). The excluded "risk" ("peril") of vacancy was neither the cause of nor a contributing factor to the loss that occurred. Indeed, the asserted "vacancy" of the Commerce Building had nothing to do with the failure of the trusses and resulting roof failure, as exemplified by Northfield's own engineering report regarding the loss, as well as Miller's.[2] Under California law, however, an exclusion precludes coverage ***only*** if it is the predominant cause of the loss. *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395, 402 (1989). Accordingly, even if the Northfield vacancy provisions are enforceable as a policy exclusion, they do not apply to and bar coverage for the losses sustained at the Commerce Building.

[1] *See* Northfield's April 30, 2018 Denial Letter at p. 8.

[2] *See* Report of Jeffrey Coronado dated April 16, 2018 submitted to Travelers, and the July 31, 2018 Report of Coffman Engineers.

***Third***, the facts support the position that Northfield has waived and/or is estopped from relying on its vacancy exclusion. The August 15, 2017 "Inspection" that Northfield conducted on the Commerce Building – which Miller paid for – found both that the Commerce Building was vacant and that certain windows of that building were broken. The focus of an Inspection undertaken by Northfield per the terms of the Policy ". . . relate only to insurability and the premiums to be charged." (Common Policy Conditions, D. "Inspections And Surveys" ¶ 2 [p. 9 of 148]). Northfield informed Miller about the Commerce Building's broken windows and demanded that they be fixed. Northfield said ***nothing*** to Miller, however, about its August 15, 2017 observation that the property was vacant, its rights to cancel the Policy if the property was vacant, its no-coverage position if the property is vacant, or the ability for Miller to obtain, albeit at a higher premium, a Vacancy Permit that would provide coverage for the building if vacant. Northfield (and/or its underwriters) had a duty to fully inform Miller about the observations made in connection with its inspection and their implications and failed to do so.

Northfield withheld from its insured what it considered to be material and relevant information about the insurability of the Commerce Building, accepting the full amount of the premiums it had charged for the Commerce Building with its eyes wide open. Northfield effectively agreed to insure the Commerce Building even if it was "vacant" as they defined it, and it has waived or is otherwise estopped from now – after an otherwise covered loss had occurred – relying upon the *vacancy* of the Commerce Building to deny coverage. *See* Ins. Code § 336; *Turner v. Redwood Mut. Life Assn.*, 13 Cal. App. 2d 573, 577-78 (1936).

***Fourth***, Northfield's assertion that the Commerce Building was "vacant" per the terms of the Policy for the sixty (60) days preceding the February 10, 2018 loss is not supported by the plain language of the Policy. Under the Policy's "Vacancy" Loss Condition, a building is deemed "vacant" unless 31% or more of the building's square footage (1) is rented or leased, and (2) used by the lessee to conduct its customary operations. As for the first requirement, there can be no reasonable doubt that more than 31% of the Commerce Building was rented to Mr. Mailyan. As for the second, the plain meaning of the undefined phrase "customary operations" refers to the common or usual work or business operations of a building's tenant. And the entirety of the Commerce Building – from the inception of the Policy on June 25, 2017, through the February 10, 2018 loss – was leased to Mr. Mailyan for $8,000 per month and used by him in its customary role as the warehouse and distribution center for his Southern California-based seasonal toy business. Thus, it was not "vacant," as both 31% thresholds are satisfied. The reasonableness of Mr. Miller's interpretation is further supported by other sections of the Policy; to wit: the "Cancellation Changes" Endorsement.

***Fifth***, Northfield's reliance on the Policy's collapse exclusion as further justification for its denial is also sorely misplaced. One of the exceptions to the Policy's "Collapse Exclusion" contained in the Policy's "Additional Coverage, Collapse" provisions is for "hidden decay". California case law from 2001involving the failure of older "bow string trusses" that caused a building's roof to collapse (and which contains the same "Additional Coverage, Collapse" *hidden decay* language as found in Northfield's Policy) is both factually and legally directly on point and mandates that Northfield cover the Commerce Building loss because the failure of the "bow string trusses" qualifies as *hidden*

*decay*.[3] *See Stamm Theatres v. Hartford Casualty Ins. Co.*, 93 Cal. App. 4th 531 (2001). Yet, Northfield, as reflected in its April 30, 2018 coverage denial letter, never conducted any analysis (nor directed its "structural engineer") to determine whether the failure of the Commerce Building's bow string trusses qualifies (as is the case here) as *hidden decay* and therefore qualifies as a covered cause of loss under the "Additional Coverage, Collapse" provisions of the Northfield policy.

Additionally, the *hidden decay* of the Commerce Building's bow string trusses was, in turn, due to lost moisture over the course of the eighty (80) years they were in place.[4] The Policy is an "all risk" policy, and the risk of "loss of moisture" for real property (which here resulted in the weakening and ultimate failure of the trusses) is a covered cause of loss. A jury presented with all the facts will find that this covered cause of loss is the efficient proximate cause of the loss irrespective of the application of the Collapse Exclusion. Coverage for the Commerce Building loss therefore exists. *See Davis v. United Servs. Auto Assn.*, 223 Cal. App. 3d 1322, 1328 (1990) ("The general rule is that in an all-risk property insurance such as the one issued by USAA to the Davises, all risks are covered unless specifically excluded in the policy.") (Citation omitted); *Garvey, supra,* 48 Cal. 3d at 413 fn. 11 (the issue of efficient proximate cause is a question for the jury).

***Finally,*** Miller is aware of facts that are sufficient – even at this early stage – to present to a jury the question of whether Northfield's denial of Miller here was unreasonable. Miller's "bad faith" claim against Northfield is currently predicated upon, *inter alia:* (i) Northfield intentionally hiding from Miller its inspection results regarding "vacancy" to use them as a coverage defense if a covered loss occurred during the policy period (*see, e.g., Howard v. American Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498 (2010) (insurer's refusal to settle could not be excused as a reasonable dispute because, *inter alia*, its no-coverage position was based on cherry-picked deposition testimony); and (ii) its failure to conduct a reasonable investigation by looking at *hidden decay* as a Covered Cause of Loss.[5] *See, e.g., Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1072 ("[T]o protect the interests of its insured, it was 'essential that an insurer *fully* inquire into *possible* bases that might support the insured's claim.") (Quoting *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 819 (1979) (Emphasis in original)).

For these and the other reasons set forth below, Northfield's denial of coverage is erroneous, and it must immediately reverse its prior declination of coverage.

---

[3] *See* Coffman Engineers, Inc.'s Forensic Report, dated July 31, 2018, pgs. 2, 5-9, attached hereto.
[4] *See* Coffman Engineers, Inc.'s Forensic Report, dated July 31, 2018, pgs. 2, 8-9, attached hereto.

[5] Northfield was required to look as hidden decay as a Covered Cause of Loss in light of the Court of Appeal's 2001 decision in *Stamm Theatres, supra*, 93 Cal. App. 4th 531.

## *I.*

## ***Material Omissions in Northfield's Coverage Denial Correspondence***

As a preliminary matter, we note that the "factual" section in Northfield's April 30, 2018 Coverage Denial Correspondence is misleading in a number of different ways. Indeed, among other things, Northfield's April 30th correspondence conveniently fails to mention:

(i) qualifying statements made by Michael Van Volkom that shine a ***very*** different light on the statements Northfield attributed to him therein;

(ii) that the purpose of its August 15, 2017 "inspections" – inspections that Northfield's insured Lance Miller paid for when he purchased the Northfield Policy – was to determine if any "insurability" issues existed at either of the buildings Northfield was insuring, including the Commerce Building;

(iii) that Miller, when informed by Northfield of its August 15, 2017 inspection "insurability" observation about the existence of broken glass windows at the Commerce Building, immediately addressed the issue by having the broken windows replaced;

(iv) that Northfield ***never*** informed Miller of its August 15, 2017 "insurability" observations about the apparent "vacancy" at the Commerce Building, until ***after*** the Commerce Building February 10, 2018 loss had occurred;

(v) that Northfield's representatives literally barged in on Mr. Mailyan – Miller's tenant – at his home, unannounced and uninvited, when they conducted their face-to-face interview with him; and

(vi) that Northfield never – in fact – established that the Commerce Building was "vacant" – as the term is defined by the Policy – for the entire sixty (60) days preceding the February 10, 2018 loss.[6]

---

[6] Though Northfield reports in its April 30, 2018 denial correspondence that Mr. Mailyan, the tenant, had not been to the Commerce Building for a couple of months before the loss on February 10, 2018 had occurred, the statements attributed to Mr. Mailyan by Northfield do ***not*** establish that the building was "vacant" as Northfield interprets the term. For example, Northfield, per its own self-serving recitation of its discussions with Mr. Mailyan, never established whether within 60 days of the Commerce Building loss – through people he employed or otherwise contracted with – he was, *inter alia,* bringing in, storing, and shipping out goods involving his toy business from the Commerce Business and how much of the building's square footage these activities involved. Given that sixty (60) days before the Loss encompassed the period before Christmas 2017, there is a significant chance that Mr. Mailyan's business was still conducting substantial business activities at the Commerce Building during this time period.



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

One can reasonably infer from Northfield's repeated failures to mention these pertinent facts in its April 30, 2018 Denial Letter that there omission evidences a failure to conduct a reasonable objective inspection.

## *II.* *Principles of Policy Interpretation*

### A. General Principles.

"An insurance policy, like all contracts, is to be interpreted to effectuate the mutual intent of the parties." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821 (1990); *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 666-67 (1995). Such intent is to be inferred, if possible, solely from the written provisions of the contract. Cal. Civ. Code § 1639. Words in an insurance policy must be understood in their ordinary sense unless given special meanings by the policy. *Maryland Casualty Co. v. Nationwide Ins. Co.*, 65 Cal. App. 4th 21, 28 (1998).

The court must interpret the contract as a whole, with each provision lending meaning to the others. It should not read any term in isolation. *Winkler v. Nat'l Union Fire Ins. Co.*, 930 F.2d 1364, 1366 (9th Cir. 1991) (applying California law); *Foster-Gardner, Inc. v. Nat'l Union Fire Ins.*, 18 Cal. 4th 857, 868 (1998) (contractual language "must be construed in the context of that instrument as a whole"); *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1392 (2008) ("We consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation."); *Stamm Theatres, Inc., supra,* 93 Cal. App. 4th at 538 (contracts must be interpreted in a manner that gives effect to every part of the agreement, with "each clause helping to interpret the other"). Moreover, insurance policies must be construed so as to avoid redundancy and render terms mere surplusage. *See, e.g., ACL Tech. v. Northbrook Property & Casualty Ins. Co.*, 17 Cal. App. 4th 1773, 1785-86 (1993).

A court's interpretation must also be from the perspective of the meaning a reasonable layperson would give the words used in context. *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 649 (2003). Context here refers not only to the meaning given to a particular word or policy provision or how such meanings are influenced by the other words or policy provisions used in the policy, but it also refers to the impact the factual context existing in the situation has upon the meaning of the words or provisions being interpreted. *Mitroff v. United Servs. Auto. Ass'n*, 72 Cal. App. 4th 1230, 1239 (1999).

When an insurance policy is susceptible to two or more reasonable interpretations, ambiguity exists. *MacKinnon, supra,* 31 Cal. 4th at 648. Any ambiguity is "resolved in the insureds' favor, consistent with the insureds' reasonable expectations." *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763 (2001) (citation omitted); *AIU, supra,* 51 Cal. 3d at 822. In determining whether there is an ambiguity, California courts "interpret the language in context, with regard to its intended function in the policy, as well as common sense." *Maryland Casualty Co., supra,* 65 Cal. App. 4th at 30. In fact, words in a Policy that are clear and unambiguous in one factual context can become

ambiguous when interpreted in a different factual context. *Bank of the West v. Superior Court,* 2 Cal. 4th 1254, 1265 (1992).

California courts have adopted special rules for the interpretation of policy exclusions. *North American Bldg. Main., Inc. v. Fireman's Fund Ins. Co.,* 137 Cal.App.4th 627, 642 (2006). While insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer. *MacKinnon, supra,* 31 Cal. 4th at 648. Notably, exceptions to exclusions, like grants of coverage in insuring agreements, are broadly interpreted in favor of the insured. *State of California v. Allstate Ins. Co.,* 45 Cal. 4th 1008, 1018 (2009); *Aydin Corp., supra,* 18 Cal. 4th at 1192.

These rules of construction are applied with even greater force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purported to be excluded. *MacKinnon, supra,* 31 Cal. 4th at 648. When a policy is written broadly to provide a broad scope of coverage for the operations of the insured's business, then policy exclusions must be interpreted narrowly in light of the purpose of the insurance coverage. *Id.* at 654. If there is any ambiguity or uncertainty in a policy exclusion, then the provision must be interpreted in favor of the insured and his reasonable expectation of coverage. *County of San Diego v. ACE Prop. & Cas. Ins. Co.,* 37 Cal. 4th 406, 415 (2005).

**B. If A Policy Provision Is Not Conspicuous, It Is Not Enforceable.**

An insurer cannot escape its basic duty to insure based upon a policy exclusion that is unclear. *Haynes v. Farmers Ins. Exch.,* 32 Cal. 4th 1198, 1204 (2004). To be effective and enforceable, a policy exclusion must be stated clearly to apprise the insured of its effect. *Id.* Any provision that takes away or limits coverage reasonably expected by an insured must be "conspicuous, plain, and clear."[7] *Id.* Any policy exclusion or provision that takes away coverage must be placed and printed in the policy in such a way that it attracts the reader's attention. *Id.* To be effective and enforceable, policy exclusions must be stated with precision and understandably, in words that are part of the working vocabulary of the average layperson. *Id.* The burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer. *Id.* "[E]xceptions and limitations on coverage the insured could reasonably expect must be called to the subscriber's attention clearly and plainly before the exclusion will be interpreted to relieve the insurer of the liability for performance." *Davis, supra,* 223 Cal. App. 3d at 1332 (citation omitted).

For example, "[c]ourts have invalidated exclusions as not conspicuous where not in a section labelled exclusions and placed on an overcrowded page, or in a section labeled 'General Limitations' but in a 'dense pack' format, or hidden in a subsequent section of the policy bearing no clear relationship to the insuring clause and concealed in fine print." *TIG Ins. Co. of Mich., supra,* 137 Cal. App. 4th at 760 fn. 11 (citing, *inter alia, Jauregui v. Mid-Century Ins. Co.,* 1 Cal. App. 4th 1544, 1549 (1991) (language limiting permissive user liability was not conspicuous because it did

[7] "The best indicator of an insured's reasonable expectation of coverage is, of course, the language of the insurance policy." *Spangle v. Farmer's Ins. Exchange,* 166 Cal. App. 4th 560, 569 (2008).

not appear in either the 'Exclusions' or 'Limits of Liability' sections where insured was likely to look, but in 'Other Insurance' section); *Ponder v. Blue Cross of Southern Cal.*, 145 Cal. App. 3d 709, 722-723 (1983) (exclusion was not conspicuous when located under a misleading caption and on a page containing more than 2,000 words, plus 17 numbers and 54 letters designating headings and subheadings divided into three columns)).

## *III.*
## *The Relevant Policy Provisions*

Northfield Policy No. WS324766 was issued to Lance Miller / Westhill Property Management Co. DBA Lance Miller for the policy period from 06/25/17 to 06/25/18. Among other things, the Common Policy Declarations page refers to a previous policy number (WS282922), it describes the business as "Lessor's risk", and it refers to an inspection fee of $175.00. The Policy contains both a liability coverage part and a property coverage part. The Policy's Schedule of Forms and Endorsements includes a reference to "Causes of Loss – Special Form." It also refers to "Endorsement – Vacancy Restriction and Fungus Exclusion Changes," which was purportedly added per an 11/16 form.

The Policy's Common Policy Conditions, which are incorporated into all Coverage Parts, provides, in pertinent part, as follows:

> **D. Inspections And Surveys**
>
> 1. We have the right to:
>
>     a. Make inspections and surveys at any time;
>
>     b. Give you reports on the conditions we find; and
>
>     c. Recommend changes.
>
> 2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. . . .

The Policy's **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** page describes the relevant Premises as follows: 9938 Commerce Avenue, Tujunga, CA, Los Angeles, 91042, 1 Story, Frame, Office, PC2." The Policy provides $550,000 in Limits of Insurance for this premises.

The Policy's **BUILDING AND PERSONAL PROPERTY COVERAGE FORM,** *which is 15 pages in length and in a dense pack two-column format*, states, in relevant part, as follows:

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1. Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building**, meaning the building or structure described in the Declarations, . . .

. . . . .

**3. Covered Causes Of Loss**

See applicable Causes Of Loss form as shown in the Declarations.

Per the terms of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, an insured, to determine what qualifies as a covered and excluded risks under the Policy, must look to the Causes Of Loss Form of the 148 pages making up the Policy.

The **BUILDING AND PERSONAL PROPERTY COVERAGE FORM** also contains from pages 10 to 12 of this form a section entitled "Loss Conditions". The Loss Condition at page 11 of this form, provides in pertinent part:

E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

. . .

**6. Vacancy**

**a. Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

(a) When policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

**b. Vacancy Provisions**

**a. Description Of Terms**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss . . . .

The Policy also contains an **Endorsement-VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES**, which in pertinent part states:

A. The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:

1. Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:

We will not pay for loss of or damage to any building that:

a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or
b. Was vacant at policy inception.

This provision does not apply if the Vacancy Permit applies.

2. The following is added to Section E., Loss Conditions:

**Increase In Hazard**

We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

The Policy issued by Northfield contains a **CAUSES OF LOSS – SPECIAL FORM** which defines **Covered Cause of Loss** as "When Special is show in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." Notably, not a single reference to the term vacancy can be found anywhere in this form.

The **CAUSES OF LOSS - SPECIAL FORM** also contains an "exclusion" section that states in part:

...

B. Exclusions

2. We will not pay for loss or damage caused by or resulting from any of the following:

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;
(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage, Collapse; or

(b) To collapse cause by one or more of the following:

(i) The "specified causes of loss";



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

. . .

Later, in the same **CAUSES OF LOSS - SPECIAL FORM,** Northfield, irrespective of the Collapse Exclusion, nevertheless promised to provide coverage under certain circumstances for loss caused by collapse. These exceptions to the Collapse Exclusion are found in the "Additional Coverage – Collapse" provisions found in this form.

D. **Additional Coverage - Collapse**

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;
   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.
   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in 2.a. or 2.b.;
      (2) One or more of the "specified causes of loss";
      (3) Breakage of building glass;
      (4) Weight of people or personal property; or
      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage - Collapse** does **not** apply to:

a. A building or any part of a building that is in danger of falling down or caving in;
b. A part of a building that is standing, even if it has separated from another part of the building; or
c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

. . .

## *IV.*
## *All-Risk Policies*

Here, Mr. Miller paid for an all-risk property policy to protect against loss to the insured premises, which included the Commerce Building. The purpose of an "all-risk" policy is to "insure losses when the cause of the loss is unknown or the specific risk was not explicitly contemplated by either party." (7 Couch on Insurance, § 101.7 (3d ed. 2010) (citations omitted). Under an "all-risk" policy, the insured has the "threshold burden of proving a loss within the policy's insuring clause." Hon. H. Walter Croskey, *et al.*, *Cal. Practice Guide: Ins. Lit.*, ¶ 6:250 (Rutter Group 2011) (citing *Garvey, supra*, 48 Cal. 3d at 406). "The burden on the insured in this situation is usually minimal, basically requiring proof only that the insured suffered a 'direct physical loss' (or 'accidental direct physical loss') while the policy was in effect." *Id.* Once the insured has done so, the burden shifts to the insurer to prove the loss was caused by an excluded peril. *Id.*; *see also Davis, supra*, 223 Cal. App. 3d at 1328 ("The general rule is that in an all-risk property insurance such as the one issued by USAA to the Davises, all risks are covered unless specifically excluded in the policy." (Citation omitted).

## *V.*
## *Analysis*

### A. Northfield's Vacancy Argument is Without Merit.

The first ground upon which Northfield has denied coverage for Mr. Miller's claim is the Policy's vacancy provision. That provision states, in pertinent part, that "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs: (1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss . . . ." Northfield's argument fails for at least three reasons.

#### *1. The Vacancy Provision is Unenforceable Because It is An Exclusion That Is Not Conspicuous.*

Preliminarily, we note that while the vacancy provision is included within a list of so-called "Loss Conditions" in Section E of the Policy's **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**, it is clearly an exclusion and must be interpreted as such. This is because it

purports to take away or limit coverage. The fact that this provision is not described as an exclusion or limitation is immaterial. Under California law, whether an insurance policy provision is an exclusion does not depend upon where the provision is located in the insurance policy. Instead, the courts look to the function that the provision serves in the policy. *See Aydin Corp., supra,* 18 Cal. 4th at 1191 (placing burden of proof on the policyholder to prove than an exception to an exclusion applied because the exception restored coverage and therefore served the function of an insuring agreement); *Dart Indus., Inc. v. Commercial Union Ins. Co.*, 28 Cal. 4th 1059, 1071 (2002) (the rule that the insurer has "the burden . . . to prove the claim is specifically excluded' . . . . applies irrespective of whether the dispositive policy language is found in clauses described as exclusions, exceptions, limitations, conditions, or endorsements"); *United Pacific Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560, 1565 (1991) ("It does not matter that the phrase appears in the 'definitions' section of the policy rather than the 'exclusions' section; in either case it performs the function of an exclusion."); *PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 291 Fed. Appx. 40 (9th Cir. 2008) ("The policy language in question, although part of the "Insuring Agreement," clearly functions as an exception to the definition of a 'Loss,' the functional equivalent of an exclusion to coverage, the burden of proof which falls upon the insurer.") (Citation omitted).

Because the vacancy provision functions as an exclusion, it follows that "an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear." *Haynes, supra,* 32 Cal. 4th at 1204. "As [the courts] have declared time and time again 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.'" *Id.* (citation omitted). "[T]o be enforceable, any provision that takes away or limits coverage reasonably expected by the insured must be 'conspicuous, plain and clear." *Id.* (citation omitted). Therefore, according to the *Haynes* court, "any such limitation must be placed and printed so that it will attract the reader's attention. Such a provision also must be stated precisely and understandably, in the words that are part of the working vocabulary of the average layperson." *Id.* Moreover, the burden of making coverage exceptions and limitations conspicuous, plain and clear rests with the insurer. *Id.* (citations omitted).

As noted above, Mr. Miller paid for an all-risk property policy to protect against loss to the insured premises. Having done so, it was reasonable for Mr. Miller to expect that the Policy covered loss unless the cause of loss was specifically excluded from coverage. This is particularly true where, as here, the **CAUSES OF LOSS – SPECIAL FORM** defines **Covered Cause of Loss** as "When Special is show in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy."[8] Moreover, as noted above, "[t]he best indicator of an

[8] Although not raised in your April 30, 2018 letter, in the event Northridge claims that the phrase "unless the loss is excluded or limited" in the **CAUSES OF LOSS – SPECIAL FORM** purportedly has the effect of requiring Mr. Miller to negate all exclusions as part of his initial burden to show coverage, such an interpretation would be completely at odds with the burden-shifting standards that are applicable to "all risk" policies. Indeed, in *Gerawan Farming Partners, Inc. v. Westchester Surplus Lines Ins. Co.*, 2008 U.S. Dist. LEXIS 4511 (E.D. Cal. Jan. 4, 2008), the court rejected an attempt by the insurer to convert an all-risk policy into a specific peril policy. The *Gerawan* court found that the phrase "excluded or limited" in the policy's definition of "Covered Causes of Loss" did not shift the burden to the insured; instead, it "merely state[d] that

insured's reasonable expectation of coverage is, of course, the language of the insurance policy." *Spangle, supra,* 166 Cal. App. 4th at 569.

Northfield cannot satisfy its burden here of establishing that the vacancy provision is conspicuous. As noted above, the Northfield policy contains various policy forms. One form is the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**. This form is 15 pages in length with two columns of provisions, one on each side, of every page. Section E, entitled "Loss Conditions", starts at the top of the left hand column on page 10 and goes on to encompass both columns on pages 10 and 11 and the first (left hand) column on page 12. "Vacancy" is the sixth of seven "Loss Conditions". The vacancy loss condition is purportedly modified by an Endorsement, entitled "**VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES**." The six other "Loss Conditions" involve the subjects of "Abandonment", "Appraisal", "Duties In The Event Of Loss Or Damage", "Loss Payment", "Recovered Property" and "Valuation". *None of the seven "Loss Conditions" other than "valuation" contain language precluding coverage if the terms of the condition are not met.*

The Northfield policy also contains a number of other policy forms relevant to the commercial property portions of the policy, such as those for "**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM**", "**COMMERCIAL PROPERTY CONDITIONS**" and "**CAUSES OF LOSS – SPECIAL FORM**". The **CAUSES OF LOSS – SPECIAL FORM** is some 10 pages in length and almost entirely contains "Exclusions" and "Limitations" that preclude coverage for the various risks/perils enumerated therein.

Moreover, as noted above, the Northfield vacancy condition is really a policy exclusion or limitation that was buried by Northfield in one of its policy forms and mischaracterized as a "condition". This conclusion is further reinforced by a number of California cases involving "vacancy" ***exclusions*** each of which contains the same or similar language compared to the language Northfield has used in its "vacancy" condition. *See, e.g., TRB Investments, Inc., supra,* 40 Cal. 4th at 23. Also, in Northfield's April 30, 2018 Denial Letter itself, there is a discussion at page 7 about vacancy increasing the risk of loss and damage to the building. Such a discussion by Northfield itself further reinforces and supports the conclusion that "vacancy" is a risk (peril) of loss, which (according to the language of its "vacancy" condition) is a basis for excluding coverage.

The reasonable insured would not expect a policy exclusion -- here the "vacancy condition" – to be buried deep into a densely packed 15-page policy form under the misleading label of "Loss

---

there will not be coverage if an exclusion or limitation applies . . . ." *Id.* at *38 (citation omitted). The court further held that in an "all risk" policy, "the insured does not have to prove that the peril proximately causing his loss was covered by the policy. Since 'all risks' of direct physical loss are covered by the Policy, and because pitting is a physical condition that caused the loss of, or damage to, the nectarines, Gerawan has met its burden of showing a covered loss." *See also Strubble v. United Services Auto. Assn.*, 35 Cal. App. 3d 498, 504 (1973) (citing *Jewelers Mutual Ins. Co. v. Balogh*, 272 F.2d 889, 891-892 (5th Cir. 1959) (rejecting proposition that, in an all-risk policy, the insured must negative each exclusion since such a reading would convert an "all risks" policy into a specific perils policy). 2008 U.S. Dist. LEXIS, at *38-39, fn. 12 (citing *Balogh*, 272 F.2d at 892).



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

Condition" along with six other provisions that do not act as an exclusion. As such, the vacancy provision is unenforceable. *See, e.g., TIG Ins. Co. ofMich., supra,* 137 Cal. App. 4th at 760 fn. 11 ("Courts have invalidated exclusions as not conspicuous where not in a section labelled exclusions and placed on an overcrowded page, or in a section labeled 'General Limitations' but in a 'dense pack' format, or hidden in a subsequent section of the policy bearing no clear relationship to the insuring clause and concealed in fine print."); *see also Jaurgui, supra,* 1 Cal. App. 4th at 1549 (1991) (language limiting permissive user liability was not conspicuous because it did not appear in either the 'Exclusions' or 'Limits of Liability' sections where insured was likely to look, but in 'Other Insurance' section).

Northfield cannot avoid this outcome by relying on the **VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES** endorsement. This endorsement notifies the insurer that there is some sort of "vacancy restriction"; however, it is still misleading because it is really an exclusion that takes away or limits coverage. Further, there is nothing in the words "vacancy restriction" that would alert an insured to conclude that vacancy is a basis for a complete denial of coverage under the Policy. A commonly accepted dictionary definition of "restriction" is "something that restricts; a restrictive condition or regulation; limitation." Random House Unabridged Dictionary 1642 (2d ed. 1993). Of course, the term "vacancy restriction" cannot have the identical meaning as the terms exclusion or limitation, as this would violate the rule that insurance policies must be construed so as to avoid redundancy and render terms mere surplusage. *See, e.g., ACL Tech., supra*, 17 Cal. App. 4th at 1785-86. This is particularly true where, as here, Northfield chose in the same sentence to use the term exclusion in connection with fungus but not vacancy. Thus, the vacancy restriction is inconspicuous and unenforceable.

*2. Even if the Vacancy Provision Were Conspicuous, It Is An Exclusion, and Vacancy was Not the Cause of Loss.*

Even assuming a court found that the vacancy condition is conspicuous and enforceable (and it is not), a court will certainly conclude that this provision functions as an exclusion, as it purports to take away or limit coverage. Again, under California law, whether an insurance policy provision is an exclusion does not depend upon where the provision is located in the insurance policy. Instead, the courts look to the function that the provision serves in the policy. *See, e.g., Aydin Corp., supra,* 18 Cal. 4th at 1991.

If the vacancy condition is properly treated as a vacancy exclusion, then it would apply to preclude coverage only if the excluded risk/peril of vacancy was the efficient proximate cause of the loss. *Garvey, supra,* 48 Cal. 3d at 402. Here, the vacancy of the building had nothing to do with the failure of the trusses and resulting roof collapse. Accordingly, the vacancy exclusion does not apply to nor bar coverage for the Commerce Building loss.

Even if Northfield were to assert that the risk/peril of vacancy in some way contributed to – along with other risks – the subject loss, it would nevertheless be subject to California's statutory based "efficient proximate cause" standard. The "efficient proximate cause" is the "one that sets others in motion," "the predominating or moving efficient cause" or the "prime" cause. *Id.* at 402. The issue of efficient proximate cause is a question for the jury. *Id.* at 413 fn. 11. If the jury determined the

predominant cause of loss was a covered risk, then the entire loss is covered. Conversely, if the predominant cause of the loss was an excluded risk, the loss would not be covered. Under the circumstances presented here, it is highly unlikely that a trier of fact would determine that the vacancy exclusion had anything to do with, let alone was the predominant cause of, the roof collapse.

3. *Northfield May Not Raise the Vacancy Provision Due to Waiver and Estoppel.*

As reflected in the Policy's "Common Policy Declarations," Northbrook charged Miller an "Inspection Fee" in the amount of $175, which "was fully earned at Inception and non-refundable in the event of flat cancellation." Inspections are addressed in the Policy in the "Common Policy Conditions" coverage part of the policy at Section D, entitled "Inspections And Surveys". It provides in pertinent part:

**D. Inspections And Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any ***such actions we do undertake relate only to insurability and the premiums to be charged***. We do not make safety inspections. . . . (***Emphasis*** added.)

The purpose of Northfield's August 15, 2017 Inspections was (as reflected by the policy provisions quoted above) related only to the "insurability and the premiums to be charged" for the buildings it was insuring under the Policy. For the Commerce Building, Northfield exercised its Inspection right and reported to Miller (through his broker) that it had found broken windows that affected the insurability of that location and demanded that Miller have the broken windows replaced, which he did.[9]

[9] In its April 30, 2018 denial letter, Northfield does mention that its representative, Coast Inspection Services, noted during its August 15, 2017 inspection the presence of broken exterior glass. Northfield failed to mention in its denial, however, that the broken exterior glass was brought to Miller's attention by Northfield and was replaced by Miller.

Northfield, as discussed in some detail in its April 30, 2018 denial letter, also observed during its August 15, 2017 inspection of the Commerce Building that it was vacant. Northfield's "vacancy" observation apparently was based upon the existence of the broken windows and the presence of plywood installed on the interior of the windows.[10] Northfield, however, never informed Mr. Miller about its conclusion on August 15, 2017, that the Commerce Building was "vacant", even though Northfield knew that "vacancy" was very relevant to the issues of a building's insurability and the premiums charged for such insurance. The "vacancy" of an insured building is relevant, for example, to issues such as: (i) whether loss sustained by a building is covered, as reflected by Northfield's denial here; (ii) the insurer's right to cancel a policy; and (iii) an insurer's ability to charge its insured additional premiums to cover any "vacancy" related risks at a building, such as the Commerce Building, through the insurer's issuance of a Vacancy Permit.

As reflected in Northfield's April 30, 2018 denial letter, it is now apparent that Northfield/Hawkeye – due to the very same August 15, 2017 inspection that discovered the broken windows – also had other significant concerns regarding the insurability of the Commerce Building based upon their observations regarding the Commerce Building's "vacancy" and that it was a warehouse (not an office building), as reflected in the policy's declaration page. Neither the "vacancy" nor "warehouse" issues – both of which involve insurability issues – were brought to the attention of Mr. Miller or his broker even though Mr. Miller had paid Northfield to have an inspection done to address that very purpose.

Moreover, in addition to the policy language about "inspections", once Northfield/Hawkeye informed Miller about one aspect of the Commerce Building's condition (the "broken windows") involving its "insurability"/increased risk, Northfield/Hawkeye assumed a duty to disclose all of its insurability/risk concerns about the Commercial Building,[11] and Miller detrimentally relied upon Northfield's disclosure obligations. Miller – if informed about the "office" mischaracterization in

[10] Though Northfield, as a consequence of the August 15, 2017 inspection, may have suspected the Commerce Building was "vacant" as of the date of its inspection, we are perplexed about how Northfield could have concluded on August 15, 2017, that the Commerce Building was vacant. Vacancy, as the term is interpreted by Northfield in its denial, is predicated upon the percentage of a buildings space that is being used. The presence of plywood on the interior of the Commerce Building windows, which windows are present only in the front of the building, facing Tujunga Blvd., would have prevented the Coast Inspection Services ("Coast") personnel who conducted the investigation for Northfield from looking into the rest of the Commerce Building. Additionally, there were no accessible windows or openings on either side of or the rear of the Commerce Building from which one could look into the building. With the front windows covered with plywood and no other means for looking inside the Commerce Building, as a practical matter, it was impossible for Coast to determine the percentage of the building being used by the lessee, per Northfield's interpretation of "vacant", to determine whether it was in fact "vacant".

[11] *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 292 (2004) (citation omitted) ("Even where no duty to disclose would otherwise exist, 'where one does speak he must speak the whole trust to the end that he does not conceal any facts which materially qualify those stated."); *see also Pashley v. Pacific E.R. Co.*, 25 Cal. 2d 226, 235 (1944) ("Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action.").

the declarations and the "vacancy" issue – would have had the "office" mischaracterization easily rectified and the vacancy issue solved, *inter alia*, by purchasing a Vacancy Permit Endorsement (which allows Northfield, in exchange for an additional premium, to insure a "vacant" building) for the Commerce Building,[12] purchasing an entirely new policy from a different insurer for the Commerce Buildings, and/or working out the perceived "vacancy" issues with his tenant.

Under the facts presented here, Northfield has waived and/or is estopped from asserting the application of the vacancy condition/exclusion. Indeed, among other things, Northfield (and/or its underwriters) knew about the increased risk of loss because the Commerce Building was purportedly vacant and, by doing nothing, they effectively agreed to insure the building even if it was vacant. The same can also be said about the fact the building was not an office but instead was a warehouse. *See, e.g., Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 33 (1995) (insurer waives, or may be estopped from asserting, a policy condition where the insurer acts in a matter wholly inconsistent with the intent to enforce such condition); *DuBeck v. California Physicians' Service*, 234 Cal. App. 4th 1254, 1265 (2015) ("An insurance company will be deemed to waive any ground which would otherwise entitle it to rescind a policy or treat it as forfeited when, despite knowledge of the facts giving it the options, it impliedly recognizes the continuing effect of the policy.") (Quotation omitted); *Eliano v. Assurance Co. of Am.*, 3 Cal. App. 4th 446, 450 (1970) ("An estoppel may arise from silence as well as from words or conduct. But this is only where there is a duty to speak, and where the party upon whom such duty rests has an opportunity to speak, and, knowing that circumstances require him to speak, remains silent.") (Quotation omitted).

Separately, Northfield/Hawkeye, in knowing about the "vacancy" issues and then failing to do anything about it, may have implicitly agreed to fully insurer the Commerce Building irrespective of the "vacancy" issue. *See* Ins. Code § 336 ("The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."); *cf. Turner, supra,* 13 Cal. App. 2d at 577-78 (held that because the insurer had at its disposal the source from which it could obtain material information which it later claimed was withheld from it, and because it made no investigation, before issuing its policy, the insurer had waived the misstatement in the application). This conclusion is consistent with the statement made by Hawkeye's owner to Mr. Miller's broker, Brian Koenig, to the effect that Northfield/Hawkeye had "screwed up" in not canceling the policy, which Northfield can do pursuant to the "Cancellation Changes" Endorsement if the building is vacant (or unoccupied) for sixty (60) days or more.

4. *In Any Event, The Commerce Building Was Not Vacant.*

For a variety of reasons, many of which are articulated above, Northfield's reliance upon the Vacancy Loss Condition, *i.e.*, the vacancy exclusion, to deny coverage for the Commerce Building

[12] It is our understanding that the cost of the endorsement would not have been prohibitive for the Commerce building and would have been around $200 per month. Moreover, per the terms of the lease, the associated costs could have been passed on to the tenant.

Loss is misplaced. Northfield also has another significant problem, as its vacancy loss condition (exclusion) provisions, when interpreted under California rules of contract interpretation in the factual context present here, are reasonably susceptible to multiple interpretations, and therefore rendered ambiguous.

The Northfield Policy contains two separate sections whose focus is on the concept of vacancy. The first of these sections is found in the "Vacancy" Loss Condition buried within the Policy's **"BUILDING AND PERSONAL PROPERTY COVERAGE FORM"**. As previously referenced, it states in part:

> E. Loss Conditions
>
> The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.
>
> . . .
>
> **6. Vacancy**
>
> **a. Description Of Terms**
>
> (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:
>
> (a) When policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.
>
> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
>
> (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or
>
> (ii) Used by the building owner to conduct customary operations.
>
> (2) Buildings under construction or renovation are not considered vacant.
>
> **b. Vacancy Provisions**
>
> **a. Description Of Terms**

> If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:
>
> (1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss . . . .

The Policy also modifies the original the Vacancy Loss Condition provisions by means of the endorsement entitled **VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES**. That endorsement, which in pertinent part replaces the subparagraph 7.b. Vacancy Provisions, states:

> A. The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:
>
> 1. Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b.** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:
>
> We will not pay for loss of or damage to any building that:
>
> a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or
>
> b. Was vacant at policy inception.
>
> This provision does not apply if the Vacancy Permit applies.
>
> 2. The following is added to Section E., Loss Conditions:
> **Increase In Hazard**
>
> We will not pay for loss or damage occurring while the hazard is increased by any means within your control or knowledge, or is not usual to the occupancy.

* * *

*(i) The Commerce Building Was Used Primarily as a Warehouse And Distribution Center by Those Who Leased that Facility*

Here, Northfield asserted that the Commerce Building was "vacant" as the term is defined in its Policy for the sixty (60) days preceding the February 10, 2018 loss and therefore is not covered under the Policy's "Vacancy" Loss Condition. Northfield's "Vacancy" based no-coverage position fails, however, because under the relevant Policy provisions, the Commerce Building is reasonably susceptible to an interpretation under the factual circumstances present here that it was not "vacant".



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

By its terms, for the Policy's "Vacancy" Loss Condition to apply and preclude coverage for a loss, the subject building must first qualify as being "vacant" as that term is defined in the Policy. The Commerce Building, before its destruction, was a cavernous warehouse building from which sales could occur in the front of the building facing toward Tujunga Blvd. The great majority of the space making up the Commerce Building is and always has simply been warehouse and storage space.

Before the Commerce Building was leased to Mr. Edvin Mailyan, it was used for the preceding couple of years by a nursery business as its warehouse and storage area, with some sales occurring at the front of the building, which faced onto Tujunga Blvd. Prior to that, for more than a decade, the Commerce Building was rented by Comcast's cable business and used primarily as a warehouse providing inventory for 20 to 30 Comcast service vans that were parked there overnight each evening.

The Commerce Building is 50' by 100' with its ceiling approximately 16' feet high. As previously mentioned, the front of the Commerce Building faces onto Tujunga Boulevard. A large parking lot is located immediately on the north side of the Commerce Building, and a liquor store is located on its other side immediately to the south. An alley is located to the rear of the Commerce Building. On the north side of the building were large "commercial" doors allowing entry from the parking lot into the warehouse for goods and vehicles. Goods/materials already stored in the warehouse could be removed and put into trucks (or other vehicles) for distribution through the same doors down a forklift ramp.

*(ii) Mailyan's Lease With Miller of the Commerce Building*

We now turn to Mailyan's lease of the Commerce Building with Miller. The Lease between Mr. Miller and Mr. Mailyan, dated December 5, 2016, provided that Mr. Mailyan could use the Commerce Building for "[a]ny lawful usage permitted by the City of Los Angeles" and was for the entirety of the Commerce Building (*see, e.g.*, Lease, ¶ 1.8.)[13] Mr. Mailyan agreed to pay Miller $8,000 per month to lease the Commerce Building, with the original lease term running for three (3) years from April 3, 2017, through March 31, 2020. Mailyan also provided a $16,000 security deposit. (Lease, ¶¶ 1.3, 1.6 (a), 1.6(b)). He was also obligated to pay for all utilities and services supplied to the Commerce Building. (Lease, ¶ 11.) Mailyan also had the right to obtain early possession of the Commerce Building prior to April 3, 2017, if Miller was able to obtain early possession. (Lease Addendum, ¶ 1, Lease ¶¶ 1.4, 3.2, 3.3.) Further, Mailyan had the right to exercise an additional three-year lease option for the Commerce Building. (Lease Addendum, ¶ 19.)

As reflected from Northfield's interviews with Mr. Mailyan, which are described in its April 30, 2018 denial, we understand that Mailyan used the Commerce Building in connection with a seasonal toy business that he operated. It is our understanding that Mr. Mailyan used the Commerce Building,

[13] Northfield previously requested and received a copy of the lease between Mailyan and Miller, which Miller provided.



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

*inter alia,* as a warehouse and distribution center for his toy business and performed all the other business functions for his toy business from other locations. Accordingly, we surmise that the toys Mr. Mailyan would buy for later resale would be delivered by truck and brought into the Commerce Building warehouse through the back of the building. The reverse process would occur when Mailyan would sell his toys to retailers and then have them distributed to them.

Based upon the terms of the Lease, Miller would not have considered the Commerce Building as being "vacant" prior to the February 10, 2018 loss since Mr. Mailyan was timely paying his rent every month and using the property consistent with the terms of his lease. Under these circumstances, since the Commerce Building was not available for lease or rental, it was not vacant from Miller's perspective. Miller's understanding is consistent with the common meaning of "vacant". When the term "vacant" is used in connection with real property in a common business context, it refers to: (i) a building or room that is both empty and available to buy or rent (*see* Cambridge English Business Dictionary); (ii) a room or building without a tenant (Webster's New World College Dictionary, 5th Edition, 2014); or (iii) "untenanted" (Free Dictionary.Com). Accordingly, from the perspective of a building owner, such as Miller here, the Commerce Building was ***not*** "vacant", since it was not available for lease, as Miller had leased it to Mailyan who regularly fulfilled his contractual lease obligations, including paying his $8,000 per month lease obligation and otherwise maintaining the building including its security.

*(iii) Detailed Analysis of Northfield's Vacancy Loss Condition Provisions*

Northfield's "Vacancy" Loss Condition contains two definitions of "vacant". One applies to policyholders who are tenants and therefore is inapplicable here. The other definition, which we focus upon below, applies when the policyholder is the building's owner, such as Mr. Miller here. It provides:

> (1) As used in this Vacancy Condition, the ***term building*** and the ***term vacant have the meanings*** set forth ***in*** (1)(a) and ***(1)(b)*** below:
>
> *    *    *
>
> (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant ***unless*** at least 31% of its total square footage is:
>
> (i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or
> (ii) Used by the building owner to conduct customary operations.

Northfield's definition of "vacant" – which is inconsistent with the common everyday meaning of the term – is framed by Northfield in the negative and presumes a building is "vacant" unless the

two 31% square footage thresholds are met. Those thresholds are that 31% or more of the building's square footage must be: (1) rented to a lessee, and (2) used by the lessee to conduct its customary operations.

***<u>"Used By The Lessee to Conduct Its Customary Operations"</u>***

Here, there is no question that more than 31% of the Commerce Building was rented to Mr. Mailyan, meaning the first threshold requirement of the Northfield definition establishing that an insured building is ***not*** vacant is met.[14] Under the Northfield definition of "vacant", one must therefore turn to the question of whether the second threshold requirement is met – *i.e.*, that *at least 31%* of the building's total square footage is "*used by the lessee . . . to conduct its customary operations.*" (*Italics* added.)

We look at each of the words contained in this clause to determine its meaning.

"Used" means "employed in accomplishing something." Merriam-Webster Dictionary Online. "Used by the lessee" therefore refers to the lessee's employment or use of the building. The word "conduct" means to direct, organize or take part in the operation or management of a particular activity. American Heritage Dictionary of the English Language (4th ed. 2000). The particular activity here is the lessee's *customary operations*. The question of whether this second 31% threshold requirement is met – which would take the building outside the definition of "vacant" – therefore focuses upon what constitutes the lessee's *customary operations*.

The phrase *"customary operations"* is not defined and, therefore, we must look to the plain meaning of the words used in context, both as to the facts presented and phrase's use within the policy, to determine what qualifies as the tenant's (here Mailyan's) *"customary operations"*. The word "customary" refers to something that is commonly practiced, is usual or observed. Merriam-Webster Collegiate Dictionary 308 (11th ed.). The word "operations" refers to the act or process of working or doing something. Webster's Third New Int'l Dictionary 1581 (1986). The phrase "customary operations" thus refers to the common or usual work or business operations of a building's tenant.

Of significance is that a lessee's "customary operations"- *i.e.*, the lessee's commonly or usually performed work – does not contain any temporal limitations. The phrase "customary operations" is therefore broad enough from a temporal standpoint to encompass a lessee's customary work or business operations no matter how often it occurs, seasonally, intermittently, bi-monthly, monthly, weekly, bi-weekly, daily, habitually or continuously. Here, Mailyan's *customary operations* at the Commerce Building involved Mailyan's seasonal use of the Commerce Building's interior spaces as a warehouse and distribution center while being responsible for the continuous maintenance and security of the entire building, both interior and exterior.

---

[14] Under the common meaning of "vacant" the presence of a rent paying tenant, here Mr. Mailyan, would by itself be enough to establish that the Commerce Building is not vacant. (*See* pg. 23, *supra.*)

Put another way, there is nothing in the plain meaning of the words "customary operations" from either the tenant's or landlord's perspective that would render the seasonal warehouse and distribution activities of Mailyan's at the Commerce Building as falling outside the common meaning of "customary operations" and therefore qualifying as "vacant". Miller's interpretation of the "customary operations" language based upon the factual circumstances presented and the policy language used is a reasonable one under California's rules of contract interpretation. *TRB Investments, Inc.*, *supra*, 40 Cal. 4th at 27.

In the instant situation, the ***entirety*** of the Commerce Building – from the inception of the Policy on June 25, 2017 through the February 10, 2018 loss – was leased to Mr. Mailyan for $8,000 per month and used by him in its customary role as the warehouse and distribution center for his Southern California based seasonal toy business. It was not "vacant".

Accordingly, from Miller's perspective both the 31% threshold requirements needed for establishing that the Commerce Building is not "vacant" are satisfied. Here 100% of the Commerce Building was leased to Mailyan and used by him continually in connection with his customary operations, to wit: running a seasonal toy business. The reasonableness of Miller's interpretation that the phrase tenant's "customary operations" encompasses the Mailyan's seasonal toy business activities at the Commerce Building is supported by other sections of the Policy.

**Analysis of "Cancellation Changes" Endorsement Vacancy & Related Provisions**

The concept of "vacant" property is also addressed in another section of the Policy, in the "Cancellation Changes" Endorsement. It provides:

> The following is added to the **Cancellation** Common Policy Condition
>
> If anyone of the following conditions exists at any building that is Covered Property in this policy, we may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least five days before the effective date of cancellation.
>
> A. The building has been vacant or unoccupied 60 or more consecutive days. This does [sic] not apply to:
>
> 1. *Seasonal unoccupancy*;
> 2. Buildings in the course of construction, renovation or addition; or
> 3. Buildings to which the Vacancy Permit endorsement applies.
>
> Buildings with 65% of more of the rental units or floor area *vacant or unoccupied are considered unoccupied* under this provision.

* * *



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

F. Failure to:

1. Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of *seasonal unoccupancy*, or

* * *

(*Italics* added.)

The Cancellation Changes Endorsement provision, as reflected from simply reviewing its terms, specifically states that from Northfield's perspective the concepts of vacancy and unoccupancy are both considered unoccupancy. The Cancellation Change Endorsement also specifically states that both vacant or unoccupied floor area "are considered unoccupied."

Additionally, the Cancellation Change Endorsement specifically exempts from the concepts of vacancy and unoccupied situations that qualify as *seasonal unoccupancy*. With the terms "vacant" and "unoccupied" both qualifying as "unoccupied", the term *"seasonal unoccupancy"* as used here therefore also encompasses the concept of seasonal vacancy. Under the Cancellation Change Endorsement, *"seasonal unoccupancy*" – which is the same as *seasonal vacancy* – such as those times when Mailyan was not actively using at least 31% of the Commerce Building as a warehouse and distribution center in his seasonal toy business, means the Commerce Building did not qualify as being "vacant" under the language used by Northfield in its Cancellation Change Endorsement.[15]

Miller, in reading the provisions of the Cancellation Change Endorsement, would also reasonably construe the concept of "seasonal unoccupancy" – as including a seasonal toy business such as Mr. Mailyan's here – that qualifies as an exception to the building being "vacant". This interpretation of the Cancellation Change Endorsement is consistent with and further supports Miller's

---

[15] Under the Policy's Cancellation Change Endorsement, the *"seasonal unoccupancy"* of the Commerce Building attributable to Mr. Mailyan's seasonal toy business operations does not qualify as a "vacancy" that would allow Northfield to cancel the Policy. Yet, Northfield asserts that the very same seasonal toy business operations do, in fact, qualify as "vacancy" for purposes of denying coverage under the Policy's "Vacancy" Loss Condition provisions. Northfield, to prevail on such an argument, would effectively have to assert that a layperson reviewing the entire Policy would have understood that Mailyan's seasonal business operations, under the exact same facts, qualifies in one portion of the Policy as vacancy precluding coverage under the Vacancy Loss Condition, but does not qualify as vacancy for purposes of canceling the Policy. Under California law, however, it is presumed that the meaning given a word or phrase that is used in one portion of the Policy has the same meaning when used in another portion of the Policy. *See Palmer v. Truck Ins. Exchange*, 21 Cal. 4th 1109, 1116 (1999). Northfield would also have to show that the insured's interpretation harmonizing the two areas of the Policy that discuss "vacancy" as not encompassing a seasonal business such as Mailyan's here was unreasonable. *See MacKinnon, supra*, 31 Cal. 4th at 655. Putting aside such issues as whether the Vacancy Loss Condition is even enforceable in the first place, it is highly unlikely under California law that Northfield can establish that Miller's interpretation is unreasonable and therefore that its Vacancy Loss Condition is not ambiguous under the facts here. *Id.*

interpretation of the Vacancy Loss Condition provisions as not including situations involving a seasonal business, such as Mailyan's here.

For Northfield to prevail in its denial of Miller's claim for coverage by relying upon the "Vacancy" Loss Condition, it must establish that periods when a seasonal business is "slow" or is not operating (such as the one run by Mr. Mailyan) qualifies as vacant. Northfield cannot do so.

**Northfield Would Have to Rewrite The Provisions of its Vacancy Loss Condition to Obtain the Interpretation It Is Asserting Applies Here**

Northfield, to successfully assert the Vacancy "Loss Condition", must first show that the Commerce Building was "vacant" as the term is defined in its Policy. For "vacant" to not apply to seasonal business activities and therefore fall outside the meaning of "customary operations" – as Northfield is effectively asking a court to do – it must rewrite the vacancy definition. This could be done only by expressly stating in the definition that the habitual, common, or otherwise regularly occurring "seasonal" or "intermittent" business operations of a tenant/lessee at a building it is continually leasing does not qualify as that tenant's customary operations. Such a result, however, would require rewriting the Vacancy Loss Condition, which one cannot do under California's rules of contract interpretation and therefore is neither a reasonable interpretation nor something a California court could do. *Rosen v. State Farm General Ins. Co.*, 30 Cal. 4th 1070, 1077-78 (2003).

Even if a court where to find that Northfield's interpretation of "customary operations" is a reasonable one, Miller's interpretation is also a reasonable one. The existence of these two reasonable interpretation creates an ambiguity that will be construed in Miller's favor and against Northfield. *Bay Cities, supra*, 2 Cal. 4th at 868. Under the factual circumstances presented here, Miller's interpretation that Mailyan's leasing of the Commerce Building (and his use of that building in connection with his seasonal toy business) does not qualify as being "vacant" under the Northfield policy is a reasonable one. By contrast, Northfield's interpretation ignores all the provisions of the policy (and many, if not most of, the relevant facts), and is therefore not a reasonable one. And, even if Northfield's interpretation were determined to be reasonable, at best, this creates an ambiguity that will be constructed against Northfield.

### B. Northfield's Collapse Argument is Without Merit.

The second reason why Northfield has denied coverage for Mr. Miller's claim is based upon the Policy's collapse provisions. Specifically, Northridge argues in its April 30, 2018 Denial Letter that, "[t]he cause of the collapse is an overstressed bottom cord of the truss, which is excluded under the policy. Mr. Coronado ruled out both wind and water as possible causes of the loss. None of the other specified causes of loss that are set forth in the additional coverage for collapse apply." Once again, Northfield is wrong.

Neither Northfield, nor its retained engineer Mr. Jeff Coronado – who is on Travelers list of "approved" engineers – ever considered Northfield's promise to provide "Additional Coverage –

Collapse" for the abrupt collapse of the Commerce Building that occurred on February 10, 2018 if "caused by" hidden decay. In fact, one could easily infer that the focus of Coronado's Report, dated April 16, 2018 – which was rife with material errors[16] – was to provide Northfield (which is a Travelers' company) with a report that would point to an excluded cause of loss which Northfield, in turn, could then rely upon to deny coverage.

Coronado's report conveniently fails to address the age of the wooden trusses, including, *inter alia*, that under current code requirements the wooden roof trusses were highly overstressed and that over the course of the approximately eighty (80) years between the Commerce Building's construction and the February 10, 2018 collapse of its wooden truss systems the strength of the building's wooden truss system would have for a variety of reasons weakened.[17]

We now turn to the Additional Coverage – Collapse provisions of the Policy, the analysis and conclusions reached in Coffman's July 31, 2018 Forensic Structural Evaluation Report, and highly relevant California case law.

While the **CAUSES OF LOSS - SPECIAL FORM** provides that Northridge "will not pay for loss or damage caused by or resulting from . . . k. Collapse . . .", it also states that "[t]his exclusion, k., does not apply: (a) To the extent that coverage is provided under the Additional Coverage Collapse . . . ." The Additional Coverage – Collapse, in turn, provides, in pertinent part, as follows:

> The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in D.1. through D.7.
>
> 1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
>
> 2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:
>
>    a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

[16] Some of the material errors made by Coronado in his April 16, 2018 Report are set forth at page 9 of Coffman's July 31, 2018 Forensic Structural Evaluation Report for the Commerce Building. This included errors that rendered Coronado's analysis inaccurate. Coronado, *inter alia*, erroneously concluded which wooden roof truss of the Commerce Building had initially failed. Contrary to Coronado's Report, the addition of an "air handling" unit, weighting some 150-200 pounds a couple of years earlier is unrelated to and was not the cause of the collapse.

[17] Coronado's Report, simply put, is highly suspect and any reliance that Northfield may have legitimately placed upon Coronado's Report previously is now no longer warranted.

. . .

c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(1) A cause of loss listed in 2.a. or 2.b.;
(2) One or more of the "specified causes of loss";
(3) Breakage of building glass;
(4) Weight of people or personal property; or
(5) Weight of rain that collects on a roof.

The term "decay" is not defined in the Policy, just as it was not in *Stamm Theatres, supra,* 93 Cal. App. 4th 531, a decision which presented the question whether a property insurance policy covering collapse of a building due to "hidden decay" applies to the unexpected failure of wooden roof trusses, with no evidence of rot. *Id.* at 534. Accordingly, the *Stamm* court turned to the dictionary to find the ordinary meaning of this term. *Id.* at 543 ("When ordinary people do not understand the meaning of a word . . . [t]hey turn to a dictionary.") (Citation omitted). When the *Stamm* court consulted dictionaries, it found that the "dictionary definitions of 'decay' include a general sense of gradual deterioration in strength or soundness, and a more specific sense of rot or organic decomposition." *Id.* at 534; *see id.* at 539-40 & fn. 2. The court added:

> In the context of this property insurance policy, we note at the outset that the "rot" definition adopted by the trial court excludes the deterioration of such common inorganic building materials as cement, brick, stone, and steel. This immediately suggests an unduly narrow limitation; a reasonable insured could surely expect coverage if an imminent collapse was brought on by hidden decay in such materials, which cannot "rot." While "decay" as applied to wooden components may first bring to mind the notion of "rot," the broader connotation of gradual loss of strength is also an ordinary meaning of the term, and is fully consistent with the intended function of the policy term "hidden decay."
>
> Hartford argues that the broader definition of "decay" "is circular as virtually all structures that collapse do so because of a decline in structural strength or soundness." However, not all collapses are due to a *gradual* process of deterioration. The "specified causes of loss" in Hartford's collapse coverage include numerous potential causes that clearly do not amount to "decay" IN THE BROADER SENSE: "Fire; lightning; explosion; windstorm . . . aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic

> action; falling objects; weight of snow, ice or sleet . . . ." Furthermore, many signs of decay are obvious and thus would never fall within the policy's coverage for "hidden decay."

*Id.* at 540-41. The *Stamm* court further reasoned that, "[i]f Hartford did not intend to create a reasonable expectation of coverage for collapse due to 'natural decline,' it could have used a term other than 'decay.' More limited terminology was certainly available to the insurer." *Id.* at 541. Since Hartford failed to do so, however, the insured, "after consulting any dictionary, would have good reason to be optimistic about its insurance coverage in this case." *Id.* at 543. The court pointed out that "[Hartford's] choice of the general term 'decay' is the source of any ambiguity arising from the coexistence of the broader and more limited definitions of the word."[18] *Id.*

The *Stamm* court concluded that "coverage could not be ruled out merely because the trusses were not rotten. An insurer promising coverage for collapse due to 'hidden decay,' without limiting the scope of the term to organic decay, is liable on claims for any collapse caused by a concealed process of gradual loss in the strength of building materials, unless other policy terms limit coverage." *Id.* at 534. Thus, under the policy and circumstances at issue in *Stamm*, "the insured could reasonably expect coverage for an imminent collapse caused by the weakening roof trusses, unless the failure was caused by defective materials or construction methods." *Id.*

The *Stamm* decision is completely consistent with both the policy and facts at issue here. Indeed, on July 31, 2018, Coffman Engineers Inc. produced its Forensic Structural Evaluation Report for 9938 Commerce Avenue, Tujunga, California. The Executive Summary of the Report provides as follows:

> On Saturday, February 10, 2018 at approximately 12:00PM PST the existing wood framed bow string roof structure partially collapsed. The building is a single-story wood framed structure built in 1938. An investigation by Coffman Engineers was conducted to determine the cause of the roof collapse.
>
> Based on our investigation, observations and structural analysis the existing bow string trusses were in general conformance with the governing building code at the time of permit (1935 Uniform Building Code). The type and quality of Douglas Fir lumber used for the building was typical for a 1938 building. Changes to the California Building Code and Los Angeles Building Code have significantly reduced the allowable tension capacity of wood members used for building structures. Our structural analysis confirms that the existing wood bottom cord of the bow string trusses are overstressed by 135% for dead loads only (Demand versus Allowable Capacity = 235%) using the current wood

[18] It is worth noting that, in *Stamm*, the trusses complied with all building regulations in effect when the theater was built, which undermined any argument by the insurer of design defect, as the trusses had borne the load placed on them for 49 years. *Id.* at 537. Likewise, here, the facts show that the Tujunga building complied with all building regulations in effect in 1938 when the permit for the Commerce Building was issued and its construction took place.

> design building codes. There is no current mandatory requirement to retrofit existing bow string wood trusses in the California or Los Angeles Building Codes.
>
> Over the years, the existing bow string trusses have been exposed to high temperatures in the unconditioned attic space of the building. High temperatures cause shrinkage of the lumber due to drying and reduce the strength of the lumber from checking. Also, the truss lumber shrinkage causes the web member and splice connection bolts to loosen over time reducing the existing capacity of the truss. Additionally, wood knots, nonparallel grain, and eccentric bolted connections contribute to further reduce the truss capacity to carry gravity and lateral loads (wind).
>
> The building is located at the foothills of the San Gabriel Mountains. Off shore gusty Santa Ana winds are a common occurrence at the building site. On February 9, 2018 Santa Ana wind warnings of 45 to 55 mph winds for February 10th and 11th were reported by the OC Register:
>
> https://www.ocregister.com/2018/02/09/santa-ana-winds-spur-fire-weather-warning-for-part-of-southern-california/
>
> Coffman Engineers has determined the failure of the roof structure started at Truss #4, second panel point from wall support (see Figures 5 through 8). Drying of the bottom cord lumber, adjacent knots to second panel point, loose bolts, and the eccentricity of the web member connections to the bottom cord all contributed to an unstable structural condition where a small external load would push the truss to failure. Therefore, the Santa Ana Wind event on February 10, 2018 was most likely the single event ("straw that broke the camel's back") that caused the progressive collapse of the existing roof structure.

Thus, like the insurer in *Stamm*, Northfield has promised coverage for collapse due to "hidden decay", without limiting the scope of the term to organic decay. Coffman Engineers, Inc.'s Forensic Report makes clear that "hidden decay" was the underlying and/or immediate cause of the collapse of the building. Thus, because Northfield promised coverage for collapse due to "hidden decay", without limiting the scope of the term to organic decay, it is liable on Miller's claim for collapse caused by a concealed process of gradual loss in the strength of building materials, such as what occurred with the Commerce Building's February 10, 2018 roof collapse.

Coffman Engineers, Inc.'s Forensic Report also discussed that the immediate cause of the loss may have been wind gusts that the Tujunga area was experiencing at the time the trusses of the Commerce Building. The Tujunga area, where the Commerce Building was located, is within a currently designated "high wind area". This "high wind area" designation, in fact, goes back to at least 1938 as reflected in the permit issued for the construction of the Commerce Building. Wind, is also a covered cause of loss under the Policy.



Fortis LLP, 650 Town Center Drive, Suite 1530, Costa Mesa, CA 92626
Telephone: 714.839.3800 | Facsimile: 714.795.2995 | www.fortislaw.com

Whether "hidden decay", "wind", "high temperatures" drying out the wooden trusses, or some combination of them, the efficient proximate cause of the failure of wooden trusses at the Commerce Building and resulting building collapse were covered causes of loss. The Commerce Building loss, contrary to the various assertions made by Northfield, is covered.

Moreover, there are sufficient facts, even at this early stage, to present to a jury the question of whether Northfield's denial of Miller here was unreasonable and, thus, in bad faith.[19] "[T]he ultimate test of [bad faith] liability in the first party cases is whether the refusal to pay policy benefits was unreasonable.' [Citations.] In other words, 'before an [insurer] can be found to have acted tortuously, *i.e.*, in bad faith, in refusing to bestow policy benefits, it must have done so 'without proper cause.'" *Opsal v. United Services Auto. Assn.*, 2 Cal. App. 4th 1197, 1205 (1991). An insurance company which acts in bad faith by refusing unreasonably to pay the insured for a valid claim covered by the policy is liable for all damages resulting from such conduct. *Shade Foods, Inc. v. Innovative Prods. Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 916 (2000) (citation omitted).

Here, Mr. Miller will be entitled to, *inter alia*, damages due to the rental of the building, which has been delayed for several months due to Northfield's unreasonable conduct. *See* Hon. W. Croskey, California Practice Guide: Insurance Litigation (Rutter Group Aug. 2016) ¶ 12:34.2 ("The tort remedies for breach of the implied covenant are *all damages proximately resulting* from its breach, including economic losses, emotional distress, certain attorney fees, and, punitive damages as well if the requirements of Cal. Civ. § 3294(a) are satisfied . . . .") (Emphasis in original) (citing *Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 462 (1974); *Archdale v. American Int'l Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 467 (2007)).[20]

## *VI.*
## *Conclusion*

For the foregoing reasons, Northfield must immediately reverse its denial and accept coverage of the claim. Please do not hesitate to contact the undersigned if you have any questions about this matter.

Regards,

*/s/ Stanley H. Shure*

Stanley H. Shure

---

[19] See discussion *supra* at p. 4, discussing "bad faith" conduct by Northfield that is currently known.

[20] In the event Northfield asserts that any other exclusions might apply, such an assertion would be unavailing. To the extent, for example, there was cracking, there is no evidence that the efficient proximate cause of the loss had anything to do with any cracking that might have existed in the trusses. In addition, the buildings were designed and constructed approximately 80 years old, and such design and construction complied with the code that existed at that time. Under these circumstances, any reliance on an exclusion based on faulty design or construction is without merit.

# EXHIBIT "D"

TRAVELERS

111 SCHILLING ROAD
HUNT VALLEY, MD 21031

JOSEPH R. SALKO
SR. COVERAGE COUNSEL – CLAIM
LEGAL PROPERTY GROUP
JSALKO@TRAVELERS.COM
TEL: (443) 353-1883
FAX: (866) 3234341

April 24, 2019

VIA Email sshure@fortislaw.com

Stanley H. Shure
Fortis LLP
650 Town Center Drive,
Suite 1530
Costa Mesa, CA 92626

RE: Insured: Lance Miller / Westhill Property Management Co. ("Miller")
Insurer: Northfield Insurance Company
Claim No.: EZY4643

Dear Mr. Shure:

Michael Baker asked that I respond to your December 28, 2018 letter, which contains citation to numerous legal authorities. I am authorized by Northfield Insurance Company to provide this response. As explained further below, it remains Northfield's position that the loss is not covered under the policy, as set forth in Mr. Baker's April 30, 2018 letter. Although I will not repeat the substance of the April 30 letter, I will address the issues raised in your December 28, 2018 letter.

**I. The Vacancy Provisions Are Conspicuous**

You contend that the vacancy provisions "were hidden by Northfield in its148-page policy, buried deep in a densely packed 15-page policy form entitled '**BUILDING AND PROPERTY COVERAGE FORM**' under the misleading label 'Loss Conditions'." We disagree. First, the policy is not unique for a commercial insurance policy, and in fact, other than the declarations pages and some of the endorsements, the policy is an ISO form[1]. The 148-page Commercial Insurance Policy includes both liability and property coverage forms. The Commercial General Liability Coverage Part of the policy is more than half of the total pages. The policy was issued

[1] The policy pages include a footer noting "Copyright, Insurance Services Office, Inc., 2011." According to the frequently asked questions section on its website: "ISO provides advisory services and information to many insurance companies. On your insurance policies, you may see notices showing ISO (Insurance Services Office, Inc.) as the copyright owner. That's because ISO develops and publishes policy language that many insurance companies use as the basis for their products. But your policy is a contract between you and your company. ISO is not a party to that contract." www.verisk.com/insurance/about/faq/

to a commercial property management company that owns and/or manages two separate premises locations. The policy cover page states "[t]his policy consists of this policy cover, the Declarations and the forms, schedules and endorsements listed. READ YOUR POLICY CAREFULLY." Indeed, under California law, an insured has a duty to read the policy. *Fields v. Blue Shield of California*, 163 Cal.App.3d 570, 578-79 (1985).

Second, your letter focuses on the vacancy provision contained on p. 11 of the 15-page BUILDING AND PERSONAL PROPERTY COVERAGE FORM, yet largely ignores the separate, one-page ENDORSEMENT – VACANCY RESTRICTION AND FUNGUS EXCLUSION CHANGES. Although we believe the vacancy provision contained on p. 11 of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM is conspicuous, it cannot be reasonably argued that the Vacancy Restriction endorsement is not conspicuous. The Schedule of Forms and Endorsements, which is located on one of the first pages of the policy, identifies the endorsement as follows:

| | |
|---|---|
| S69 – CP (11/16) | Endorsement – Vacancy Restriction and Fungus Exclusion Changes |

Thus, the insured is advised at the beginning of the policy that an endorsement exists containing a "Vacancy Restriction."

Not only does the endorsement contain the words "**VACANCY RESTRICTION**" at the top of the page in bold and all caps, the endorsement cautions "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The endorsement then provides as follows:

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

A. The **Building and Personal Property Coverage Form** and **Condominium Commercial Unit-Owners Coverage Form** are revised as follows:

1. Paragraph **6.b. Vacancy Provisions** of the **Building and Personal Property Coverage Form** and Paragraph **7.b** in the **Condominium Commercial Unit-Owners Coverage Form** of Section **E., Loss Conditions** is replaced by the following:

   We will not pay for loss or damage to any building that:

   a. Has been vacant for more than sixty consecutive days before that loss or damage occurs; or

   b. Was vacant at policy inception.

This provision does not apply if the Vacancy Permit applies.

* * *

You place significant reliance on *TIG Ins. Co. of Michigan v. Homestore, Inc.*, 137 Cal.App.4th 749 (2006) to support your assertion that the vacancy provisions are not conspicuous. Yet a fair reading of that case supports the opposite conclusion. Notably, the court found the provision at issue in *TIG Ins. Co. of Michigan* to be conspicuous based on the following factors: (1) the misrepresentation provision was included in a section titled "REPRESENTATIONS"; (2) "the section itself is short – two numbered paragraphs following an introductory paragraph and an introductory sentence – and each paragraph and the introductory sentence are set off by double spacing"; and (3) the section was in the same type, with spacing in the same manner, as the other general condition provisions. *Id.* at 760-61. The court thus concluded the provision at issue was "not hidden in a 'dense pack' or on an overcrowded page – the hallmark of exclusions found not to be conspicuous." *Id.* at 761.

The vacancy provisions in the Northfield policy issued to Mr. Miller check all the boxes of conspicuousness as discussed in *TIG Ins. Co. of Michigan*:

1. As amended by endorsement, the vacancy provisions are contained in a single page endorsement that highlights the term "**VACANCY RESTRICTION**" in the title of the endorsement, which is located at the top of the page in large font, bold letters and all caps;

2. The vacancy provisions are preceded by introductory sentences advising the insured that the endorsement changes the policy, and in particular the Commercial Property Coverage Part. The endorsement also cautions the insured to read the endorsement carefully;

3. The vacancy provision itself is short, with an introductory sentence explaining that the vacancy provisions in the Building and Personal Property Coverage Form is replaced, and then followed by a total of four sentences, all in the same type, with the same spacing manner, as the remainder of the page.

"A coverage limitation is conspicuous when it is positioned and printed in a manner that will attract the reader's attention." *Brown v. Mid-Century Ins. Co.*, 215 Cal.App.4th 841, (citations omitted). Given the vacancy provisions in the insured's policy are included in a separate endorsement with the term "**VACANCY RESTRICTION**" in the title, along with all the other factors set forth above that meet or exceed the policy provision at issue in *TIG Ins. Co. of Michigan*, it is our position the vacancy provisions are conspicuous under California law.[2]

---

[2] Although not directly on point, California courts hold that if an endorsement conflicts with the body of the policy, the endorsement controls. *See, e.g., American Way Cellular, Inc. v. Travelers Property Cas. Co. of Am.*, 216 Cal.App.4th 1040, 1057 (2013) (stating "[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls"); *Venoco, Inc. v. Gulf Underwriters Ins. Co.*, 175 Cal.App.4th 750, 766

**II. The Vacancy Provisions, Which Are A Coverage Restriction, Are Enforceable Under California Law**

As I understand your position, you assert that vacancy is a peril that was neither the cause nor a contributing factor of the loss. Aside from whether that is true from a factual standpoint, your position makes no sense. In the context of the Miller policy, vacancy is not a peril. Rather, it is a condition describing the property when the following occurs:

**6. Vacancy**

**a. Description of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

**(a)** . . .

**(b)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**(i)** Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

**(ii)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

* * *

In addition to being included in the "Loss Conditions" section of the policy, the above provision is specifically identified as a "Vacancy Condition", which makes sense because "vacancy" is a description of the building condition pursuant to the policy definition. Moreover, paragraph 6.b. of the vacancy provision states that Northfield will not pay for loss or damage caused by six specified perils, even if otherwise Covered Causes of Loss, if the building is vacant in breach of

---

(2009) (stating "as a matter of law, the language of a special endorsement . . . overrides the language in other parts of the policy in case of conflict. ... This is particularly the case where the conflicting language is contained in a pre-printed form in the policy. The 'specially prepared portions of a contract control over those which are printed or taken from a form."). Courts thus place an emphasis on the meaning of an endorsement relative to the main body of the policy. It cannot be reasonably argued that placing the vacancy provisions in an endorsement, in and of itself, renders the provision inconspicuous; In fact, just the opposite is true under California law.

the Vacancy Condition.[3] For Covered Causes of Loss other than the six specified causes that are excluded, the amount otherwise payable under the policy is reduced by 15%. In Miller's policy, the Vacancy Restriction and Fungus Exclusion Changes endorsement broadens the exclusion to include any loss or damage to a vacant building, unless a vacancy permit is issued. The point is that vacancy itself is not a peril.

Your assertion that vacancy does not apply because it is not the predominant cause of loss is contrary to California law. California courts have enforced vacancy provisions even though vacancy is not the predominant cause of loss. In *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal.4th 19 (2006), the Supreme Court addressed a vacancy provision in the context of whether a building undergoing renovation constitutes "construction" for purposes of an exception to the policy's definition of a vacant building. Importantly, the loss itself was caused by a burst water heater or water line. It was not "caused" by vacancy. Although the court remanded the case for a determination in the trial court as to whether the building was "under construction" such that the vacancy exclusion would not apply, the court did not even suggest that the vacancy exclusion would not apply because vacancy was not the predominant cause of the loss. Rather, the court recognized the purpose of a vacancy provision is because "vacant buildings face an increased risk of property crime, including vandalism, as well as property damage arising from neglect or disrepair." *Id.* at 29.

In *Travelers Property Cas. Co. of America v. Superior Court (Braum)*, 215 Cal.App.4th 561 (2013),[4] the court concluded that a vacancy provision excluded a loss caused when all the appliances, toilets, faucets and air conditioning returns were removed from the units of a condominium building. *Id.* at 569. In the Braum policy, the vacancy provision appeared as one of several provisions in a "Limitations" section. Again, vacancy was not the peril; rather, the peril was an alleged theft that the court ultimately concluded was not covered because the building was vacant. Notably, the definition of a vacant building in the policy at issue is nearly identical to that of the Miller policy. *See id.* at 577.

*TRB Investments* and *Braum* both establish that California courts will enforce vacancy provisions without consideration as to whether vacancy is the efficient proximate cause of the loss. California courts have also enforced various policy conditions that, upon an insured's breach, can result in a determination of no coverage for what might otherwise be a covered cause of loss. In *American Way Cellular, Inc. v. Travelers Property Cas. Co. of America*, 216 Cal.App.4th 1040 (2013), the policy included a "Protective Safeguards Endorsement For Sprinklered Locations and Restaurants", which required the insured to maintain an automatic sprinkler system "[a]s a condition of . . . insurance." The endorsement contained an exclusion stating:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

---

[3] Page 11 of the Building and Personal Property Coverage Form.

[4] For sake of brevity, the short form citation of this case will be "*Braum*" in the remainder of this letter.

> a. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
>
> b. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order. . . .

*Id.* at 1045. The building, which was damaged by fire, was not equipped with an automatic sprinkler system. The court "conclude[d] that American Way was precluded from coverage because it failed to maintain an automatic sprinkler system under the terms of the Endorsement." *Id.* at 1055.[5]

Although obviously separate subject matters, the policy condition at issue in *American Way Cellular* is similar in many respects to the vacancy condition in the Miller policy. Both the protective safeguards provision and the vacancy provision are included within an endorsement amended to the policy. The *American Way Cellular* policy required the insured to maintain an automatic sprinkler system as a condition of coverage; Miller's policy requires that the building not be vacant for more than 60 consecutive days as a condition of coverage. In the event the respective policy conditions are not met, a fire loss is excluded under the *American Way Cellular* policy, whereas *any* loss or damage is excluded under Miller's policy.

Our position is that the vacancy provision is conspicuous and otherwise enforceable, which is supported by the above authorities. The assertion on page 16 of your letter that "there is nothing in the words 'vacancy restriction' that would alert an insured to conclude that vacancy is a basis for a complete denial of coverage under the Policy" misses the mark. First, as acknowledged in your letter, a commonly accepted definition of "restriction" is "something that restricts; a restrictive condition or regulation; limitation." Notably, the vacancy provision in *Braum, supra*, was within a section of the policy titled "Limitation." Given that a relevant dictionary definition of "restriction" is "limitation", we fail to see any material difference between a "restriction" and a "limitation" in the context of a vacancy provision.

Second, you place a misguided significance on the fact that the vacancy provision in *TRB Investments* involves solely a vacancy exclusion, as if that is a material factor differentiating the policy at issue in *TRB Investments* from Miller's policy. It is not. Here is the complete description of the policy that was relevant to the court's opinion in *TRB Investments*:

> As originally issued, this policy covered property located on California Avenue in Bakersfield, California. An amendatory endorsement was added to this policy upon its renewal in June 2000. This endorsement ***included*** a vacancy exclusion that provides as follows:

[5] *See also, Brizuela v. CalFarm Ins. Co.*, 116 Cal.App.4th 578 (2004) (enforcing claim denial and dismissing action with prejudice for the insured's failure to appear for an examination under oath, in breach of policy conditions) (and cases cited therein).

8. Vacancy

If loss or damage occurs to a building that has been vacant for more than 60 consecutive days prior to the occurrence of that loss or damage, we will:

a. not pay for any loss or damage caused by:

1. Vandalism;

2. Sprinkler leakage, unless you have protected the system against freezing;

3. Building glass breakage;

4. Water damage;

5. Theft, or

6. Attempted theft

b. Reduce the amount we would otherwise pay for the loss or damage by 15%.

A building is vacant when it does not contain enough business personal property to conduct customary operations.

Buildings under construction are not considered vacant.

*TRB Investments*, *supra*, 40 Cal.4th at 23-24 (emphasis added). It is both speculative and misleading to conclude, based on the limited portion of the amendatory endorsement quoted, that the vacancy provision at issue in *TRB Investments* is solely the quoted exclusion. The court states that the exclusion is included as a part of the amendatory endorsement. Whether the provision was conspicuous was not at issue, so there was no need for court to describe the entire amendatory endorsement, the section heading under which the vacancy provision appeared, or whether the vacancy provision was a condition, restriction or limitation. There is no basis to conclude anything about the context of the vacancy provision in the otherwise undescribed amendatory endorsement.

Third, we believe the following statement is more than sufficient to alert an insured to conclude that vacancy is a basis for a complete denial of coverage: "We will not pay for loss of or damage to any building that: . . ." That identical or nearly identical phrase appears in the vacancy provisions in both *TRB Investments* and *Braum*, as well as the exclusion contained in the protective safeguards endorsement in *American Way Cellular* – all of which were enforced by

California appellate courts. In fact, you will surely find the same or substantially similar phrase in virtually every property policy, including throughout the Miller policy.

**III. There Is No Waiver or Estoppel**

Next, we address the assertion that by "knowing about the 'vacancy' issues and then failing to do anything about it, [Northfield] may have implicitly agreed to fully insurer (sic) the Commerce Building irrespective of the 'vacancy' issue." We disagree. "Waiver is an intentional relinquishment of a known right after knowledge of the facts." *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.*, 175 Cal.App.4th 64, 77 (2009). The elements of estoppel are as follows:

> (1) the party to be estopped knew the facts; (2) the other party was ignorant of the true facts; (3) the party intended his [or her] conduct would be acted upon, or acted in a manner that the party asserting the estoppel had a right to believe it so intended; and (4) the other party relied upon the conduct to his [or her] injury. Where one of the elements is missing, the can be no estoppel.

*Dollinger Deanza Assoc. v. Chicago Title Ins. Co.*, 199 Cal.App.4th 1132, 1155 (2011).

Mr. Miller cannot establish the elements of waiver or estoppel. Among other reasons, Mr. Miller possessed or had the ability to possess the complete extent of knowledge of the vacancy condition at the property. He owns the property.[6] Northfield did not possess such knowledge. Thus, there can be no waiver as Northfield did not possess the knowledge to possibly waive any right.

With respect to waiver, the Miller policy provides as follows in the Common Policy Conditions:

> **B. Changes**
>
> This policy contains all of the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. The policy's terms can be amended or waived only by endorsement, issued by us and made a part of this policy.
>
> * * *

Mr. Miller, as the first Named Insured, did not request a vacancy permit or other change to the vacancy restriction endorsed to the policy. And Northfield did not issue an endorsement amending or waiving any term, condition or obligation under the policy. Thus, there is no waiver.

---

[6] Although we do not have verification as to who owns the property, we assume it was either Mr. Miller or Westhill Property Management Co.

In addition, there can be no estoppel because (a) Northfield did not possess the factual knowledge; and (b) Mr. Miller was not "ignorant of the true facts." *See Dollinger Deanza Assoc., supra*, 199 Cal.App.4th at 1155. Mr. Miller knew or should have known the history of vacancy at the building, business operations occurring at the building and how long the building would be vacant as that term is defined under the policy.

To explain further, the policy in force at the time of the loss was issued with an effective date of June 25, 2017. On June 20, 2017, Mr. Miller signed an ACORD Commercial Insurance Application for the renewal policy. In the application, Mr. Miller asserts that the loss location is "100% OCCUPIED" by a single tenant engaged in the business of "Gardening Supplies."

On August 15, 2017, Coastal Inspection Services inspected the property and noted the following:

> Location 2 is a vacant commercial building with a parking lot to the right of the building. It is in Tujunga, north of the 210 freeway and near the cross streets in Foothill Blvd. and Commerce Ave. The fence surrounding the parking lot is high with barbed wire. The entrance to the building is locked and gated, and there are protective bars inside the windows.
>
> Upon inspection there was broken glass, and I recommended that they get it fixed as soon as possible.

Photographs attached to the inspection report show the exterior of the building with signage on the windows stating, "Grand Opening November 15th", "hydro-garden" and various "hyrdro-garden" product signs. Notably, these are the same signs that were on the windows when Northfield inspected the building after the loss occurred. Mr. Miller signed the June 20, 2017 renewal application asserting that the tenant operations consist of "Gardening Supplies", yet the tenant who entered the April 3, 2017 lease that was in effect at the time of the August 15, 2017 Coastal Inspection Services inspection claimed that his business was a "seasonal" holiday business selling toys.

It is undisputed that on June 20, 2017, Mr. Miller signed the renewal application asserting that the property was 100% occupied by a tenant operating a gardening supply business.[7] Although

---

[7] Mr. Miller's signature is prefaced by the following paragraph (all caps and bold in original):

**ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES.**

Coastal Inspection Services noted that the building was vacant on August 15, 2017, there is no way for Coastal or Northfield to know how long the property had been vacant or how long it would continue to be vacant. Mr. Miller is the person in the best position to know the history of vacancy and business operations at the building, not Northfield.

Mr. Miller has an obligation under California law to read the policy, so he is presumed to have knowledge of the vacancy provisions. Northfield's knowledge[8] that the building was vacant on a particular day during the policy period is irrelevant with respect to coverage under the policy. Mr. Miller was in the best position to determine whether he was in compliance with all policy conditions, including the vacancy condition. It is not Northfield's obligation to monitor the building to ensure Mr. Miller is in compliance.

Moreover, Northfield has no obligation to take any action upon learning that the building appeared vacant on a particular date during the policy period. It is Mr. Miller's obligation to ensure compliance with the vacancy condition, not Northfield's. Importantly, the vacancy condition has a 60-day grace period during which an insured has ample time to either cure the vacancy condition or request a vacancy permit, neither of which happened. Northfield was under no obligation to ensure Mr. Miller's compliance.

In addition to the fact that Mr. Miller possessed the complete knowledge of vacancy at the property, Mr. Miller cannot show that he relied on any statement, action or conduct by Northfield to his detriment. Mr. Miller is unable to rely upon Northfield's knowledge that the property appeared vacant on August 15, 2017 to assert estoppel because the policy requires Mr. Miller to obtain Northfield's consent to any changes to the policy. Moreover, the "policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy." Mr. Miller did not request a change to the policy to remove the vacancy restriction, nor did Northfield make such a change.

That the doctrines of waiver and estoppel are not available to Mr. Miller should not be surprising. Consistent with courts throughout the country, California courts have long rejected attempts to expand coverage beyond the terms of the policy based upon the doctrines of waiver and estoppel.

> 'The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be distinguished from the waiver of, or estoppel to assert, grounds of forfeiture. . . .'

---

We presume that Mr. Miller was being truthful when he asserted in the renewal application that the building was 100% occupied as of June 20, 2017. Northfield reserves all rights in connection with this assertion, which seems contrary to other facts developed in Northfield's investigation.

[8] For purposes of this letter, Northfield assumes it was in possession of the letter prior to the loss but reserves its right to investigate that issue further.

> [citations omitted] ['there is a definite distinction between the waiver of a right to declare a forfeiture, to cancel or rescind based upon some breach of a condition of the policy on the one hand and the extension of coverage provided by the policy on the other'].)

*Supervalu, Inc., supra,* 175 Cal.App.4th at 77. *Supervalu* involved a coverage dispute as to the meaning of the term "occurrence" under excess workers' compensation policies issued by various insurers to Supervalu. From 1990 to 2006, the insurers provided excess workers' compensation policies that indemnified Supervalu for loss in excess of the self-insured retention "resulting from an occurrence." *Id.* at 69. For 15 years, the insurers interpreted occurrence to mean a single, overall disability rating. *Id.* In 2005, the insurers asserted that when multiple injuries led to a single, overall disability rating, each injury was an occurrence subject to the self-insured retention. *Id.* Rejecting Supervalu's contention that the insurers waived and/or were estopped to assert a different policy interpretation, the court explained:

> Supervalu suggests that waiver and estoppel are triggered because respondents paid past claims and settlements without requiring apportionment between events causing damage to employees. But Supervalu does not point to any evidence that respondents intentionally waived their rights as to current claims. Further, the policy language does not cover any risks except liability for benefits above the self-insured retention for each accident and occupational disease. As a consequence, Supervalu is asserting estoppel to expand coverage under the policies, which is impermissible, rather than to simply avoid a forfeiture of benefits. The consequence is plain under case law. Supervalu cannot establish waiver or estoppel.

*Id.* at 77.

*Fidelity & Guaranty Fire Corp. of Baltimore v. Bilquist,* 99 F.2d 333 (9th Cir. 1938) illustrates how the concepts of waiver and estoppel are viewed in the context of a policy condition restricting occupancy of a building only for dwelling purposes. Although not identical, the occupancy restriction is similar in concept to a vacancy restriction in that both provisions place restrictions on coverage conditioned on the use of the building. In addition to a provision restricting occupancy for dwelling purposes, the policy contained a condition providing: "This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void . . . if the hazard increased by any means within the control or knowledge of the insured . . . ." *Id.* at 334. Like the Miller policy, the policy also included the following condition requiring any waiver of a policy provision to be in writing:

> . . . no officer agent, or other representative of this Company shall have power to waive any provision or condition of this Policy except such as by the terms of this Policy may be the subject of the agreement endorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have

> such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this Policy exist or be claimed by the insured unless so written or attached.

*Id.* The insured built a bar in one room of the dwelling, including beer taps and six stools, and served beer and wine. *Id.* A fire then destroyed the building. Although the fire did not start in the bar room, the insurer declined coverage asserting that it insured the building only when occupied for dwelling purposes. *Id.* On appeal, the policyholder argued that the insurer should be estopped from asserting the occupancy restriction because the insurer's agent knew that the property was being used as a bar. Although Washington law applied, it is virtually identical to California law with respect to the doctrines of waiver and estoppel to expand coverage under an insurance policy. The court explained:

> It has been held in Washington that 'while an insurer may be estopped, by its conduct or knowledge or by statute, from insisting upon a forfeiture of a policy, yet, under no conditions, can the coverage or restrictions on the coverage be extended by the doctrine of waiver or estoppel.'
>
> ***
>
> The applicability of the estoppel principle is dependent on whether the provision 'while occupied only for dwelling house purposes' and the one 'while contained in the above described dwelling house building' are conditions or restrictions on coverage. We think they are the latter, and recovery cannot be had without reformation.

*Id.* at 335 [citations omitted].

Under California law, courts have applied waiver or estoppel to bar insurers from insisting on a forfeiture of a policy based on conditions of coverage such as nonpayment of premium and incontestability clauses. *See, e.g., Crump v. Northwester Nat'l Life Ins. Co.*, 236 Cal.App.2d 149 (1965) (admission that life insurance policy would have been incontestable after two years was sufficient to bar insurer from attempt to void policy *ab initio* for a technical immaterial breach of condition); *Nelson v. Nat'l Guaranty Life Co.*, 131 Clap. 669 (1933) (life insurer that previously accepted late premium payments waived or was estopped to assert forfeiture provision of life insurance policy for nonpayment of premium).

Under California law, policy conditions that may bar an insurer from insisting on a forfeiture are distinguishable from conditions that are excluded under the terms of the policy. In *Conner v. Union Automobile Ins. Co.*, 122 Cal.App. 105 (1932), the court distinguished an insurer's "waiving of conditions which are required by the terms of the policy as a prerequisite to the establishment of liability, such as prompt notice of the accident", from the creation of "liability for conditions which are specifically excluded by the very terms of the instrument." *Id.* at 110.

The condition in *Connor* that was specifically excluded under an automobile policy was using the automobile while towing a trailer. In *Bilquist*, coverage was limited based on the insured's compliance with the condition to occupy the building as a dwelling.

In the Miller policy, loss or damage is excluded if the building is vacant for 60 or more days. Based on the substantial authorities discussed above, neither waiver nor estoppel are available to extend coverage to a vacant building beyond the terms of the policy, even if Northfield knew that the building was vacant on August 15, 2017.

**IV. The Building Was Vacant Within the Meaning Of The Policy**

Northfield stands by the facts and discussion set forth in its April 30, 2018 letter with respect to vacancy. In addition, Northfield responds to the insured's position that the building was not vacant as follows:

- The suggestion that the policy's definition of "vacant" is inconsistent with dictionary definitions is without merit. Similar definitions were enforced in *TRB Investments* and *Braum*, both discussed above. Dictionary definitions are irrelevant when the policy defines the term.

- There is no evidence of any operations taking place at the property, let alone seasonal. Mr. Mailyan's vague statement about a seasonal business is inconsistent with the other facts set forth in our April 30, 2018 letter. In addition, we note that the signage on the windows after the loss occurred is the exact same signage existing on the date of the August 15, 2017 inspection by Coastal Inspection Services. The signs do not reflect a toy business. The signs, which dominate the exterior windows, include one advertising "HydroGarden.[9]" According to www.hydrogarden.com, "HydroGarden is one of the true pioneers of the UK's hydroponics industry. . .. Hydroponics systems and grow lights are the gardening tools of the 21st century." Another sign exclaims "GRAND OPENING! NOV. 15th", which at the latest appears to have been November 15, *2016*, and possibly earlier.

- The suggestion that Mr. Miller would have read the policy and concluded that the seasonal toy business complied with the policy is entirely inconsistent with the actual facts. To the contrary, it appears that Mr. Miller was not even aware of the business that his tenant intended to operate. On the June 20, 2017 renewal application, Mr. Miller attested that the tenant's business was "Gardening Supplies."

- At the time after the claim was reported and the issue of vacancy raised by Northfield, the information provided by the insured's representatives is inconsistent and contrary to the information provided in your letter. Among other differences are the following:

[9] As shown by photographs, the "o" in "hydro garden" is a water drop.

- On February 20, 2018, John Hartshorn with Greenspan advised that there is no evidence of tenant property in the building and he did not know why. He also stated that he believed the last tenant operated a hydroponics related business.

- During the February 23, 2018 site inspection, Michael Van Volkom stated the following: (1) the current tenant started paying rent in March – April 2017; (2) he did not know what type of business the tenant intended to operate but guessed that it was some type of general retail store; (3) the current tenant had installed their own locks but had not yet moved their business into the premises and were not yet operating any business at the premises; (4) the only tenant contents were reportedly two ladders, which is consistent with Mr. Volkow's statement that the tenant had not yet moved in; (5) other than possibly fluorescent lights and an electrical panel on the interior wall, Mr. Van Volkom was unaware of any improvements made by the tenant to the building. Mr. Van Volkom further stated he did not know if the current tenants installed the lights and electrical panel; and (6) the prior tenants operated a hydroponics business and left approximately 8-10 months before the loss.

- In response to the vacancy issue raised in Northfield's reservation of rights letter, the insured's public adjusters repeatedly took the position that the only fact that mattered was whether the building was rented to a tenant. For example, in an April 12, 2018 email from Arnie Abramson of Greenspan states "The unit was rented to a tenant who was paying rent. If the tenant is in the building or not is not relevant to the 'Vacancy Clause.' Once the unit is rented to a tenant, the insured has no reason to 'check up on the tenant' to see if he's there or not at any moment. The vacancy clause is for building owners who DON'T rent the property and simply keep the property as investment real estate.[10]"

- It was not until your December 28, 2018 letter did the insured or anyone on the insured's behalf take the position that the tenant had ever operated a business at the loss location.

In summary, we believe there is overwhelming evidence to show that it is more likely than not that the building was vacant for an extended period of time – certainly well more than 60 days – before the loss.

## V. The Collapse Was Not Caused By A Covered Cause Of Loss

[10] The policy was issued to Mr. Miller and his management company, not the tenant. It is the insured's obligation to comply with all policy terms and conditions, including the Vacancy Restriction endorsement.

Northfield rejects your assertion that it hired Jeff Coronado, a licensed engineer, to "provide Northfield (which is a Travelers' company) with a report that would point to an excluded cause of loss which Northfield, in turn, could then rely upon to deny coverage." This allegation is absolutely, categorically, 100% false. Northfield takes allegations of unprofessional conduct, fraud and collusion very seriously. Your allegations are absolutely, without reservation, rejected. Michael Baker has zero incentive to collude with a licensed engineer to orchestrate a coverage denial. Mr. Baker's obligation is to abide by the terms of the policy. Your speculative allegations to the contrary are not well taken. Northfield will vigorously defend Mr. Baker and any other employee from these baseless and defamatory allegations.

Attached is a copy of Mr. Baker's February 22, 2018 email to Jeff Coronado in which the assignment is made. Mr. Baker simply requests that Mr. Coronado "Determine Cause of Roof Collapse." At no time did Mr. Baker suggest to Mr. Coronado any predetermined outcome or even what possible coverage issues might apply. Mr. Coronado was not provided a copy of the policy or even a summary of the policy language. He was simply asked to determine the cause of loss, without any interference or influence from Mr. Baker.

Mr. Coronado's April 16, 2018 report confirms the assignment he received from Mr. Baker:

> 1.0 ASSIGNMENT
>
> Travelers Insurance assigned Jeff Coronado Structural Engineering Consultants to perform a limited structural investigation of the structure at 9938 Commerce Avenue, Los Angles, California. Specifically, the cause associated with a recent roof collapse was to be determined.

In reliance upon Mr. Coronado's opinions as to the cause of loss, Northfield then applied the terms of the policy to determine that the loss is excluded (assuming that the building was not vacant). Northfield reasonably relied on the opinions of a qualified, licensed structural engineer. Northfield did not attempt to substitute its judgment for that of Mr. Coronado or attempt to steer Mr. Coronado's investigation toward a particular cause of loss or outcome.

Based on statements by the insured's representatives, Mr. Coronado investigated whether wind was the cause of loss and ruled it out. Until your December 28, 2018 letter, there was never any allegation or suggestion that "hidden decay" was a cause of loss. Contrary to the assertion in your letter, Northfield was not obligated or required to disprove every possible cause of loss. *Alex R. Thomas & Co. v. Mut. Serv. Cas. Ins. Co.*, 98 Cal.App.4th 66, 73-74 (2002).

Upon receipt of the July 31, 2018, Coffman Engineers Inc. report[11], Mr. Baker forwarded the report to Mr. Coronado for his review and comment. Attached are Mr. Coronado's comments.

[11] Notably, the first time Northfield received the Coffman report was when it was provided by your office on January 10, 2019, more than 5 months after the report was completed and more than 9 months after Mr. Coffman first inspected the property. On April 27, 2018, Mr. Abramson advised Mr. Baker that the insured retained an

Mr. Coronado's opinions as to the cause of loss have not changed. Although I will not restate Mr. Coronado's opinions, I believe Mr. Coffman's opinions warrant comment. Mr. Coffman's conclusions are as follows:

> **Conclusion**
>
> - Photographs and observations of the failed building show that the north and south walls were pulled inward the most at the location of the second truss from the east end (see Figure 7). This is consistent with how the walls would move if the Truss #4 failed first. The observations of this truss showed a failure at the second (2nd) panel point from the north end of this truss where a large knot was located (see Figure 8). The bottom chord at this location was carrying both axial tension forces as well as secondary bending forces caused by the eccentric arrangement of the two web members (vertical and diagonal) that frame into the bottom chord panel point.
>
> - The trusses in this building, which were highly stressed based on current knowledge of allowable tensile stresses in wood, were gradually losing their ability to carry loads. It is our opinion that the cause of the failure was the added loads caused by gusty winds that were reportedly present the day of the collapse. The collapse could have also occurred spontaneously without external load due to the high overstresses from dead loads and drying of the lumber over time.

As support for his opinion that "added loads caused by gusty winds that were reportedly present the day of the collapse," Mr. Coffman relies upon a weather warning published in the Orange County Register on February 9, 2018, before the loss even occurred. The warning states in part:

> Santa Ana winds will buffet parts of Southern California over the weekend, combing (sic) with low humidity levels to once again create the potential for dangerous, wind-driven wildfires, the National Weather Service said today.

---

engineer who would be able to prove that wind was the cause of loss. Mr. Abramson requested that Northfield keep its file open for 30 days so that the insured could provide its engineer's report and the parties could attempt to amicably resolve the claim. Mr. Baker agreed to keep the file open, but no report was provided to Northfield. Mr. Baker followed up with Mr. Abramson multiple times over the next several months requesting a copy of the engineer's report. By the time the report was received in January 2019, the building had been demolished.

> The gusty north-northeast winds will develop Saturday evening and become strong overnight into Sunday, prompting the NWS to issue a fire weather watch from Saturday evening through Sunday afternoon.[12]

Mr. Coffman provides no actual weather records to support his opinion that "[t]he Santa Ana Wind event on February 10, 2018 was most likely the single event ('straw that broke the camel's back') that caused the progressive collapse of the existing roof structure due to an external load." His opinion is based on pure speculation as to the actual winds occurring on the date of loss. In contrast to a wind warning, the actual wind data relied upon by Mr. Coronado shows that the predicted high winds did not materialize on the date of loss.

In addition to the absence of actual, reliable wind data to support his opinion, Mr. Coffman's opinion does not establish or even suggest wind as the efficient proximate cause of the loss. Although he concludes that the cause of the loss was the "gusty winds that were reportedly present," he also describes the wind as the "straw that broke the camel's back." Under California law as cited in your letter, the "straw that broke the camel's back" is not the efficient proximate cause of a loss.

Mr. Coffman then surmises that "[t]he collapse could have also occurred spontaneously without external load due to the high overstresses from dead loads and drying of the lumber over time." On page 2 of his report, Mr. Coffman concurs with the conclusion of Mr. Coronado that the trusses were overstressed. Mr. Coffman's opinions regarding the exposure to high temperatures and drying of the lumber appear to be a general statement not particular to the specific trusses at issue. With respect to overstressed trusses and drying, Mr. Coffman does not place more importance in one factor over the other.

To summarize Mr. Coffman's opinions: (1) the cause of the loss is "gusty winds that were reportedly present," which is not based on actual wind data; or (2) the loss "could have" occurred without wind due to "high overstresses from dead loads and drying of the lumber over time." Considering the actual opinions in the report, we disagree with the assertion in your December 28, 2018 letter that "Coffman Engineers, Inc.'s Forensic Report makes clear that 'hidden decay' was the underlying and/or immediate cause of the collapse of the building." The report does not set forth such an opinion. Given the equivocal opinions, the Coffman report does not provide an opinion that would assist either Northfield or a factfinder in determining the efficient proximate cause of the loss, i.e., the most important or predominant cause of loss.

In summary, Northfield stands by its position set forth in its April 30, 2018 letter that the loss is not covered. Neither this letter nor the April 30, 2018 letter is intended to be an exhaustive recitation of every fact that might bear on coverage. Northfield continues to reserve all rights under the policy and any applicable law. Please also review pages 8-9 of Northfield's April 30,

---

[12] Although we understand that in a vacuum it does not prove the absence of high winds, we note that despite the warnings of "potential for dangerous, wind-driven wildfires," a search of the Cal Fire website shows no such wildfires occurred in the area on or around the date of loss.

2018 letter for important information regarding the "Legal Action Against Us" condition of the policy, as well as other information regarding the insured's rights.

Sincerely,

*Joseph R. Salko*

Joseph R. Salko

cc: Michael Baker

# EXHIBIT "E"

## SIXTH TOLLING AGREEMENT

This Sixth Tolling Agreement ("Agreement") is made between Northfield Insurance Company ("Northfield") and Lance Miller / Westhill Property Management Co. (collectively, "Insured").

## RECITALS

WHEREAS, Northfield issued to Insured policy # WS324766 with an effective period from June 25, 2017 to June 25, 2018 (the "Policy"). The Policy provided coverage for a commercial building located at 9938 Commerce Ave., Tujunga, California 91042 (the "Property").

WHEREAS, on February 10, 2018, a roof collapse occurred at the Property and Insured submitted a claim ("Claim") under its Policy. On April 30, 2018, Northfield wrote to Insured explaining Northfield's position that the Policy did not provide coverage for the loss. Insured disagrees with Northfield's coverage position. Northfield and Insured have agreed to discuss a potential resolution of the coverage dispute.

WHEREAS, the Parties previously entered into a fifth tolling agreement, which expires October 31, 2021;

WHEREAS, both Northfield and Insured require more time in which to explore resolution of the Claim. The parties wish to avoid unnecessary litigation motivated solely or primarily by concern over the potential lapsing of a contractual suit limit.

## AGREEMENT

1. Beginning February 10, 2018, any contractual suit limit in the Policy or applicable statute of limitation is tolled with respect to the Claim until December 31, 2021.

2. Except as expressly stated in paragraph 1 above, the parties reserve all rights, claims, and defenses whether existing now or in the future, all of which remain unmodified by this Agreement. No waiver is intended except as is expressly stated in paragraph 1, and no estoppel whatsoever is intended.

3. Any defense based on any suit limitation period, statute of limitations, or other deadline remains enforceable to the same extent that it would have been enforceable on February 10, 2018 absent this Agreement.

4. This Agreement contains the final agreement of the parties with respect to the subject matter herein, and all prior agreements and

communications, oral or written, are merged herein. This Agreement can only be modified by a writing signed by both parties.

5. This Agreement has been mutually drafted by the parties and shall be construed in that manner.

6. This Agreement may be executed in counterparts and a facsimile or PDF copy of the signature of one party may be treated as an original. A facsimile or PDF copy of this Agreement may be treated as an original.

LANCE MILLER, INDIVIDUALLY AND ON BEHALF OF WESTHILL PROPERTY MANAGEMENT CO.

Dated August ___, 2021 ______________________

NORTHFIELD INSURANCE COMPANY

Dated August 26th, 2021 By: ______________________

Its: General Adjuster

CSC

null / ALL
**Transmittal Number: 24625337**
**Date Processed: 03/17/2022**

# Notice of Service of Process

**Primary Contact:** Sharon Brooks - MS 08-A
The Travelers Companies, Inc.
One Tower Square
Rm 8MS
Hartford, CT 06183-0001

| | |
|---|---|
| **Entity:** | Northfield Insurance Company<br>Entity ID Number 2319164 |
| **Entity Served:** | Northfield Insurance Company |
| **Title of Action:** | Lance Miller vs. Northfield Insurance Company |
| **Matter Name/ID:** | Lance Miller vs. Northfield Insurance Company (12106562) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Los Angeles County Superior Court, CA |
| **Case/Reference No:** | 22STCV09168 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 03/16/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Fortis LLP<br>714-839-3800 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

Electronically FILED by Superior Court of California, County of Los Angeles on 03/15/2022 03:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
22STCV09168

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
NORTHFIELD INSURANCE COMPANY, an Iowa Corporation; and DOES 1-100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
LANCE MILLER dba WESTHILL PROPERTY MANAGEMENT

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court
111 N. Hill St.
Los Angeles, CA 90012

CASE NUMBER: *(Número del Caso):*
22STCV09168

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Stanley H. Shure Esq./Salvatore Picariello Esq. Fortis LLP 650 Town Center Drive Suite 1530 Costa Mesa, CA 92626 714-839-3800

DATE: *(Fecha)* 03/15/2022 Clerk, by *(Secretario)* Sherri R. Carter Executive Officer / Clerk of Court N. Alvarez, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of (specify): Northfield Insurance Company

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

Electronically FILED by Superior Court of California, County of Los Angeles on 03/15/2022 03:42 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
22STCV09168

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Stanley H. Shure, Esq. (SBN 116230)/Salvatore Picariello, Esq. (SBN 190442)<br>Fortis LLP<br>650 Town Center Drive Suite 1530<br>Costa Mesa, CA 92626<br>TELEPHONE NO.: 714-839-3800 FAX NO.: 714-795-2995<br>ATTORNEY FOR (Name): sshure@fortislaw.com; spicariello@fortislaw.com | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 111 N. Hill St.<br>MAILING ADDRESS: Same<br>CITY AND ZIP CODE: Santa Ana, CA 92701<br>BRANCH NAME: Los Angeles, CA 90012 | |
| CASE NAME:<br>Sperry Commercial, Inc., et al. v American Home Assurance | |

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 22STCV09168 |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [x] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (*check all that apply*): a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action (*specify*): 2
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: March 15, 2022

Salvatore Picariello
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE: Lance Miller v Northfield Insurance Co. | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

**Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

| SHORT TITLE: Lance Miller v Northfield Insurance Co. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1, 2, 3<br>1, 2, 3 |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1, 2, 3<br>10 |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2, 5<br>2, 5<br>1, 2, 5<br>1, 2, 5 |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case<br>☐ A6034 Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11<br>5, 11<br>5, 6, 11 |
| | Insurance Coverage (18) | ☑ A6015 Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 5<br>1, 2, 3, 5<br>1, 2, 3, 8, 9 |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels______ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018 Mortgage Foreclosure<br>☐ A6032 Quiet Title<br>☐ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6<br>2, 6<br>2, 6 |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: Lance Miller v Northfield Insurance Co. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Judicial Review | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus<br>☐ A6152 Writ - Mandamus on Limited Court Case Matter<br>☐ A6153 Writ - Other Limited Court Case Review | 2, 8<br>2<br>2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment<br>☐ A6160 Abstract of Judgment<br>☐ A6107 Confession of Judgment (non-domestic relations)<br>☐ A6140 Administrative Agency Award (not unpaid taxes)<br>☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112 Other Enforcement of Judgment Case | 2, 5, 11<br>2, 6<br>2, 9<br>2, 8<br>2, 8<br>2, 8, 9 |
| Miscellaneous Civil Complaints | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only<br>☐ A6040 Injunctive Relief Only (not domestic/harassment)<br>☐ A6011 Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8<br>2, 8<br>1, 2, 8<br>1, 2, 8 |
| Miscellaneous Civil Petitions | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages<br>☐ A6123 Workplace Harassment With Damages<br>☐ A6124 Elder/Dependent Adult Abuse Case With Damages<br>☐ A6190 Election Contest<br>☐ A6110 Petition for Change of Name/Change of Gender<br>☐ A6170 Petition for Relief from Late Claim Law<br>☐ A6100 Other Civil Petition | 2, 3, 9<br>2, 3, 9<br>2, 3, 9<br>2<br>2, 7<br>2, 3, 8<br>2, 9 |

| SHORT TITLE: Lance Miller v Northfield Insurance Co. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: ☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | | | ADDRESS: 9938 Commerce Ave |
|---|---|---|---|
| CITY: Tujunga | STATE: CA | ZIP CODE: 91042 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: March 15, 2022

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet, Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).
5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.
6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS: Stanley Mosk Courthouse 111 North Hill Street, Los Angeles, CA 90012 | FILED Superior Court of California County of Los Angeles 03/15/2022 Sherri R. Carter, Executive Officer / Clerk of Court By: N. Alvarez Deputy |
| NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER: 22STCV09168 |

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Robert S. Draper | 78 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 03/15/2022
(Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By N. Alvarez, Deputy Clerk

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

2019-GEN-014-00

FILED
Superior Court of California
County of Los Angeles

MAY 03 2019

Sherri R. Carter, Executive Officer/Clerk
By ____________, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT — MANDATORY ELECTRONIC FILING FOR CIVIL | FIRST AMENDED GENERAL ORDER |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"** An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court. (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"** For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"** An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"** A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format. Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs. Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

i) Depositions;

ii) Declarations;

iii) Exhibits (including exhibits to declarations);

iv) Transcripts (including excerpts within transcripts);

v) Points and Authorities;

vi) Citations; and

vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day <u>before</u> the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

i) Any printed document required pursuant to a Standing or General Order;

ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

iii) Pleadings and motions that include points and authorities;

iv) Demurrers;

v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

vi) Motions for Summary Judgment/Adjudication; and

vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019

Kevin C. Brazile

KEVIN C. BRAZILE
Presiding Judge

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS

**Superior Court of California**
**County of Los Angeles**

**Los Angeles County**
**Bar Association**
**Litigation Section**

**Los Angeles County**
**Bar Association Labor and**
**Employment Law Section**

**Consumer Attorneys**
**Association of Los Angeles**

**Southern California**
**Defense Counsel**

**Association of**
**Business Trial Lawyers**

**California Employment**
**Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | | CASE NUMBER: |

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at ***www.lacourt.org*** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to ____________ (INSERT DATE) for the complaint, and ____________ (INSERT DATE) for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR PLAINTIFF)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR DEFENDANT)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR DEFENDANT)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR DEFENDANT)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR ____________)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR ____________)

Date:

____________________ (TYPE OR PRINT NAME) ➤ ____________________ (ATTORNEY FOR ____________)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO.: (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – DISCOVERY RESOLUTION** | | CASE NUMBER: |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

iii. Be filed within two (2) court days of receipt of the Request; and

iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

   It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR PLAINTIFF)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ______________________)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ______________________)

Date:

(TYPE OR PRINT NAME) ➤ (ATTORNEY FOR ______________________)

Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | | CASE NUMBER: |

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: ________________ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: ________________ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | | CASE NUMBER: |

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

**The following parties stipulate:**

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR _______________)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR _______________)

Date:

_______________________ ➤ _______________________
(TYPE OR PRINT NAME) (ATTORNEY FOR _______________)

**THE COURT SO ORDERS.**

Date: _______________________ _______________________
JUDICIAL OFFICER

Print Save Clear

FILED
LOS ANGELES SUPERIOR COURT
MAY 11 2011
JOHN A. CLARKE, CLERK
N. Navarro
BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| General Order Re Use of Voluntary Efficient Litigation Stipulations | ORDER PURSUANT TO CCP 1054(a), EXTENDING TIME TO RESPOND BY 30 DAYS WHEN PARTIES AGREE TO EARLY ORGANIZATIONAL MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation. This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: May 11, 2011

Carolyn B. Kuhl
Carolyn B. Kuhl, Supervising Judge of the Civil Departments, Los Angeles Superior Court

Superior Court of California, County of Los Angeles

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

## Main Types of ADR

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
- **JAMS, Inc.** Assistant Manager Reggie Joseph, RJoseph@jamsadr.com (310) 309-6209
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

Day of trial mediation programs have been paused until further notice.

**Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm